# KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY

WASHINGTON, DC

CHICAGO, IL

STAMFORD, CT

—————

BRUSSELS, BELGIUM

—————

AFFILIATE OFFICES

MUMBAI, INDIA

**200 KIMBALL DRIVE**

**PARSIPPANY, NEW JERSEY 07054**

—————

(973) 503-5900

FACSIMILE

(973) 503-5950

www.kelleydrye.com

—————

DIRECT LINE: (973) 503-5920

EMAIL: jboyle@kelleydrye.com

October 28, 2009

**VIA ECF**

Honorable Madeline Cox Arleo, U.S.M.J.
United States District Court for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

> Re:  *Tullett Prebon, plc v. BGC Partners, Inc.*
>       Civ. No.:  09-5365-SDW-MCA

Dear Judge Arleo:

We represent Tullett Prebon plc ("Tullett") in the above-referenced action. This action was just recently filed, however, we believe there are exigent circumstances that support holding a scheduling conference, pursuant to L.Civ.R. 16.1(a)(2), in order to discuss, among other things, significant concerns over the preservation of evidence and the need to commence discovery as soon as possible.

As set forth in the Complaint, this case involves claims that BGC Partners, Inc. ("BGC") has sponsored and orchestrated the *en masse* resignations on numerous occasions of employees of Tullett across the globe. It is alleged that BGC adopts a consistent approach of luring the head of and/or other senior members of a specifically identified team or trading desk in Tullett to join BGC with the promise of extraordinary sign-on bonuses (in the form of forgivable loans) coupled with indemnities against legal action taken against them for the breach of their employment and/or fiduciary obligations. BGC then uses those individuals, while still employed by Tullett and privy to proprietary and confidential information, to act as its "recruitment sergeants" to procure the remaining team members to join BGC in breach of their contractual and common law duties. As a result, Tullett has also commenced legal actions against BGC in London and Hong Kong.

Specifically, as to the Complaint herein, in August and September of this year, BGC orchestrated raids on Tullett's New York and New Jersey offices resulting in 81 brokers leaving or indicating an intention to leave Tullett. As a result, on October 22, 2009, Tullett commenced this action seeking damages of at least $1 billion based on its claims that BGC

Honorable Madeline Cox Arleo, U.S.M.J.
October 28, 2009
Page Two

engaged in, among things, unfair competition, unlawful interference with contracts and economic relationships, misappropriation of proprietary and confidential information, raiding, and aiding and abetting breaches of fiduciary duties, as well as violated N.J.S.A. 2C:41-4. The conduct described in the Complaint is of a continuing nature and is developing on an almost daily basis.

        In the London action, there are significant and credible claims that agents of BGC have engaged in rampant spoliation of evidence. For example, in order to facilitate BGC's insidious scheme, prospective Tullett recruits either purchase or are equipped with electronic hand-held devices (*e.g.*, Blackberrys) to orchestrate their collective defections. Tony Verrier, Tullett's former chief operating officer and Tullett defector, apparently "lost" seven Blackberrys and was unable to unlock an eighth device due to inexplicable password problems. Other Tullett defectors, including various heads of trading desks, mysteriously lost or misplaced their hand held devices when requested to relinquish them to the court. These electronic devices likely contain critical information that may chronicle BGC's conspiracy. The destruction and/or loss of this evidence has been referred to in numerous press accounts, which we have attached to this letter. Tullett is concerned that this same pattern has or will occur in this action.

        Accordingly, and particularly in light of the continuing nature of the conduct alleged in the Complaint, we respectfully request that Your Honor schedule an expedited conference pursuant to L.Civ.R. 16.1(a)(2) in order to discuss, among other things, the preservation of evidence and the need for the accelerated commencement of discovery. We believe early entry of an order directing preservation of evidence and commencing discovery as soon as possible will also promote the just, speedy, and least expensive determination of this action. *See* Fed. R. Civ. P. 1.

        Thank you for Your Honor's consideration.

                            Respectfully submitted,

                            *s/ Joseph A. Boyle*

                            Joseph A. Boyle

JAB:mc
Attachments
cc:    Stephen Merkel, Esq. (via FedEx w/attachments)
       General Counsel
       BGC Partners, Inc.

# ATTACHMENTS

# Tullett accuses rival of 'illegal poaching'

Print

By Jane Croft, Law Courts Correspondent
Published: October 15 2009 02:21 | Last updated: October 15 2009 02:21

**Tullett Prebon**, the interdealer broker, has accused a rival City firm of orchestrating an "unlawful poaching operation" using a series of text messages to lure top brokers.

