Joseph A. Boyle
Vincent P. Rao, II
KELLEY DRYE & WARREN LLP
200 Kimball Drive
Parsippany, NJ 07054
(973) 503-5900
(973) 503-5950 (fax)
*Attorneys for Plaintiff*
*Tullett Prebon, plc*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TULLETT PREBON, plc, <br><br>         Plaintiff, <br><br>     v. <br><br> BGC PARTNERS, INC. <br><br>         Defendant. | CIVIL ACTION NO.:  2:09-CV-5365 (SDW)(MCA) <br><br><br> **FIRST AMENDED** <br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Tullett Prebon plc ("Tullett Prebon"), by and through its attorneys Schulte Roth & Zabel LLP and Kelley Drye & Warren LLP, as and for its First Amended Complaint, alleges as follows:

## NATURE OF THE ACTION

1.      Tullett Prebon brings this action in response to the persistent efforts by its direct competitor, BGC Partners, Inc. ("BGC"), to cripple Tullett Prebon's inter-dealer broker business on a global scale, and to destroy Tullett Prebon's market capitalization and competitive advantage.

2.      Last year, BGC and its affiliates systematically and wrongfully targeted and lured away brokers from Tullett Prebon's London, Tokyo, and Hong Kong subsidiaries.  In

Tokyo, BGC and its affiliates lured away from Tullett[1] nine out of ten brokers from the Yen Interest Rate Options desk.  In Hong Kong, BGC and its affiliates lured seven out of ten brokers from the Non-Deliverables Forwards desk.  In London, BGC and its affiliates successfully lured away twelve senior-level brokers from the Treasuries and Government-Regulated Securities desks; it solicited 90 others.  In an ensuing litigation, a Justice of the English High Court referred to BGC as having "*a cynical disregard for the law and employees' duties.*"

3.      The latest raid, conducted by BGC and certain of its affiliates, involved the poaching of 77 brokers that were taken from several of Tullett Prebon's New Jersey-based subsidiaries (the "Raid").  The Raid, like the other raids conducted against Tullett worldwide, was planned and executed by BGC executives.  As a direct result of BGC's conduct in the Raid, Tullett Prebon has suffered, among other things, the loss of $387 million of its market capitalization from August 13, 2009 (the day before the Raid was announced) through December 28, 2009.

4.      One of Tullett Prebon's U.S. subsidiaries, Tullett Prebon Financial Services LLC (f/k/a Tullett Liberty Securities LLC) ("Tullett Financial"), already has commenced a FINRA arbitration against one of BGC's subsidiaries that has participated in the Raid, BGC Financial, L.P., to recover damages for injuries it suffered as a result of that subsidiary's actions.  Both Tullett Financial and BGC Financial, L.P. are registered with FINRA.  However, the FINRA arbitration cannot reach the conduct of BGC, which is not registered with FINRA, nor can Tullett Financial recover all of the damages for injuries suffered by Tullett Prebon in the Raid.  Accordingly, this action is brought to recover damages already suffered by

---

[1]     The term "Tullett" is used throughout to refer to any and all of Tullett Prebon's operating subsidiaries, either individually or collectively.

Tullett Prebon as a result of BGC's raiding activity, and to address the continuing unlawful activities of BGC in the U.S. that are destroying Tullett Prebon's business and shareholder value.

5.     The execution of BGC's well-planned and premeditated raids on Tullett follows the same pattern in each global location.  BGC first gains the assistance and cooperation of desk heads and other senior-level employees who oversee critical aspects of Tullett's inter-dealer broker business.  Those senior-level employees are bribed with extraordinary compensation packages and broad indemnities to provide BGC with, among other things, confidential information belonging to Tullett Prebon and its subsidiaries concerning, among other things, productivity, salary, and bonus figures for the "target" employees and to act as "recruiting sergeants" for BGC.  That those senior-level employees are under contract with Tullett entities has been no bar to BGC enlisting their aid.  The most productive Tullett brokers were targeted first.  Lower-producing and more junior brokers who depend on the liquidity and leadership of the brokers taken in the first wave were poached in subsequent waves.

6.     The Raid involved, among other things, material misrepresentations and omissions by BGC about the number of employees who would be joining BGC and BGC's technological capabilities.  BGC also made misrepresentations to Tullett employees that, in an effort to cut operational costs, Tullett Prebon's subsidiaries had plans to fire them or reduce their bonuses, to bring additional pressure on those employees to join BGC.

7.     BGC conducted the Raid through telephone calls, e-mails, and text messages with the targeted employees.  BGC also secured law firms purportedly to represent the employees, whereas in fact those firms were paid by BGC and/or its affiliates and took direction from BGC.  Through those lawyers, BGC created the pretext for the contract employees to

3

breach their agreements with Tullett while at the same time denying the very existence of the Raid that they were helping to carry out.

8.     The Tullett employees who defected also wrongfully and secretly contacted Tullett customers before leaving, falsely informing them that Tullett was losing a critical mass of personnel necessary to service their business, and thereby attempting to ensure that those customers would continue to direct business through them and away from Tullett after their departure to BGC.  Indeed, as BGC knows, it is this asset of the inter-dealer broker business -- customer relationships -- that is the most valuable in Tullett Prebon's industry.  Tullett Prebon and its subsidiaries have invested an extraordinary amount of time and money to develop this asset over the years -- BGC's conduct has, and will continue to, destroy the value of this asset.

9.     BGC's long-term unlawful strategy to raid Tullett Prebon's subsidiaries worldwide is a callous attempt to destroy its direct competitor, or cripple it by causing direct economic harm to Tullett Prebon, rather than compete by legitimate means.  For that reason, this case is one in which an award of treble damages pursuant to New Jersey's RICO statute, as well as punitive damages, is necessary.

10.     The Raid is ongoing; BGC continues to acquire Tullett Prebon's confidential information, and continues to use it to solicit Tullett employees in an effort to destroy or cripple Tullett Prebon's business.  Tullett Prebon has suffered enormous losses to its market value and competitiveness.  BGC has shown no sign that it is willing to stop its unlawful activity.  Only a court order directing BGC to discontinue its systematic destruction of Tullett Prebon's subsidiaries will put an end to BGC's attempt to drive Tullett Prebon out of business.  Because the raids are planned and executed by the BGC parent corporation -- in concert with its

4

management and subsidiaries -- only a court order directed against the BGC parent corporation can stop the illegal activity.

## THE PARTIES

11.     Plaintiff Tullett Prebon is a United Kingdom public company.  It is headquartered at 155 Bishopsgate, London, EC2M 3TQ, United Kingdom.  Tullett Prebon and its subsidiaries have offices around the world, including New Jersey.  All of Tullett Prebon's U.S. operations are headquartered and based in the State of New Jersey.

12.     BGC Partners, Inc. is an inter-dealer broker incorporated under the laws of the State of Delaware and has its principal place of business at 499 Park Avenue, New York, New York 10022.  It is a direct competitor of Tullett Prebon in the inter-dealer broker market and also has subsidiaries with offices around the world.  BGC conducts business in a number of states, including but not limited to the State of New Jersey.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).  This action is between a citizen of a foreign state and a citizen of the State of Delaware and New York State; the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this action occurred in New Jersey.

## THE FACTS

### The Inter-Dealer Brokerage Business

15.     Inter-dealer brokers create liquidity in financial markets by matching large "wholesale" bids and offers presented by banks, investment banks, and other financial

institutions on certain securities and derivative financial products. The inter-dealer broker

business mainly deals with products that are traded over-the-counter ("OTC"), which means that

they are not traded on an organized exchange. Both electronic platforms and voice-broking is

used depending on the nature of the product being traded. Many OTC markets require voice-

broking rather than the use of an electronic database because of the complexity of the product or

the need to create liquidity.

16. The top five inter-dealer broker firms are Tullett Prebon, BGC, ICAP,

Tradition, and GFI. Tullett Prebon is currently the second-largest inter-dealer broker globally

and BGC is the fourth largest. Tullett Prebon utilizes a combination of voice-broking and

electronic-broking and has traditionally focused on more complex products that require voice-

broking. Over the past few years, Tullett Prebon has also been developing an electronic broking

platform to support its voice-broking capabilities.

17. Inter-dealer broker firms organize their businesses into groups that

specialize in broking specific types of securities; those groups are referred to in the industry as

"desks." Individual brokers who work on those desks have relationships with the traders at the

firm's institutional clients. These relationships are perhaps the single most valuable asset of an

inter-dealer broker. Tullett Prebon invests in those assets by having its subsidiaries expend

millions of dollars in travel and entertainment allowances to an individual broker over the course

of his or her employment with a Tullett entity. It is those customer relationships that are at the

heart of the assets of Tullett Prebon's business. They create the pool of potential buyers or

sellers that enables inter-dealer brokers to match trades for their customers. These customer

relationships and liquidity go hand-in-hand. More customer relationships create a greater pool of

offers to buy and sell. Those offers comprise the liquidity of the desk, and allow the firm to fill

customer orders quickly and efficiently, thereby attracting more and more business to the inter-dealer brokers and ultimately bringing value up to Tullett Prebon.

18.     No single broker can provide enough liquidity for an entire desk.  An effective inter-dealer broker desk requires a critical mass of brokers working as a team.  A desk that falls below that critical mass will not be able to provide sufficient liquidity for its customers, and will lose orders and revenues for the entire desk.  Because a broker's compensation is determined largely by the revenue he or she is able to generate, a loss of liquidity on the desk as a whole can have a significant negative impact on an individual broker's compensation.  This in turn can cause a broker to leave one inter-dealer broker to work for another inter-dealer broker with a larger desk.