In written submissions made to the High Court on Wednesday, Tullett alleged rival BGC offered "well over £40m to Tullett brokers" as part of an alleged poaching raid.

Tullett, which acts as an intermediary for the trading of securities in over-the-counter markets and is run by chief executive Terry Smith, is seeking compensation from BGC and wants an order preventing such approaches to staff.

The court heard that key players in the alleged poaching conspiracy included Tony Verrier, who left as chief operating officer of Tullett last year to become BGC's executive managing director and general manager for Europe.

They also included Shaun Lynn, who is president of BGC, and Tullett desk heads James Bowditch and James Hall, who have allegedly entered into a forward contract with BGC.

The court heard that Mr Verrier, who started his new job at BGC in early January, was allegedly "paid a very substantial sum to deliver desk heads to BGC".

Written submissions show that in February BGC agreed sign-on payments with BGC of £1.1m ($1.8m) with Mr Bowditch and £750,000 with Mr Hall.

Tullett alleges these sign-on fees were designed to incentivise the desk heads to recruit their staff to BGC, and that BGC had approached at least 21 Tullett desk heads who were responsible for more than 100 Tullett brokers.

Daniel Oudkerk, acting for Tullett, read out one text message allegedly sent by Mr Bowditch to a broker on his desk, Bradley St Pierre, on January 9, which read: "OK mate. TV [Tony Verrier] will call U later and so will I. Maybe all is not lost. Upfront dosh could be tad more. Working hard to set us all up."

He told the court that "many thousands of text messages" had disappeared as a number of those alleged to be "recruiting sergeants" for BGC had lost their mobile phones or BlackBerrys.

"Where we have text messages, they show clearly the texts were being used as a recruitment exercise," he said.

He pointed to telephone records that showed calls had taken place between Mr Verrier and Mr Lynn, and Mr Verrier and Mr Bowditch, which Tullett alleges points to evidence that the men were acting together to recruit Tullett desk heads.

He said that Mr Verrier had lost seven BlackBerrys in a 12-month period and his eighth BlackBerry had become password protected.

Mr Oudkerk added that "key recruiting sergeant" James Bowditch also disposed of his mobile phone after service of proceedings. He said that James Hall also lost his mobile phone within hours of an application being served.

"We say that the pattern of disposal of evidence is telling," Mr Oudkerk told the court.

The loss of such highly paid employees had had "a substantial impact" on **Tullett**, he told the court, referring to them as the "crown jewels".

On Wednesday night BGC, which contests the allegations, said in a statement that it was continuing to expand geographically and increase its broker headcount. "We fully contest these allegations," it said.

BGC is expected to outline its opening arguments on Thursday.

Copyright The Financial Times Limited 2009. Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.



Copyright 2009 The Press Association Limited
All Rights Reserved

# PRESS ASSOCIATION

Press Association Mediapoint

October 14, 2009 Wednesday 4:58 PM BST

**SECTION:** HOME NEWS

**LENGTH:** 620 words

**HEADLINE:** COURT BATTLE OVER 'POACHED' BROKERS

**BYLINE:** Jan Colley, Press Association

**BODY:**

Brokers allegedly poached from a City firm by a rival through an unlawful conspiracy were the company's ``crown jewels", the High Court heard today.

Tullett Prebon, the world's second biggest bonds dealer, claims that it will suffer ``very substantial loss" if BGC Partners is allowed to continue its operation - which BGC ``fully" contests - and wants a ruling on liability and an order preventing such approaches.

Opening the seven-week case in London, counsel Daniel Oudkerk told Mr Justice Jack: ``We say that the conspiracy has been pursued using our own staff and, in particular, Tullett's own desk heads, and the defendants have been involved in inducing gross breaches of contract."

He said that the principal actors were: BGC; Tullett's former Global Chief Operating Officer Anthony Verrier; BGC President Shaun Lynn; Tullett Forward Cable Desk Head James Hall; Tullett Short End Sterling OBS Desk Head James Bowditch and solicitor John Marshall.

The ``essential plank in the unlawful conspiracy" was the use of forward contracts and sign-on payments to lever out Tullett staff.

``At the heart of this lies what has been called an early exit strategy co-ordinated by Lynn, Verrier and BGC, and what was used was a construct of sham constructive dismissal claims in order to deliver the Tullett employees to BGC far earlier than they would have been entitled to join BGC under the Tullett contract."