19.     In addition to liquidity, inter-dealer brokers also distinguish themselves by the breadth of financial products in which they can facilitate transactions.  Often, large financial firms want to acquire positions in multiple financial products at the same time.  For example, a large position in bonds might be coupled with an equally large position in credit default swaps to hedge the bond position.  In that case, an order placed at one desk will lead to simultaneous orders at one or more additional desks at the same inter-dealer broker firm.  In this way, different desks feed off of and reinforce each other.

20.     Conversely, a substantial drop in liquidity on one desk can ripple through the entire enterprise.  Clients typically prefer to work with a firm that can meet all of their trading needs, and, as a result, can be deterred from using a firm that no longer has sufficient liquidity at one of its desks.  The resulting loss of revenue is not only felt by the firm as a whole, but also by each individual broker whose compensation is affected by the lost revenue.  Once

again, this drop in compensation can cause a broker to seek employment with another inter-dealer broker.

21.     Tullett Prebon, through its subsidiaries, has developed a strong global network of desks which is critical to being able to establish and develop relationships with traders.  Tullett Prebon also has developed a full and diverse product range and is generally recognized to be strong in traditional products, including Treasury products, fixed income, and interest rate derivatives.

22.     BGC is the fourth largest inter-dealer broker and is generally regarded as weaker than Tullett Prebon both in the range of products that it offers and in the depth of its broking capabilities in the products that it does offer.  BGC is weak in many areas where Tullett Prebon is strong, including sterling OBS, forward cable, dollar cash, forward yen, spot FX, and all Treasury products including Treasury swaps.

23.     BGC's global pattern of raiding Tullett is designed to do two things:  (1) to steal the capabilities and market share that Tullett Prebon has developed, focusing especially on areas where Tullett Prebon is strong; and (2) to use illegal means to cripple a direct competitor by destroying Tullett Prebon's market value and competitive edge.

**BGC's Global Raiding Pattern**

24.     In January 2009, BGC began a quick succession of attacks on Tullett entities around the world.  BGC hit London in January, Tokyo in February, and Hong Kong in March.

25.     Earlier this year, BGC attacked Tullett Prebon's London subsidiary. Beginning on January 4, 2009, BGC, acting primarily through Tony Verrier, BGC's current Executive Managing Director and the former Global Chief Operating Officer of Tullett Prebon,

wrongfully lured away twelve employees from London's Treasuries and Government-Regulated Securities desks.

26.     Specifically, Verrier approached at least 21 high-level Tullett employees who were in charge of different brokerage desks with offers of employment at BGC.  He did so with the intention of using those desk heads to act as "recruiting sergeants" to poach the teams of brokers under their supervision.  The desk heads typically were offered substantial sums -- frequently millions of Pounds Sterling -- to distribute among their desks' brokers as sign-on fees to join BGC.  The desk heads were offered those pools of money subject to the condition that they would successfully persuade a critical mass of brokers from their teams to join BGC.  As part of that process, BGC organized and held mass meetings with the brokers.  More than 90 Tullett brokers were offered jobs with BGC's London affiliate.

27.     By February 2009, approximately 13 Tullett brokers and desk heads signed "forward contracts" to join BGC on a future date.  Sometime between February 9th and 11th, and again on March 2nd, the recruited brokers sent substantially identical letters to Tullett indicating that they would be leaving Tullett to join BGC once they were "free to do so."

28.     On March 26, 2009, several of the brokers who signed forward contracts with BGC failed to show up for work at Tullett.  They asserted that, notwithstanding that their contracts in some cases had more than two years to run, they were entitled to treat their contracts as having been terminated and, accordingly, were free to join BGC.  Over the course of the next few days, nine of the Tullett brokers who agreed to join BGC resigned from their employment with Tullett -- claiming constructive dismissal on the flimsiest of grounds.  Even if no pretense could be devised to prompt those brokers to walk away from their contracts, BGC still had no intention of allowing Tullett's brokers to serve through the remainder of their contract terms.  If

no fabricated opportunity presented itself, then a mass walkout was planned. Verrier told one of Tullett's desk heads that: *"once a sufficient number of [Tullett] brokers had been signed up we would get a call one day asking us to get up and walk out."*

29.     Purposeful, furtive conduct designed to hide evidence confirmed that the London raid was illegal. Faced with a number of requests to return mobile devices, Verrier claimed to have "lost" seven blackberries over the course of one year and claimed that he could not unlock the password to another. Verrier's secretary also claimed to have "lost" two blackberries. More than a dozen other blackberries were bought and later destroyed by the heads of Tullett's trading desks.

30.     The London raid is the subject of currently pending proceedings in the English High Court. At the outset of those proceedings, the Honorable Mr. Justice Jack referred to BGC as having "a cynical disregard for the law and employee's duties" and noted that BGC's "tactics [] are likely to have de-stabilised a substantial part of Tullett Prebon's work force." Mr. Justice Jack also noted that the evidence was strong that "BGC has [sic] attempted to fabricate cases of constructive dismissal in order to justify recruits leaving early."

31.     BGC also raided Tullett offices in Asia. In February 2009, BGC lured nine out of ten brokers away from the Yen Interest Rate Options Desk ("IRO Desk") at Tullett Prebon's subsidiary in Tokyo. BGC induced the Tullett brokers to resign effective immediately in breach of their contractual obligations and to join BGC.

32.     Each of the brokers from the IRO Desk, including desk head Barry Hogg, had fixed-term contracts with Tullett. BGC used large sign-on bonuses to entice Hogg and other senior members of the IRO Desk to break their binding employment agreements with Tullett. Once the senior brokers decided to join BGC, the junior members on the IRO Desk were left

with no choice but to follow suit.  To encourage that outcome, Hogg negotiated their contracts with BGC.  As further incentive, BGC provided indemnities to all of the brokers who left Tullett prematurely.

33.    In March 2009, BGC induced seven out of ten brokers sitting on the Non-Deliverable Forwards desk at Tullett's Hong Kong subsidiary to abandon Tullett in breach of their contracts.  Consistent with its raiding practice, BGC used select high-level Tullett employees to induce their subordinates to breach their contracts with Tullett and join BGC.  For example, working on behalf of BGC (but while still employed by Tullett), Nick Chan, a desk head, lured his entire team to BGC.

**The Raid**

34.    Tullett Financial and another Tullett Prebon operating subsidiary, Tullett Prebon Americas Corp. ("Tullett Americas"), were the primary targets of the Raid.  They have approximately 250 brokers working out of offices located at 101 Hudson Street, Jersey City, New Jersey, and another approximately 150 working out of offices located at 80 Pine Street in New York City.  Tullett Financial and Tullett Americas are both wholly-owned subsidiaries of Tullett Prebon.

35.    On August 14, 2009, BGC announced the Raid.  Coordinating the Raid to inflict maximum damage to the morale of Tullett's brokers, BGC made sure that the first wave of employee resignations all occurred on the same day.  Those resignations were submitted via letters from three different law firms purporting to represent different groups of Tullett employees.  Confirming the highly orchestrated nature of the Raid, the three law firms used almost identical language and had the letters delivered to Tullett Financial's legal department in

Jersey City simultaneously on Friday afternoon, August 14, 2009.  Copies of those letters are attached hereto as Exhibits 1, 2, 3 and 4.

36.     The first wave of the Raid targeted more than 30 brokers at Tullett Financial.  Six brokers left on the first day of the Raid, 17 gave notice of their intent to terminate their contracts, and an additional 9 at-will employees gave notice that they intended to resign.

37.     Since the initial wave, an additional 47 brokers have resigned or given notice of termination of their contracts.  By the time the Raid took place, customers (unlike Tullett's senior officers) were already aware that a massive number of brokers would be leaving Tullett for BGC.  Indeed, some customers were under a false impression that entire desks would be departing.

38.     The Raid was aimed squarely at Tullett Prebon's New Jersey-based operations.  The targeted subsidiaries are headquartered in New Jersey, and have their senior management, legal department, compliance department, human resources department, information technology department, as well as the majority of their inter-dealer brokerage desks located there.  One of those subsidiaries, Tullett Financial, also has an office in New York City, New York, where a number of the desks poached during the Raid are located.  Regardless of what offices were involved, the Raid was intended to and did inflict significant damage to Tullett Prebon's New Jersey-based operations.  In total, those subsidiaries lost 77 brokers from 10 different desks as a result of the Raid.  Those brokers represent more than $100 million in average annual lost revenue and their loss will affect Tullett Prebon's New Jersey-based subsidiaries' ability to generate revenues in New Jersey and to employ support personnel and vendors who are located, or operate, in New Jersey.

39.    The Raid was specifically designed to destroy those aspects of Tullett Prebon's capabilities where Tullett Prebon excelled, thus undermining Tullett Prebon's market value and competitiveness.  Indeed, BGC's executives stated to numerous Tullett brokers while trying to recruit them as part of the Raid that the Raid was primarily designed to do exactly that.

**BGC Misappropriates Tullett Prebon's
And Tullett's Confidential Information**

40.    BGC first sought the assistance and participation of Tullett's senior brokers and desk heads, including James Byrne, James Rogers, Robert Miller, John Siedem, Alexis Feliciano, Peter Cassidy, Charles Veneziano, and John Pagan (collectively, the "Senior Employees").  BGC needed the cooperation of the Senior Employees so they could, among other things, gain access to proprietary and confidential information belonging to Tullett Prebon and its subsidiaries that would be used to execute the Raid.