Mr Oudkerk said that another aggravating feature was the way in which the defendants had sought to cover their tracks.

``We don't shrink from saying in this case that mobile phones have been used to further the conspiracy and have been disposed of to conceal the conspiracy."

He told the court that Mr Verrier had lost seven ``BlackBerries" over a 12-month period and one key ``recruiting sergeant", Mr Hall, had lost his phone within hours of being served with an application for delivery up, while another, Mr Bowditch, disposed of his mobile the day after service of proceedings.

He said that telephone records which the judge would see showed many thousands of text messages which were not before the court as the phones had been disposed of.

``Were you to see one, they show clearly that text messages were being used for the recruitment exercise and they have been disclosed by other employees who received the texts but decided not to join BGC. It is clear they make good Tullett's case on the conspiracy."

He went on: ``Tullett's case is that the foundations of this conspiracy were laid from August 2008 when Mr Verrier was recruited by Mr Lynn to BGC and, in the same way that desk heads in this case have been paid many hundreds of thousands of pounds to deliver their teams to BGC, so we infer Mr Verrier was paid very substantial sums to deliver those desk heads and their teams to BGC."

He added: ``We say that Verrier then assisted Lynn to recruit Bowditch and Hall to the conspiracy."

In their written submissions to the court, Mr Oudkerk and Jefferey Onions QC said that the scale of BGC's ambitions was apparent from the number of desk heads approached and the millions of pounds distributed in inducements.

``To date BGC has offered well over £40 million to Tullett brokers as part of the unlawful poaching operation."

They added: ``It is obvious that Tullett will suffer very substantial loss if the defendants are allowed to continue the poaching operation.

``Tullett's brokers are its 'crown jewels' and generate tens of millions of pounds in revenue. They are extremely difficult to replace.

``Where, as here, teams of brokers have been ripped out in whole or in part, it will take many years to re-build those teams and the key client relationships."

The hearing was adjourned until tomorrow.

**LOAD-DATE:** October 15, 2009



Copyright 2009 Associated Newspapers Ltd.
All Rights Reserved
DAILY MAIL (London)

October 16, 2009 Friday

**LENGTH:** 466 words

**HEADLINE:** BROKERS GO TO COURT OVER DOUBLE DEALING

**BYLINE:** BY BEN LAURANCE

**BODY:**

A ROW between two leading City firms over the poaching of staff has burst into the open in the High Court, with allegations of conspiracy, lying and the deliberate concealment of evidence.

Tullett Prebon, the interdealer broker headed by pugnacious City veteran Terry Smith, has launched a legal claim against rival BGC, alleging that Tullett's top dealers were encouraged to break their contracts.

Key figures at Tullett were lured away by BGC offering contracts that were 'clearly illegal', barrister Daniel Oudkerk, for Smith's firm, told the court. This was part of a conspiracy to strip Tullett of its most valuable traders, he alleged.

The targets of BGC's poaching exercise were then encouraged to cook up 'sham constructive dismissal claims' so that staff could move jobs before their notice periods expired, Mr Oudkerk added.

In addition, it was alleged that more than a dozen mobile phones and BlackBerrys containing text messages sent between brokers as they secretly planned their departures were mysteriously lost before their contents could be disclosed to the court. More than 10,000 text messages were involved.

At the centre of the saga is 45-year-old Tony Verrier, who was Tullett's chief operating officer for five years. He told Smith in April last year that he would not renew his contract. He is accused of starting a campaign to lure key figures away from Tullett while he was still an employee of the firm.

BGC agreed to pay the heads of two of Tullett's trading desks a total of nearly £2m as signingon fees to jump ship.

Counsel for Tullett spelled out a catalogue of lost BlackBerrys that could have yielded evidence about the alleged conspiracy. 'Between April 2008 Ö and April 2009, Tony Verrier claims to have lost or disposed of at least seven BlackBerry handsets,' according to documents submitted by Tullett. 'An eighth BlackBerry handset has inexplicably become "password protected".'

The papers continue: 'The BlackBerrys tend to disappear or become password protected at the points in the [ defendents'] conspiracy, such as when court applications are served, at the time of signing a contract with BGC, or when Mr Verrier receives a letter before action.'