41.    Because of their positions of authority and responsibility as Tullett desk heads, Tullett Prebon and its subsidiaries entrusted the Senior Employees with information about Tullett's corporate and growth strategy, business development, business methods, plans, policies, financial reports, current or planned transactions, details of brokerage arrangements, names of clients (or their employees), suppliers and terms of business, employees' salary and bonus compensation, individual employees' productivity and customer relationships, terms of employment contracts, and other employee information, including names, addresses, mobile phone numbers, and abilities.

42.    Two of the Senior Employees, Peter Cassidy and Robert Miller, who have been members of Tullett's Executive Committee since 2005 and 2007 respectively, also had access to highly detailed and confidential profit and loss information broken down by product,

customer, and broker.  BGC used this confidential information to structure the incentives that would lure away the targeted Tullett brokers.

43.     BGC actively sought confidential information from Tullett's desk managers and other senior employees and actively sought their assistance in recruiting other brokers on their desks.  For example, in the early summer of 2009, Jimmy Shand, the head of Tullett Financial's Agencies desk, was contacted on his personal cell phone by Faye Eden, personal assistant to Shaun Lynn, the President of BGC.  Eden wanted to set up a meeting between Shand, Lynn, and other BGC executives.  Shand eventually met with Lynn; Lee Amaitis, BGC's Vice Chairman and the number two executive at BGC; and Sean Windeatt, BGC's Chief Operating Officer.  At that meeting, the BGC executives began their attempt to recruit Shand to join BGC and bring Tullett Financial's Agencies desk with him.  The recruitment process lasted over the course of several meetings, all of which included various BGC executives.

44.     At some of those meetings, Shand was introduced to other BGC employees who worked specifically with BGC's broking technology.  Not only did they try to impress Shand with BGC's technology in an effort to get him to move to BGC, but they also pumped him for information on how Tullett's technology worked, how Tullett Financial priced certain financial products, and how certain types of trades were processed.  Those BGC employees continued to call Shand to press for information concerning Tullett's technological capabilities.  They called so often that Shand eventually had to ask Lynn to make them stop.  The technology they were inquiring about is proprietary to Tullett Prebon and Tullett and is kept confidential from direct market competitors like BGC.

45.    In another meeting, held at the Greenwhich Hotel in Manhattan with Lynn; Windeatt; and Mark Webster, a senior executive at BGC Financial, L.P., Shand was offered $2 million that he could in turn provide to the other members of his desk as an up-front payment to induce them to leave Tullett. The BGC executives made it clear that they wanted Shand to recruit the members of his desk on BGC's behalf. Shand was surprised that Lynn knew exactly who worked on his desk and confidential information regarding the operation of that desk, including who his top producers were and their salaries and bonuses, as well as the desk's overall profitability. Such information was only accessible to Tullett's accounting department and people more senior to Shand. Accordingly, this information could only have come from other Senior Employees who were willing to provide BGC with confidential information. This information is shared with and reviewed by management at Tullett Prebon and is instrumental in making business decisions at the parent company level. It is never shared with direct market competitors like BGC.

46.    This pattern was repeated with other desk heads and senior employees. For example, in the summer of 2009, prior to the announcement of the Raid, John Galano, a desk manager on Tullett's Federal Funds desk in New Jersey, was contacted in New Jersey by Verrier to set up a meeting between the two. Verrier met with Galano several times in August 2009. At their second meeting, Verrier offered Galano a contract and told him about the compensation arrangement that would be provided for his desk if it could be moved to BGC. Verrier also made it abundantly clear that he wanted and intended Galano to actively recruit his desk on behalf of BGC.

47.    Verrier made similar offers to Frank Pantano, a desk head on Tullett Americas' New Jersey Spot desk. Pantano initially was contacted in New Jersey on his cell

phone by Verrier in late August 2009.  They met a few days after the call to discuss moving the

Spot desk to BGC.  Verrier offered him a package which included approximately $2 million that

could be used as sign-on bonuses for the other members of the Spot desk that Pantano was able

to recruit.

48.     Upon information and belief, BGC made similar statements and used

similar tactics to recruit the Senior Employees and to secure their assistance in recruiting other

members of their desks.

49.     Each of the Senior Employees owed their employer a fiduciary duty and a

duty of loyalty, and each signed an employment agreement with a Tullett entity and, with the

exception of Cassidy (whose employment agreement has expired), each Senior Employee was

bound to the terms of those agreements.  BGC convinced the Senior Employees to breach those

duties and to convince other Tullett brokers to do the same.

50.     At all times, BGC had full knowledge of the employees' contractual

obligations and common law duties to their employers.  In fact, BGC instructed the Senior

Employees to use secret means to communicate, and further instructed them not to tell Tullett

management of the planned Raid, notwithstanding that each Senior Employee had a common law

obligation (and Byrne and Rogers additionally had a contractual requirement) to do so.

**BGC Executives And The Senior Employees Approach Tullett Brokers**

51.     Byrne and Rogers, co-heads of Tullett Financial's Treasuries desk, were

among the first to be recruited by BGC to assist it in carrying out its Raid.  BGC instructed

Byrne and Rogers to approach the highest-producing Treasuries desk brokers first.  Acting

according to instruction, Byrne and Rogers approached Michael Farrell in early 2009.  Mr.

Farrell was the top-producing broker on the Treasuries desk.  Byrne and Rogers told Farrell that

they were making arrangements to move the entire desk to BGC.

52.     Because of Farrell's importance to the Treasuries desk, he was informed of

the Raid well before the other members of the desk.  During the months prior to the Raid, other

brokers who sat on the Treasuries desk began to notice that Byrne and Rogers were not

performing as usual, and were often talking to each other off the desk.  They began to hear

rumors that Byrne and Rogers were trying to "sell" the desk.  Byrne approached at least one

broker as early as mid-July to tell him that he would get a call about a "business opportunity."

Then, several weeks before the Raid, Byrne approached many more members of the desk to

obtain their private cell phone numbers and private e-mail addresses.  He told them that he was

collecting their contact information for a barbeque that he was throwing.  Of course, there was no

"barbeque"; he was collecting their information so that BGC executives could call them on their

private phone lines and recruit them as part of the Raid.

53.     Shortly thereafter, members of the Treasuries desk were contacted on their

personal cell phones by Faye Eden, Lynn's London assistant.  Faye Eden set up appointments

with those brokers to meet individually with Webster in a private guest room in the Greenwich

Hotel in New York City, as well as at other locations near Tullett Financial's New York office.

54.     Webster arrived at those meetings already armed with confidential salary,

bonus, and performance data, which was wrongfully provided to him and BGC by Byrne and the

other Senior Employees.  Webster made offers to the brokers on the Treasuries desk, which

included terms of employment and detailed compensation packages that closely matched their

terms of employment at Tullett.  Tellingly, Webster did not need to ask most of them about their

current compensation, performance, the revenues they produced, or their customer base at

Tullett. Those questions were unnecessary because, as noted, Webster had already obtained that information from the Senior Employees.

55.     This same basic pattern was repeated in connection with the recruitment of other brokers on other desks. For instance, Christopher Wilkes, a broker on Tullett Americas' Eurocash desk in New Jersey, was approached in June 2009 by Patrick Enright, a close associate of one of the Senior Employees, Charles Veneziano. Working on behalf of BGC, Enright told Wilkes about the Raid and asked if he wanted to join BGC. Around the third week of August, Wilkes was contacted in New Jersey on his personal cell phone by Verrier. They met approximately one week later. Wilkes was offered the same salary as he received at Tullett in addition to a sign-on bonus. Verrier was able to structure a competitive compensation package because he had already been provided with confidential information about Wilkes' salary by the Senior Employees.

56.     Similarly, Kevin Conway, a Vice President and broker on Tullett Americas' Eurocash desk in New Jersey, was approached directly by BGC through Verrier. He received a call and a text message in New Jersey from Verrier on his personal cell phone in the third week of August. Conway was provided with a contract that offered him a salary increase over his salary at Tullett. Verrier was able to structure an appealing compensation package because he had already been provided with confidential information about Conway's salary by the Senior Employees.

57.     John Masse, a broker on Tullett Americas' Eurocash desk in New Jersey, was approached directly by BGC through Verrier. He received a call in New Jersey from Verrier just before Labor Day weekend on his personal cell phone. After they met, Verrier sent a contract to Masse in New Jersey over Masse's personal e-mail. The contract offered a salary

increase over his salary at Tullett. Verrier was able to structure an appealing compensation package because the Senior Employees had already provided BGC with confidential salary and employment information.

58.    Joseph Rotelli, a Vice President and broker on Tullett Americas' Eurocash desk in New Jersey, was approached directly by BGC through Verrier. He received a call in New Jersey from Verrier on or about August 24th or 25th on his personal cell phone. When they met the next day, Verrier offered Rotelli a salary increase to lure him to BGC, reflecting the fact that Verrier had already been provided with Rotelli's salary and other confidential employment information.

59.    Daniel Downey, a broker on Tullett Americas' Eurocash desk in New Jersey, was approached directly by BGC through Verrier. He received a text message in New Jersey from Verrier in mid-August on his personal cell phone. They met soon after and Verrier offered Downey the same salary that he had at Tullett but with some better terms to lure him to BGC. Verrier knew his salary and terms of employment at Tullett because he had already been provided with that information by the Senior Employees.

60.    Kevin Moore, a Vice President and broker on Tullett Americas' Eurocash desk in New Jersey, was approached directly by BGC through Verrier. He received a call in New Jersey from Verrier in late August on his personal cell phone. They met soon after and Verrier offered Moore the same salary he received at Tullett with a signing bonus. Verrier knew his salary and terms of employment at Tullett because he had already been provided with that information by the Senior Employees.