BROKERS GO TO COURT OVER DOUBLE DEALING DAILY MAIL (London) October 16, 2009 Friday

Verrier's personal assistant also lost two BlackBerrys. One of the executives who agreed to move to BGC lost his Tullett phone; a second key figure lost his personal BlackBerry. And two other key figures replaced their phones.

According to Tullett, 'Mr Verrier also admits that in late 2007 he expressed the view that if an individual had concerns about their BlackBerry text messaging, the best course of action was "to lob it [the Blackberry] in the Thames".'

BGC, its president Shaun Lynn, Tony Verrier and others are fighting the Tullett claim.

The case resumes next week and is expected to last until December.

**LOAD-DATE:** October 15, 2009



Copyright 2009 Guardian Newspapers Limited
All Rights Reserved



The Guardian (London) - Final Edition

October 15, 2009 Thursday

**SECTION:** GUARDIAN INTERNATIONAL PAGES; Pg. 27

**LENGTH:** 585 words

**HEADLINE:** Financial: BGC had £40m fund to poach staff from Tullett, court hears: Key employees allegedly lost a dozen BlackBerries: Quiet restaurants used for defection discussions

**BYLINE:** Simon Bowers

**BODY:**

A band of key employees at money brokers at Tullett Prebon bought, and later disposed of, more than a dozen BlackBerries in order to marshal a £40m mass defection to rival firm BGC Partners, a court has heard. At the heart of the alleged conspiracy and cover up was Tony Verrier, 45, one of London's most experienced inter-dealer brokers and, until his departure last autumn, Tullett's chief operating officer.

Lawyers for Tullett, a FTSE-250 firm run by combative chief executive Terry Smith, have accused Verrier of seeking to turn trading desk heads into "recruiting sergeants" for defection plans hatched with BGC. Verrier had been Smith's righthand man since the two joined forces through the 2004 merger of Collins Stewart Tullett and Prebon Yamane.

Court papers show Tullett claiming BGC had committed "well over £40m of expenditure" to the alleged staff poaching raid, which saw 13 traders switch employer. "Many millions" were paid to Verrier by way of a sign-on sum, Daniel Oudkerk QC, acting for Tullet, told the high court in London. Counsel for Verrier stood up to remind the court that both sides had agreed not to mention the exact figure in open court.

Faced with a string of requests to surrender mobile devices, Verrier claimed to have "lost" seven BlackBerries and had been unable to help unlock an eighth, which had inexplicably become password protected. Verrier's secretary at Tullet also lost two BlackBerries while heads of trading desks also said their mobiles had been lost or disposed of for innocent reasons. "The pattern of disposals of evidence in this case is compelling," Oudkerk told the court. He suggested around 45,000 messages had been lost.

Some of the text message evidence has been salvaged from those Tullett employees who were persuaded not to defect. One read: "OK mate. TV (assumed by Tullett to be Tony Verrier) will call you later & so will i. Maybe all is not

Page 2
Financial: BGC had £40m fund to poach staff from Tullett, court hears: Key employees allegedly lost a dozen
BlackBerries: Quiet restaurants used for defection discussions The Guardian (London) - Final

lost. Upfront dosh could be a tad more. Working hard to set us all up."

Quiet London restaurants were used for meetings to discuss defections. Papers show some witnesses claim there was not always universal agreement. One Tullett broker allegedly told Verrier: "Your company's shit, why should we do this?" Verrier later told the broker if he tried to row back on an agreement to defect he "would nail (the broker) to the fucking wall".

As well as claiming a co-ordinated defection conspiracy, Tullett alleges Verrier, BGC and the defectors agreed to lodge "sham constructive dismissal claims" to wriggle out of notice and non-compete periods in their contracts with Tullett.

In Verrier's case, he claims he was freed from his contractual obligations to Tullett after an article appeared last summer in a Sunday newspaper claiming he was in Langkawi, Malaysia, on holiday with a mistress. The report had appeared days after Verrier told Smith he intended to go and work for BGC and he had been off work sick when it appeared. He blamed the article for ruining his marriage and believes the story was planted by Tullett.

The case is just the latest in a string of regular legal disputes over "tapping-up" allegations between inter-dealer broker firms. Highly specialised and highly paid, the most experienced brokers in these opaque markets are much sought after.

Tullett has made similar allegations against BGC in America over the defection of 52 brokers and is seeking damages running into hundreds of millions of dollars.

The latest trial, between Tullett and BGC, opened yesterday. BGC denies the allegations.

**LOAD-DATE:** October 15, 2009