61.    Mickey Mahler, a broker on Tullett Americas' Eurocash desk in New Jersey, was approached in August 2009 by Patrick Enright. Working on behalf of BGC, Enright

told Mahler about the Raid and provided contact information for Verrier.  Verrier offered him a

salary that was better than his compensation at Tullett.  Verrier was able to structure an enticing

compensation package because he had been provided with confidential information concerning

Mahler's salary and terms of employment by the Senior Employees.

63.     Brokers on other Tullett desks were approached by BGC and the Senior

Employees in a similar way.  Upon information and belief, all of the Senior Employees

collaborated with BGC in helping to set up meetings with BGC executives and other members of

their desks.  Confidential information belonging to Tullett Prebon and its subsidiaries was used

in structuring incentives to lure brokers at all of the Tullett desks affected by the Raid.

**BGC Repeatedly Misrepresents The Extent Of The Raid**

63.     A key part of BGC's strategy to lure Tullett's brokers to BGC was to

repeatedly misrepresent to them that all or most of their desk was moving to BGC.  For example,

BGC, through its executives and through Byrne and Rogers, repeatedly told Farrell that BGC

would be taking Tullett Financial's entire Treasuries desk.  At his initial meeting with Lynn,

Windeatt, and Webster, Farrell was told that BGC would hire the entire Treasuries desk.  This

statement was knowingly false when it was made.  The BGC executives met with and called

Farrell on his cell phone several more times over the next few months, including contacting

Farrell in New Jersey.  At those meetings and on those calls, BGC's representatives repeatedly

misrepresented to Farrell that the entire Treasuries desk was leaving to join BGC -- even though

they knew that simply was false.  Finally, at their last meeting at the Greenwich Hotel in

Manhattan, Lynn, Windeatt, and Webster pressed Farrell to sign a contract with BGC, again

telling him that BGC was getting everyone who worked on the Treasuries desk to sign contracts

with BGC.

64.     This was a crucial piece of information for Farrell, as it was for the other brokers caught in BGC's scheme. As noted above, customer relationships are the lifeblood of the inter-dealer broker industry. They create the liquidity that enables inter-dealer brokers to match trades for their customers. In Farrell's case, the other brokers on the Treasuries desk were crucial for providing the matching buy and sell orders that make up the inter-dealer broker market in Treasury swaps. If he was the only broker left on the desk, there would be no customers to match orders with. In effect, BGC was telling Farrell that they were going to rob him of all liquidity on his desk. If he could not generate trades for his customers, he would lose the benefit of the Tullett customer relationships that he helped Tullett develop over his 15-year career. BGC's misrepresentations concerning the effectiveness of the Raid were intended to and did cause Farrell to believe that his entire desk would be leaving for BGC and that he had little choice but to join BGC with the rest of his desk.

65.     Mr. Farrell was initially persuaded to sign a forward contract with BGC. After he joined BGC, he learned that he had been deceived. As a result, he decided to return to Tullett. He learned that directly contrary to the BGC executives' statements to him, less than half of the Treasuries desk had actually been recruited to move to BGC -- only 11 had joined BGC compared to approximately 14-15 who remained at Tullett. More importantly, those 14-15 who remained represented a huge portion of the desk's liquidity in Treasury swaps, a market that Farrell had helped Tullett develop for 15 years. Far from being robbed of liquidity by staying at Tullett as the BGC executives had led him to believe, he actually found that he had been robbed of liquidity by moving to BGC.

66.     BGC's misrepresentations were even more effective on the less productive and more junior brokers. Those brokers depended on the liquidity generated by other brokers

and on the leadership of their desk heads.  They had even less hope than the high-producing

brokers of salvaging their careers in the face of a mass exodus to BGC.  Knowing this, BGC

repeatedly knowingly misrepresented the extent of the Raid to each broker that it targeted.

67.     For example, when recruiting Wilkes, Verrier knowingly misrepresented

to him, among other things, that approximately 15 to 16 people would be leaving Tullett's

Eurocash desk and moving to BGC.  He made Wilkes believe that he would be left behind on a

decimated desk if he did not agree to join BGC.  Verrier's statements convinced Wilkes to sign a

contract with BGC, which he received in New Jersey via his personal e-mail address.

68.     Verrier made similar misrepresentations to Conway and Moore.  Verrier

knowingly misrepresented to Conway, among other things, that BGC was recruiting other

brokers on Conway's desk, including all of the "heavy-hitters."  Verrier's misrepresentations led

Conway to sign a contract with BGC.  Verrier told Moore, among other things, that BGC was

looking to hire brokers in Moore's area of expertise.  Verrier's statements also led Moore to sign

a contract with BGC.

69.     While recruiting Rotelli, Verrier knowingly misrepresented to him, among

other things, that BGC was recruiting many other Tullett brokers, including many from the

Eurocash desk.  Verrier said that BGC wanted to act quickly and that Rotelli would not want to

be left out.  Verrier's misrepresentations led Rotelli to sign a contract with BGC.

70.     Similar misrepresentations were made to Downey.  When Verrier and

Downey met for the first time, Verrier knowingly misrepresented to him that BGC was looking

to recruit the entire Eurocash desk.  In particular, Verrier knowingly misrepresented to him that

BGC was talking to a number of people on Downey's desk because BGC was looking to take

brokers with experience in Downey's area of expertise.  He explained that it was his mission to

make BGC more competitive, so he was targeting Downey's desk that week and would target a different Tullett desk the following week.  Downey negotiated his contract with Verrier from New Jersey via his personal cell phone.  At a later meeting, Verrier knowingly misrepresented to Downey that "everyone is on board."  Verrier's misrepresentations led Downey to sign a contract with BGC.

71.     Similarly, Patrick Enright told Mahler in August 2009 that a "bunch of people" would be leaving for BGC and that it would be good for Mahler if he was part of the group.  Mahler met with Verrier in early September and he also told Mahler that a number of people were coming over to BGC.  Verrier's and Enright's statements led Mahler to sign a contract with BGC, which he received in New Jersey over his personal e-mail address.

72.     Upon information and belief, BGC and the Senior Employees made similar knowing misrepresentations to other Tullett brokers working on other desks.  Those misrepresentations led those brokers to sign contracts with BGC and leave their employment with Tullett.

**BGC Misrepresents The Capabilities Of Its Technology**

73.     In addition to misrepresenting the number of people who would be coming to BGC from their desks, BGC also misrepresented the capabilities of its technology with the intent of having Tullett brokers believe those false claims, and, as a result, agree to work for BGC.  Over many years, Tullett Prebon and its subsidiaries have created sophisticated, proprietary technology to assist Tullett brokers in matching buy and sell orders for customers.  This technology was distinctive in that it allowed for "straight-through processing" of customer transactions.  Straight-through processing is a complex methodology for recording transactions directly in client's records.  It is an electronic interface between Tullett and its customers that

allows a transaction to be automatically recorded in the customer's "book" upon execution. This was highly valuable to Tullett's customers because it did not require them to do anything to record the transactions themselves and it enabled them to see in real-time their transaction and risk status. Tullett's computer systems also were well suited to broking Tullett's products, providing its brokers ready access to the most relevant information and thus allowing them to fill customer orders quickly and accurately.

74.     When trying to lure Tullett brokers, BGC repeatedly misled them into believing that BGC's technology was equal to or better than the technology they were using at Tullett. For example, Farrell was repeatedly led by BGC to falsely believe that BGC's computer systems were equal to Tullett's in their suitability for broking Treasury swaps and that BGC was also capable of straight-through processing of customer transactions. Working on behalf of BGC and under BGC's instructions, Byrne and Rogers told Farrell during the recruitment process that they had met with high-ranking BGC technology personnel and had learned about BGC's technology. They described that technology as the "best in the world" and told Farrell that the entire Treasuries desk could simply "unplug" at Tullett and "plug in" at BGC. Those statements from Byrne and Rogers, acting at the behest of BGC, were intended to and did lead Farrell to believe that BGC had technology for the broking of Treasury swaps that was equal to or better than Tullett Financial's. In particular, Farrell was led by BGC to falsely believe that BGC possessed appropriate computer systems for broking Treasury swaps and the capability to perform straight-through processing of customer transactions.

75.     It was only after Farrell had signed a contract with BGC and arrived at BGC's offices that he discovered that he had been misled. In fact, BGC had not developed computer systems that were appropriate for the broking of Treasury swaps. Its systems were

more difficult to use and did not provide ready access to relevant information. As a result, Farrell found that he could not provide his customers with the same quality information as he could at Tullett, nor could he provide information as quickly. During the short time he was at BGC, Farrell's customers complained about the problems they were experiencing as a result of BGC's lack of sophisticated broking technology. Farrell also learned from brokers who worked at BGC's Treasuries desk that BGC's inferior technology was one of the reasons that BGC lacked a large share of the market in broking Treasury swaps.

76. When Farrell complained to Byrne and Rogers about BGC's technology, he was finally told that the computer systems they had learned about when they were recruiting Farrell were only a "demo" of a system that was under development. In direct contradiction to what Farrell was told while being recruited by BGC, those systems were not actually in use at BGC. Rogers admitted that the representations made to Tullett brokers about BGC's technological capabilities were false as he admitted that BGC's current systems were a "bag of shit."

77. Mr. Farrell also learned that BGC did not possess straight-through processing capabilities. This meant that after he had executed a transaction, Farrell had to call the customer to tell him or her that the transaction was executed and the customer would then have to manually type the transaction into the customer's system. This created more work for the customer and lengthened the transaction process. Customers complained about this to Farrell in the short time that he was at BGC.

78. Mr. Farrell relied on BGC's misrepresentations concerning its technology in making the decision to sign a contract with BGC. Appropriate technology is crucial to the broking of Treasury swaps and very important to the customer base that Farrell has helped

25

Tullett cultivate over his 15-year career.  Mr. Farrell would not have made the decision to sign a contract with BGC or move to BGC had he been told the truth about BGC's technology when BGC was recruiting him, and this fact was known to BGC at the time BGC made the misrepresentations about BGC's technological capabilities.

79.     Upon information and belief, BGC and the Senior Employees made similar knowing misrepresentations to other brokers on other desks.  Those brokers were falsely led to believe by BGC that BGC's technology was better than it actually was and relied on those misrepresentations in deciding to join BGC.

**BGC Uses Other Misrepresentations And**
**Deceptive Tactics To Recruit Tullett Brokers**

80.     Tullett's brokers were subjected to other misrepresentations, deceptive tactics, and bullying.  The Senior Employees, along with various executives of BGC and BGC's subsidiaries, including Verrier and Webster, continuously contacted Tullett's brokers on their personal cell phones and via text messages throughout the work days, nights, and weekends.  Those communications included calls and text messages from New York to brokers working in Tullett Financial's and Tullett Americas' New Jersey offices.  Webster also sent a BGC contract, via facsimile, to Robert Van Nostrand's (a broker on Tullett's Treasuries desk) attorney located in New Jersey.

81.     BGC used aggressive bullying tactics to induce Tullett's brokers to join BGC.  For example, on the evening of Friday, August 14, 2009, Byrne called a broker on the Treasuries desk at home and directed him to resign from Tullett and join the exodus to BGC by the following Monday.  When that broker declined, Byrne egregiously insulted him and slammed down the phone.

82.    BGC also knowingly deceived Tullett's brokers into believing that they had poor career prospects at Tullett.  For example, Verrier misrepresented to, among others, Wilkes and Masse, that Tullett Prebon and its affiliates had plans to cut operational costs by firing some brokers and reducing others' bonuses to help convince them to leave Tullett.

83.    Webster repeated his and BGC's desire to "decimate" Tullett's business and told Anthony Tagliarini, a broker on Tullett Financial's Treasuries desk, that if he did not come to BGC that he was making "a big fucking mistake" because there would be very few brokers left after the Raid.  He warned Tagliarini that he did not want to be "the last man standing," or be "3rd, 4th, or 5th in this business."  Webster told Tagliarini that after BGC had finished with Tullett's Treasuries desk, it would go after Tullett's Energy, Equities, and Corporate desks, and would then attack Tullett's operations throughout the Americas.  Webster also said that BGC would use similar tactics to take down BGC's other competitors.

84.    BGC knew that, if given the choice of staying with Tullett through the years it would take to re-build the desk, or of following their fellow desk members, a significant percentage of the junior brokers would choose to leave Tullett along with their team.  As such, BGC offered those brokers substantially less favorable terms, which they nevertheless were forced to accept if they did not want to be left on what they were told would be a deserted desk, or more importantly, at a company that BGC threatened would soon be "decimated."

85.    As BGC is aware, the simultaneous loss of liquidity at a select few trading desks can significantly impact a multitude of desks across many Tullett entities.  It can deprive Tullett of valuable cross-selling opportunities.  Thus, a successful raid on one desk has the strategic effect of luring both junior and senior brokers from other desks to BGC for fear that they will be left without sufficient liquidity to effectively service their customers.  For example,

when Galano was initially contacted by Verrier in late August concerning employment at BGC, he informed Verrier that he was not interested in leaving Tullett. After learning that groups of brokers in New Jersey and New York were leaving or planning to leave Tullett, he reconsidered his position and met with Verrier to discuss employment and negotiate contract terms with BGC.

86.   The loss of liquidity not only impacts the compensation of the brokers who work at those desks -- which BGC knows will lead to even more defections -- but also threatens to weaken the firm's reputation overall, making it more difficult to rebuild the affected desks. Thus, by selectively targeting a critical mass of brokers at specific desks, BGC devised a plan that was intended to and did damage Tullett Prebon for years to come -- at relatively little cost. BGC also knew that even in instances where it did not make the effort to actually recruit Tullett brokers, simply misrepresenting its intent to do so, coupled with a number of significant defections from other desks, would cause a mass exodus of brokers from Tullett.

**BGC Provides Lawyers Who Are**
**Specifically Hired To Assist In The Raid**

87.   Tullett's brokers were provided with counsel secured by BGC. Those attorneys abandoned any pretense of providing independent counsel to their clients regarding their legal obligations as Tullett employees. Instead, those law firms -- in a unanimous chorus -- each worked only to further BGC's aims in conducting the Raid and argued that its clients' legal rights would be determined by BGC.

88.   On August 14, 2009, BGC announced its Raid by instructing the lawyers that it had purportedly hired to represent the poached Tullett brokers to send the first volley of letters announcing the Raid. BGC instructed the lawyers to send the first wave of employee resignations on the same day so as to inflict maximum damage to the morale of Tullett's entire New Jersey and New York operations. Those resignations were submitted via letters from three

different law firms purporting to represent different groups of employees.  Confirming the highly

orchestrated nature of the Raid, the three law firms used almost identical language and had the

letters delivered to Tullett Financial's legal department in Jersey City simultaneously on Friday

afternoon, August 14, 2009.  (*See* Exhs. 1, 2, 3 and 4.)

89.     The lawyers' letters were designed not to protect the poached employees,

but to further BGC's interests in conducting the Raid.  Specifically, the attorneys' letters state that

various employees who are still under contract with Tullett are resigning, effective immediately,

to go to work for BGC, while others who are still under contract will continue to work for Tullett

for only so long as BGC -- Tullett's major competitor -- decides that they can continue to do so:

> Also, please be advised that each of the Tullett Employees has
> signed a contract for future employment with BGC Financial, L.P.
> ("BGC").  By the terms of those contracts, the Commencement
> Date for each of the individual employees will not occur until after
> BGC determines that he is free and able to commence employment
> with BGC as determined by BGC.  As a result, these individuals
> intend to continue in their current positions as employees with
> Tullett only for as long as BGC determines that there is a lawful
> and enforceable contractual restriction on their commencing work
> with BGC.

90.     Similar language was used in subsequent resignation letters, which were

purportedly sent on behalf of the departing employees, but which were actually sent at the behest

of BGC in furtherance of the Raid.  In most cases, the employees for whom the letters were sent

had no opportunity to provide input or even review the letters before they were sent, or have any

input into when they were sent.  Instead, BGC directed their content and their timing so that they

would be most effective in the execution of the Raid.

91.     For example, after Wilkes agreed to join BGC, BGC provided him with

New Jersey counsel, McElroy, Deutsch, Mulvaney & Carpenter, LLP ("McElroy").

Communications between Wilkes and McElroy were sent and received in New Jersey via

Wilkes's personal e-mail and through the mail.  McElroy was purportedly hired to represent

Wilkes, but was actually hired by BGC to engineer Wilkes's involvement in the Raid.  On

September 4, 2009, McElroy sent a resignation letter, purportedly on Wilkes's behalf, to Tullett's

offices in New Jersey.  Wilkes had no input into what the letter said or when it would be mailed.

92.    Mr. Conway was provided with the same New Jersey counsel.  He

communicated with McElroy in New Jersey via phone and mail to and from Conway's residence

in New Jersey.  McElroy was purportedly hired to represent Conway, but was actually hired by

BGC to engineer Conway's involvement in the Raid.  On September 4, 2009, McElroy sent a

resignation letter, purportedly on Conway's behalf, to Tullett's offices in New Jersey.  Conway

had no input into what the letter said or when it would be mailed.

93.    Mr. Masse was contacted in New Jersey on his personal cell phone by the

same New Jersey counsel.  They communicated via phone and mail to and from Masse's

residence in New Jersey.  McElroy was purportedly hired to represent Masse, but was actually

hired by BGC to engineer Masse's involvement in the Raid.  On September 4, 2009, McElroy

sent a resignation letter, purportedly on Masse's behalf, to Tullett's offices in New Jersey.  Masse

had no input into what the letter said or when it would be mailed and did not see a copy of it

before it was mailed.

94.    When Verrier presented Rotelli with a contract, he told him that he would

be provided with counsel to represent him.  Rotelli was then contacted on his personal New

Jersey cell phone by McElroy.  Despite Verrier's statements, McElroy was hired by BGC not to

represent Rotelli but to engineer Rotelli's involvement in the Raid.  Rotelli communicated with

McElroy via phone and mail to and from Rotelli's residence in New Jersey.  On September 8,

2009, McElroy sent a resignation letter, purportedly on Rotelli's behalf, to Tullett's offices in

New Jersey while Rotelli was on vacation. Rotelli had no input into what the letter said or when it would be mailed and did not see a copy of it before it was mailed.

95.    After signing a contract with BGC, Downey was contacted by McElroy in New Jersey on his personal cell phone. McElroy was purportedly hired to represent Downey, but was actually hired by BGC to engineer Downey's involvement in the Raid. Mr. Downey communicated with McElroy lawyers via phone from Downey's residence in New Jersey. On September 4, 2009, McElroy sent a resignation letter, purportedly on Downey's behalf, to Tullett's offices in New Jersey. Mr. Downey had no input into what the letter said or when it would be mailed and did not see a copy of it before it was mailed.

96.    Mr. Moore was also contacted in New Jersey by McElroy lawyers. McElroy was purportedly hired to represent Moore, but was actually hired by BGC to engineer Moore's involvement in the Raid. On September 4, 2009, McElroy sent a resignation letter, purportedly on Moore's behalf, to Tullett Financial's offices in New Jersey. Mr. Moore had no input into what the letter said or when it would be mailed.

97.    The lawyers that were hired for the other Tullett brokers poached in the Raid were similarly hired solely for the benefit of BGC. Upon information and belief, those brokers were also given no opportunity to provide input on the content or timing of their resignation letters. Those letters were written solely for the benefit of BGC to aid in the execution of the Raid.

**BGC Plans For Tullett Brokers**
**To Breach Their Agreements With Tullett**

98.    As was the case in its previous raids on Tullett Prebon's global subsidiaries, an integral part of BGC's plan for the Raid was to construct situations to serve as a

pretext for the departing employees to breach their contractual obligations at the earliest opportunity.

99.     After soliciting the Tullett employees, BGC had them sign "forward contracts."  Forward contracts were necessary because the vast majority of employees from the New Jersey-based Tullett entities who have either resigned or have given notice of their intention to resign are under fixed-term contracts with Tullett.  The forward contracts state that the poached Tullett employees are under contract to begin work with BGC as soon as BGC determines that they are "free to do so."  As an additional incentive to join in the Raid, those contracts also provided indemnities to all Tullett brokers who left prematurely.

100.     The forward contracts are an integral part of BGC's scheme.  Not only do they purport to lock in Tullett employees who might otherwise be persuaded to stay with Tullett, but they also provide a pre-fabricated basis for those employees to walk out on their obligations to Tullett.  In fact, BGC had no intention of allowing the departing employees to serve out the rest of their contract terms with Tullett.  The forward contracts and lawyers' letters were completely pretextual.

101.     From the very beginning of the Raid, BGC manufactured reasons for the Tullett brokers to breach their contractual and common law duties owed to Tullett entities.  One of the initial resignation letters notified Tullett Financial that six of its employees (five of whom were under contract with Tullett Financial) were resigning effective immediately.  The stated reason for their immediate resignation was Tullett Financial's purportedly improper failure to install a certain "electronic trading platform" for U.S. Treasuries.  (*See* Exh. 2.)  In fact, only two of the six employees had contracts that contained provisions regarding the installation of an electronic trading platform, and the provisions gave those individuals an express window

32

(January 15-31, 2009) to resign without restraint if the trading platform was not in place at that

time -- which it was not.  Effectively, those brokers chose to unilaterally re-write their contracts

to afford them a right to resign whenever they wished.  The only real reason for the simultaneous

resignations was a sweeter deal with BGC, and in the case of junior brokers, fear that they would

be left on an undermanned and unprofitable desk.

102.    At the same time, Tullett was hit with arbitration demands from a number

of the departing brokers.  BGC caused the lawyers it hired (purportedly to represent some of the

poached Tullett brokers) to commence two FINRA arbitration proceedings against Tullett

entities.  The statements of claim filed in connection with those arbitrations are dated the very

day and the next business day after the claimants named therein (along with 23 other Tullett

employees) submitted their resignations as part of the Raid.

103.    In both arbitrations, the poached Tullett employees seek injunctive relief

that would prohibit Tullett from enjoining them from commencing work at BGC.  The claimants

argue that Tullett entities breached their contractual obligations to them, and thus the restrictive

covenants contained in their employment agreements should be disregarded.  Of course, those

allegations are fabricated, concocted merely to provide a means to permit the poached employees

to immediately commence work at BGC in violation of their contractual and common law

obligations to Tullett entities.  Clearly, BGC was concerned that Tullett Prebon or its subsidiaries

would try to protect its business by seeking preliminary injunctive relief and coordinated the two

FINRA arbitrations as a pretext to avoid that.

104.    In an even more telling illustration of BGC's tactics, BGC had the

resigning employees' lawyers direct Tullett Financial not to discuss with the departing employees

anything relating to their future employment with BGC or Tullett.  BGC knew that it could not

33

lawfully prevent Tullett from communicating with its own employees regarding their future employment. BGC also knew that Tullett would have to have those conversations with its employees when faced with the magnitude of BGC's Raid. Accordingly, Tullett senior officers met with the targeted employees to try to convince them to stay with Tullett.

105.   Almost immediately, the reason for BGC's purported "gag order" was revealed. Notwithstanding the obvious need (and legal right) for Tullett to communicate with its employees, on September 15th, counsel for six Tullett employees who previously purported to give notice of termination of their contracts sent Tullett a letter stating that those employees were resigning effective immediately (in breach of their contracts) because Tullett refused to honor the unlawful restriction -- imposed by the attorneys hired by BGC -- on Tullett's right to communicate with them. A copy of that letter, dated September 15, 2009, is attached hereto as Exhibit 5. The September 15th letter accuses Tullett of, among other things, "approach[ing] the Employees in an effort to induce them to breach their contractual obligations to BGC, despite the Employees' repeated protestations." The letter notifies Tullett that BGC and the departing employees were choosing to construe Tullett's communications *with Tullett Financial's own employees* as a constructive breach of their employment agreements. Those constructive breaches were relied on to justify the employees' immediate resignations and refusal to honor the restrictive covenants contained in their contracts with Tullett.

106.   A virtually identical letter, dated October 1, 2009, was sent by the McElroy law firm asserting the same pretext to justify breaches of contract by seven of the brokers from Tullett Americas' Eurocash desk. A copy of that letter, dated October 1, 2009, is attached hereto as Exhibit 6. The letter from McElroy accuses Tullett of, among other things, "attempt[ing] to interfere with and induce [the brokers] to breach their contracts for future

employment with BGC" by having "direct discussions" *with Tullett's own employees*, and concludes that "[a]s a result, [the brokers] are not bound by any restrictions on competition" set forth in their employment agreements with Tullett.

107.    Thus, true to form, BGC, operating through lawyers it selected for the approached employees, announced resignations based on the remarkable legal theory that: (a) employees under long-term contracts with Tullett had signed forward contracts with BGC; (b) Tullett had discussed those contracts with the brokers, and in several instances some decided to rescind their BGC offers; and (c) therefore all of the brokers on that desk who had received offers from BGC now were free to resign.  (*See* Exhs. 5 & 6.)  The net result: 13 Tullett brokers walked off the job.

**BGC Makes Material Misrepresentations To**
**Tullett Regarding The Existence Of The Raid**

108.    On August 19th, Tullett's counsel responded to the initial resignation letters, noting that the resigning employees were clearly part of a coordinated raid on Tullett Financial's brokerage business.  At that time, approximately 30 brokers had resigned or noticed their intention to do so.  Nevertheless, counsel to several of the departing employees denied any such raid, asserting in a letter sent to Tullett's counsel that the mass resignations only showed that "a number of Tullett employees have determined that Tullett has breached their employment agreements or otherwise engaged in misconduct, and/or have become disillusioned with how Tullett has treated them and so have decided to seek employment elsewhere consistent with their rights to do so."  A copy of that letter, dated August 20, 2009, is attached hereto as Exhibit 7.

109.    The comments by that counsel -- written at the behest of BGC and the departing employees -- were obviously false and intended to mislead Tullett as to the continuing Raid on Tullett's brokers.  And, that deception was clearly coordinated by BGC, as it was

35

replicated in almost identical language by a lawyer from a different law firm who represents

many of the other departing employees.  In that letter, dated August 20, 2009, the attorney denied

the existence of the Raid and stated that the departing employees' conduct was in no way planned

or orchestrated, stating that the mass resignations:

> indicate only that a number of Tullett employees have determined that
> Tullett has breached their employment agreements or otherwise engaged
> in misconduct, and/or have become disillusioned with how Tullett has
> treated them and so have decided not to renew their employment
> agreements and to seek employment elsewhere consistent with their rights
> to do so.

A copy of that letter, dated August 20, 2009, is attached hereto as Exhibit 8.

110.    In yet another letter, dated August 27, 2009, the same counsel explicitly

denied the existence of a coordinated Raid executed with the help of senior-level Tullett

employees.  That letter stated that "at-will employees on the same desk made a logical and

independent decision to join their colleagues' future employer.  Nothing was engineered . . .

There were no 'ring leaders.'"  A copy of that letter, dated August 27, 2009, is attached hereto as

Exhibit 9.

111.    Despite counsels' assertions to the contrary, it is now patently clear that

BGC has orchestrated a massive raid of Tullett Prebon's New Jersey-based subsidiaries.  BGC's

repeated misrepresentations to the contrary were designed to thwart Tullett Prebon and its

subsidiaries from taking any measures to counter the Raid.  Had BGC been truthful about the

Raid, Tullett would have had a chance to make counteroffers to some of the employees that BGC

was targeting, and, more importantly, would have had a chance to reassure Tullett brokers that

their desks would survive and thrive despite the Raid.  BGC's misrepresentations about the very

existence of the Raid only made it easier for BGC to mislead Tullett brokers into believing that if

they did not join with BGC, they would be the only one left on a decimated desk.

## The Effect Of BGC's Raid On Tullett Prebon

112.     BGC's raiding activity has caused Tullett Prebon to suffer the loss of no
less than $387 million of its market capitalization from August 13, 2009 (the day before the Raid
was announced) through December 28, 2009 -- equivalent to a 28.2% loss compared to a
weighted average loss from Tullett Prebon's competitors Tradition, GFI, BGC, and ICAP of
9.3%.  In addition, numerous stock analysts have downgraded Tullett Prebon's stock rating and
noted the effect of BGC's raiding activity on Tullett's stock.  For example, one analyst noted that
"Shares in Tullett Prebon fell more than 12 per cent after the inter-dealer broker revealed that
recent staff defections to rival BGC Partners on its North American dealing desks had led to a 9
per cent fall in revenue between July and October."  Jeremy Grant and Alistair Gray, *Broker
defections hit Tullett Prebon*, Financial Times, Nov. 13, 2009, *available at*
http:www.ft.com/cms/s/0/5d941d64-d03b-11de-a8db-00144feabdc0.html.

113.     Moreover, BGC's continued raiding of Tullett Prebon's subsidiaries
threatens Tullett Prebon with enormous economic and reputational harm.  BGC's strategy has
already caused the mass defection of 77 employees in New Jersey and New York, and an
additional 83 employees at Tullett Prebon's worldwide affiliates.  BGC continues to steal Tullett
Prebon's confidential information about its employees, including detailed salary, bonus, and
productivity information about individual employees.  And BGC is continuing to use that
information to solicit Tullett employees in New Jersey, among other places.  The damage that
BGC has already done to Tullett Prebon's reputation as a result of the Raid will only make it
more difficult for its subsidiaries to retain their employees and recruit new brokers to rebuild
their damaged desks.  BGC has even taken active steps to prevent Tullett from replacing the lost
brokers.  Specifically, when Tullett Prebon's subsidiaries have attempted to hire at-will brokers

to replace the ones lost in the Raid, BGC has attempted to hire them out from under Tullett just to make it more difficult for Tullett to replace the brokers it lost in the Raid.  Only an injunction on behalf of the Tullett parent company issued against the BGC parent company can stop BGC's attempt to cripple a direct competitor through unlawful means.

### FIRST CAUSE OF ACTION
### Racketeering Under New Jersey RICO Statute, N.J.S.A. 2C:41-4

114.    Plaintiff repeats and re-alleges its allegations made in paragraphs 1-113 as if they were fully set forth herein.

115.    BGC is a "person" as defined by N.J.S.A. 2C:41-1(b).  Plaintiff is also a "person" as defined by N.J.S.A. 2C:41-1(b).

116.    BGC at all times relevant to this action was also an "enterprise" as defined by N.J.S.A. 2C:41-1(c).

117.    BGC at all times relevant to this action was an inter-dealer broker firm, which is engaged in or whose activities affect trade or commerce in New Jersey, as defined by N.J.S.A. 2C:41-1(h).  The acts and actions complained of herein affect commerce in the State of New Jersey.

118.    BGC, Verrier, and the Senior Employees also constituted an association in fact and an "enterprise" as defined by N.J.S.A. 2C:41-1(c).  At all relevant times to this Complaint, BGC, Verrier, and the Senior Employees had continuity of structure and personnel, a common or shared purpose and an ascertainable structure distinct from that inherent in the patterns of racketeering activity.  Further, BGC, Verrier, and the Senior Employees created an enterprise and existed as an ongoing association engaged in or affecting commerce in New Jersey, and had an ascertainable structure apart from the patterns of racketeering activity alleged

in this Complaint. BGC, Verrier, and the Senior Employees were linked together by more than their participation in the same patterns of racketeering activity alleged in this Complaint.

119.     BGC was associated with Verrier and the Senior Employees and together they both aided and abetted and/or conspired to, and did, as part of an enterprise, conduct or participate in the conduct of the affairs of this enterprise through engaging in a pattern of racketeering activity as alleged in this Complaint.

120.     BGC organized Verrier and the Senior Employees by conducting or participating, directly or indirectly, in the conduct of their affairs.

121.     BGC conspired to, and did, derive or receive income from a pattern of racketeering activity, some part of which was used to organize and direct Verrier and the Senior Employees, enabling them to defraud Tullett Prebon and its subsidiaries, as set forth herein.

122.     BGC devised a scheme and artifice to defraud Tullett Prebon and its subsidiaries, and also obtained money and property from Tullett Prebon and its subsidiaries by means of false and fraudulent pretenses, representations and promises. BGC's fraudulent scheme also deprived Tullett of its intangible right to the honest services of its employees by inducing Tullett's employees, who were purporting to act for and in the interests of Tullett, to act in BGC's interests instead. BGC committed this fraud by means of the mails and interstate and foreign wires in violation of 18 U.S.C. §§ 1341, 1343 and 1346. In particular, BGC committed mail fraud and wire fraud by effectuating the following false and fraudulent scheme:

       a.     BGC employees and other operatives conspired with senior
       Tullett desk managers in New Jersey and New York to plan the aforesaid Raid,
       including providing BGC with confidential information (as described above) and
       continuing to accept salaries and retention bonuses from Tullett despite having signed

contracts with BGC and despite having no intention to honor the contracts with Tullett;

        b.     BGC employees and other operatives conspired with senior Tullett desk managers in New Jersey and New York to actively conceal BGC's approach to more than 80 brokers with commercial bribes;

        c.     BGC employees and other operatives conspired with senior Tullett desk managers in New Jersey and New York to further BGC's plan of doing permanent damage to Tullett Prebon's worldwide operations, and to recruit massive numbers of brokers, not by legitimate means, but by unlawful means designed to damage employee morale and undermine Tullett Prebon's subsidiaries' successful businesses and Tullett Prebon's market value and competitiveness;

        d.     Knowing that senior Tullett desk managers in New Jersey and New York had express contractual and common law obligations to advise Tullett of the planned Raid, BGC (through its employees and operatives) instructed Tullett employees to use secret and difficult-to-trace means of communication, shield communications though allegedly attorney-client privileged communications and to avoid the use of Tullett computers or telephones to communicate with each other;

        e.     BGC employees and other operatives conspired with Tullett desk managers in New Jersey and New York to make false and fraudulent statements to Tullett brokers about the number of Tullett brokers who would be leaving to join BGC and their future prospects working for Tullett entities, including "you will be the last man standing," "Tullett is going out of business," "Everyone on your desk already has signed on with BGC" and similar untruthful statements;

    f.  BGC employees and other operatives conspired with Tullett desk managers in New Jersey and New York to make false and fraudulent statements to Tullett brokers about BGC's technological capabilities and inducing them to join BGC under the false impression that BGC's broking technology was equal to or better than Tullett's;

    g.  BGC employees and other operatives conspired with Tullett desk managers in New Jersey and New York to create a false and fraudulent story -- and relayed it to the targeted brokers -- that in an effort to reduce operational costs, Tullett had plans to fire some of its brokers and reduce the bonuses of others;

    h.  BGC employees and other operatives conspired with attorneys, hired by BGC to purportedly represent various employee groups, to fabricate illegal justifications for Tullett brokers to breach their contractual obligations to Tullett entities; and

    i.  BGC employees and other operatives conspired with attorneys, hired by BGC to purportedly represent various employee groups, to make false and fraudulent statements denying any connected or coordinated raiding activity.

  123.  As a result of their mail and wire fraud, BGC engaged in the requisite predicate acts to constitute a "pattern of racketeering activity" as defined by N.J.S.A. 2C:41-1(d), as each of those racketeering activities: occurred on more than one occasion, occurred after the effective date of N.J.S.A. 2C:41-2, occurred within a ten year period of each other, embraced unlawful conduct with the same purpose -- poaching employees and destroying Tullett Prebon's business, involved the same participants, were committed by the same methods, and were interrelated.

124.    BGC used this "pattern of racketeering activity" as the means to operate and control its enterprise, as defined by N.J.S.A. 2C:41-1(b), by stealing Tullett employees, trade secrets, and protected information for its benefit, in violation of N.J.S.A. 2C:41-2(a) and (b).

125.    In addition, BGC conducted and participated both directly and indirectly in its own affairs, and the affairs of the association in fact consisting of BGC, Verrier, and the Senior Employees, through this pattern of racketeering activity, in violation of N.J.S.A. 2C:41-1(c).

126.    Finally, BGC conspired with its subsidiaries, Verrier, and the Senior Employees as defined by N.J.S.A. 2C:5-2 to violate N.J.S.A. 2C:41-2(a-c), in violation of N.J.S.A. 2C:41-2(d).

127.    The aforementioned predicate "pattern of racketeering activity" was both the "but for" cause, or cause-in-fact, and proximate or legal cause of injuries to Tullett Prebon including, but not limited to, the loss of value of Tullett Prebon's shares.

128.    New Jersey courts have jurisdiction under N.J.S.A. 2C:41-4 to prevent, restrain, and punish BGC's violations of N.J.S.A. 2C:41-2.

129.    Under N.J.S.A. 2C:41-4(c), Plaintiff, as a person damaged in his business by violation of N.J.S.A. 2C:41-2, is entitled to both treble damages and also "costs of the suit, including attorney's fees, costs of investigation, and litigation."

## SECOND CAUSE OF ACTION
### For Unfair Competition

130.    Plaintiff repeats and re-alleges its allegations made in paragraphs 1-129 as if they were fully set forth herein.

131.    BGC used unfair and dishonest conduct to lure away Tullett employees in a premeditated manner.  BGC used Senior Employees to assist it in carrying out its corporate raids of Tullett Prebon's subsidiaries.

132.    Each of the Senior Employees have common law duties and, with the exception of Cassidy, contractual obligations that they owe to Tullett entities.  Notwithstanding those duties and obligations, each of the Senior Employees, as well as additional employees who sit on their desks, were induced by BGC to breach those obligations to those Tullett entities.

133.    During their employment with Tullett Prebon's subsidiaries, the Senior Employees had access to vast amounts of proprietary and highly confidential information belonging to Tullett Prebon and its subsidiaries.  That information included material concerning corporate and marketing strategy, business development, business methods, plans, policies, research results, financial reports, current or planned transactions, details of brokerage arrangements, names of clients (or their employees), suppliers and terms of business, and information on employees, including names, addresses, mobile phone numbers, abilities, and terms and conditions of employment.

134.    That proprietary and confidential information was not known outside of Tullett Prebon or its subsidiaries.  It is of great value to Tullett Prebon and its subsidiaries and would be of great value to Tullett Prebon's competitors.  Tullett Prebon and its subsidiaries went to great measures to protect that information.

135.    In order to protect its confidential and proprietary interests, many Tullett brokers are required to execute contracts providing for: (i) an express prohibition on the use or disclosure of any confidential or proprietary information either while employed or at any time thereafter; (ii) express obligations of faithful, diligent and loyal service; and (iii) post-termination

restrictive covenants (typically including a blanket prohibition on working for a competitive business in at least the three to six months after termination).

136.   At BGC's request, the Senior Employees wrongfully and in bad faith misappropriated and exploited that confidential and proprietary information by sharing it with BGC to assist it in its unlawful scheme to destroy Tullett Prebon's market value and competitive advantage.  BGC knowingly obtained confidential and proprietary information with the intent to harm Tullett Prebon by stealing the customers and employees of its subsidiaries -- all part of its strategic plan to raid and destroy entire components of Tullett Prebon's subsidiaries' businesses thus destroying Tullett Prebon's market value and competitive advantage.

137.   BGC's wrongful and fraudulent use of Tullett Prebon's confidential and proprietary information constitutes unfair competition, which has damaged and continues to damage Tullett Prebon.  Tullett Prebon has been caused damage by this unfair competition through, among other things, the loss of value of Tullett Prebon's shares.

138.   BGC also used fraudulent means to cause the Senior Employees and other Tullett brokers to breach their common law and contractual duties to Tullett entities.  BGC wrongfully and in bad faith made material misrepresentations and omissions to Tullett brokers as a coordinated part of the Raid.  Those material misrepresentations and omissions were intended to and did cause Tullett brokers to breach their common law and contractual duties to Tullett entities.  BGC's raiding pattern was intended to and did cause significant damage to Tullett Prebon's market value and competitive advantage.

139.   BGC's wrongful and fraudulent raid of Tullett Prebon's subsidiaries constitutes unfair competition, which has damaged and continues to damage Tullett Prebon.

Tullett Prebon has been caused damage by this unfair competition through, among other things, the loss of value of Tullett Prebon's shares.

140.    BGC's unfair competition is ongoing.  BGC's acts have caused, and unless enjoined will continue to cause, irreparable harm and injury for which Tullett Prebon has no adequate remedy at law, including but not limited to, loss of reputation and goodwill.

**THIRD CAUSE OF ACTION**
**For Misappropriation Of Trade Secrets And Confidential Information**

141.    Plaintiff repeats and re-alleges its allegations made in paragraphs 1-140 as if they were fully set forth herein.

142.    Tullett Prebon possesses a number of trade secrets and other confidential information, all of which are crucial to the successful operation of its business.  Those secrets and information include, without limitation, proprietary and confidential information relating to Tullett employees, Tullett Prebon's and Tullett's business operations, and/or information relating to historical and projected revenues for clients of Tullett Prebon's subsidiaries.

143.    BGC obtained and used Tullett Prebon's trade secrets and confidential information during its improper solicitation of Tullett employees.  BGC received that information in exchange for providing certain senior-level Tullett employees with current and future employment and economic incentives.  Tullett Prebon has been caused damage by BGC's misappropriation of its trade secrets and confidential information through, among other things, the loss of value of Tullett Prebon's shares.

144.    BGC's misappropriation of trade secrets and confidential information is ongoing.  BGC's acts have caused, and unless enjoined will continue to cause, irreparable harm and injury for which Tullett Prebon has no adequate remedy at law, including but not limited to, loss of reputation and goodwill.

## FOURTH CAUSE OF ACTION
### For Tortious Interference With Business Relationships

145.    Plaintiff repeats and re-alleges its allegations made in paragraphs 1-144 as if they were fully set forth herein.

146.    Tullett Prebon has existing, protectable economic rights in its relationships with its subsidiaries, including those that were attacked in the Raid.  Tullett Prebon's subsidiaries carry out the day-to-day activities of its worldwide inter-dealer broker business.

147.    BGC was at all relevant times aware of the existence of the economic relationships between Tullett Prebon and its subsidiaries.  In furtherance of the Raid, BGC maliciously, oppressively, and willfully induced and/or encouraged Tullett employees to resign and join BGC, thus interfering with Tullett Prebon's economic relationships with its subsidiaries.

148.    As a direct and proximate result of BGC's actions, Tullett Prebon has suffered monetary loss resulting from BGC's interference with its economic relationship with its subsidiaries through, among other things, the loss of value of Tullett Prebon's shares.

149.    BGC's tortious interference with Tullett Prebon's business relationships is ongoing.  BGC's acts have caused, and unless enjoined will continue to cause, irreparable harm and injury for which Tullett Prebon has no adequate remedy at law, including but not limited to, loss of reputation and goodwill.

## FIFTH CAUSE OF ACTION
### For Raiding

150.    Plaintiff repeats and re-alleges its allegations made in paragraphs 1-149 as if they were fully set forth herein.

151.    BGC's Raid is part of a massive worldwide attack on Tullett Prebon's inter-dealer broker business, following on similar raids in London, Tokyo, and Hong Kong.

Those raids all followed the same pattern. BGC first solicited senior-level Tullett employees who would provide highly confidential information concerning Tullett employees. That information could then be used by BGC and the disloyal senior-level employees to solicit additional employees, which would lead to mass resignations from Tullett.

152.   BGC was at all times aware that its use of current Tullett employees in its raids was improper and would cause them to breach a number of legal duties (both common law duties and contractual obligations) owed to Tullett entities.

153.   BGC's conduct amounted to an unlawful corporate raid of Tullett Prebon's subsidiaries' business operations in an effort to destroy Tullett Prebon's market value and competitive advantage. Its actions were willful, wanton, and malicious, and were intended to cripple and perhaps destroy Tullett Prebon, a direct competitor in the inter-dealer broker market, and have caused Tullett Prebon damage, including but not limited to, through the loss of value of Tullett Prebon's shares.

154.   BGC's raiding activity is ongoing. BGC's acts have caused, and unless enjoined will continue to cause, irreparable harm and injury for which Tullett Prebon has no adequate remedy at law, including but not limited to, loss of reputation and goodwill.

**PRAYER FOR RELIEF**

**WHEREFORE**, Tullett Prebon respectfully requests that this Court issue judgment:

(A)   On the first cause of action, awarding damages calculated by the loss in market value suffered by Tullett Prebon as a result of the Raid, those damages to be determined at trial and trebled pursuant to N.J.S.A. 2C:41-4, but not less than $1 billion, plus attorneys fees and costs;

(B)   On the second, third, fourth, and fifth causes of action, awarding compensatory damages calculated by the loss of market value suffered by Tullett Prebon as a result of the Raid, in an amount to be determined at

trial but not less than $387 million, plus exemplary and punitive damages for the willful and malicious acts by BGC, in an amount to be determined at trial but not less than $500 million;

(C)     On the second, third, fourth, and fifth causes of action, awarding compensatory damages calculated by the impairment of Tullett Prebon's goodwill in an amount to be determined at trial but not less than $60 million, plus exemplary and punitive damages for the willful and malicious acts by BGC, in an amount to be determined at trial but not less than $500 million;

(D)     Awarding Tullett Prebon an injunction permanently enjoining BGC from conducting any future raids on Tullett Prebon or its subsidiaries in violation of applicable law;

(E)     Awarding all costs and expenses, including attorneys' fees and expenses, prejudgment interest, and all other sums provided for under the law; and

(F)     Awarding such other and further relief as the Court may deem just and proper.

Dated: Parsippany, New Jersey
       January 11, 2010

KELLEY DRYE & WARREN LLP

By: _____
    Joseph A. Boyle
    Vincent P. Rao, II
200 Kimball Drive
Parsippany, New Jersey 07054
(973) 503-5920
*Attorneys for Plaintiff*

SCHULTE ROTH & ZABEL LLP
Robert M. Abrahams
David K. Momborquette

919 Third Avenue
New York, New York 10022
(212) 756-2000

*Of Counsel*

## JURY DEMAND

Tullett Prebon plc hereby demands a trial by jury of all causes of action so triable.

Dated:  January 11, 2010

_____
Vincent P. Rao, II

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that on January 11, 2010, Plaintiff Tullett Prebon plc's First Amended Complaint and Jury Demand was served via ECF and email on:

> Donald A. Robinson, Esq.
> Keith J. Miller, Esq.
> Leda Dunn Wettre, Esq.
> ROBINSON, WETTRE & MILLER LLC
> ONE NEWARK CENTER
> 19TH FLOOR
> NEWARK, NJ 07102
>
> And
>
> Eric Seiler, Esq.
> Lindsey R. Skibell, Esq.
> John N. Orsini, Esq.
> Andrew Levine, Esq.
> Hallie B. Levin, Esq.
> Friedman Kaplan Seiler & Adelman LLP
> 1633 Broadway
> New York, NY  10019
>
> Attorneys for Defendant

Dated:  January 11, 2010

_____
Vincent P. Rao, II