UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------x

Tullett Prebon plc,

                     Plaintiff,

          - against -

BGC Partners, Inc.,

                  Defendant.

-------------------------------------------------x

:
:
:
:
:
:
:
:
:

Civ. No.: 2:09-cv-05365-SRC-MCA

## MEMORANDUM OF LAW OF PLAINTIFF TULLETT PREBON PLC IN OPPOSITION TO DEFENDANT BGC PARTNERS, INC.'S MOTION TO DISMISS AND MOTION TO STAY

### KELLEY DRYE & WARREN LLP

200 Kimble Drive
Parsippany, New Jersey 07950
(973) 503-5920

*Attorneys for Plaintiff*

### SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, New York  10022
(212) 756-2000

*Of Counsel*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

THE ALLEGATIONS ................................................................................. 4

    The Raid .................................................................................... 4

    BGC's Misrepresentations................................................................ 5

    BGC's Misappropriation Of Confidential Information.................... 7

    Damage To Tullett Prebon ................................................................ 8

    The First Amended Complaint.......................................................... 9

    The FINRA Arbitration.................................................................... 9

    New Jersey Contacts ...................................................................... 10

ARGUMENT ......................................................................................... 11

I.   BGC's Motion To Dismiss For  Failure To State A Claim Should
    Be Denied .................................................................................. 11

    A. The Applicable Standard ............................................................ 11

    B. Tullett Prebon Has Standing To Assert The Claims In The
       First Amended Complaint Because It Is Suing To Recover
       For Injuries Directly Inflicted On It By BGC .............................. 12

    C. The First Amended Complaint States A Claim Under The
       New Jersey RICO Statute........................................................... 17

       1.  The New Jersey RICO Statute Applies To BGC's Conduct .... 17

       2.  New Jersey Law Applies To This Action ............................... 19

       3.  The First Amended Complaint Adequately Pleads A RICO
          Injury ............................................................................... 24

       4.  The First Amended Complaint Adequately Pleads RICO
          Causation .......................................................................... 26

       5.  The First Amended Complaint Adequately Pleads A
          Pattern Of Racketeering Activity ......................................... 31

    D. The First Amended Complaint States A Claim For Raiding
       Under New Jersey Law .............................................................. 34

    E. Tullett Prebon Has Standing To Assert A Cause Of Action
       For Tortious Interference............................................................ 36

i

F.  Tullett Prebon Has Standing To Assert A Cause Of Action
    For Misappropriation Of Trade Secrets And Unfair
    Competition ................................................................. 39

II.  The Tullet Subsidiaries Are Not Necessary Or Indispensable
     Parties To This Action ......................................................... 44

    A. The Tullett Subsidiaries Are Not Necessary Parties ..................... 44

    B. Neither Are The Tullett Subsidiaries Indispensable Parties ......... 49

III.  This Action Should Not Be Stayed Pending The Resolution Of
      The FINRA Arbitration ...................................................... 51

CONCLUSION ............................................................................. 55

# TABLE OF AUTHORITIES

**CASES**                                                                 **PAGE(S)**

*Aamco Transmissions, Inc. v. Marino*,
  CIV. A. Nos. 88-5522, 88-6197, 1990 WL 106760 (E.D. Pa. July 18,
  1990) ...................................................................................................25

*Abe's Rooms, Inc. v. Space Hunters, Inc.*,
  833 N.Y.S.2d 138 (2d Dep't 2007) ....................................................43

*Abels v. Farmers Commodities Corp.*,
  259 F.3d 910 (8th Cir. 2001) ............................................................31

*Acton Co. of Mass. v. Bachman Foods, Inc.*,
  668 F.2d 76 (1st Cir. 1982)........................................................45, 49

*Aetna U.S. Healthcare, Inc. v. Columbia Cas. Co.*,
  No. Civ. A. 99-596, 1999 WL 554606 (E.D. Pa. July 20, 1999) .......................14

*AgGrow Oils L.L.C. v. Nat'l Union Fire Ins.*,
  242 F.3d 777 (8th Cir. 2001) ............................................................53

*Alexander & Alexander of N.Y. Inc. v. Fritzen*,
  495 N.Y.S.2d 386 (N.Y. App. Div. 1985), *aff'd*, 503 N.E.2d 968 (N.Y.
  1986) ...................................................................................................39

*Alexander v. CIGNA Corp.*,
  991 F. Supp. 427 (D.N.J. 1998), *aff'd*, 172 F.3d 859 (3d Cir. 1998) .................33

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
  228 F.3d 429 (3d Cir. 2000) ............................................................24

*Am. Home Mortgage Corp. v. First Am. Title Ins. Co.*,
  No. 07-01257, 2007 WL 3349320 (D.N.J. Nov. 9, 2007)...................................51

*Anderson v. Corinthian Colls., Inc.*,
  No. C06-5157 FDB, 2006 WL 2380683 (W.D. Wash. Aug. 16, 2006)..............53

*Avtec Indus., Inc. v. Sony Corp. of America*,
  205 N.J. Super. 189 (N.J. Supp. Ct. App. Div. 1985) ........................................37

*BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.*,
  229 F.3d 254 (3d Cir. 2000) ...........................................................................41

*Balfour v. Gutstein*,
  547 F. Supp. 147 (E.D. Pa. 1982) ...................................................................54

*Bank of Am. Nat'l Trust and Savs. Assoc. v. Hotel Rittenhouse Assoc.*,
  844 F.2d 1050 (3d Cir. 1988) ..........................................................................51

*In re Barney's, Inc.*,
  206 B.R. 336 (S.D.N.Y. 1997)..........................................................................53

*Bayer Corp. v. Smithkline Beecham PLC*,
  No. 95 Civ. 5582 (SHS), 1996 WL 34164 (S.D.N.Y. Jan. 29, 1996) ................47

*Blevins v. Katherman*,
  Civil Action No. 1:07-CV-0633, 2009 WL 712350 (M.D. Pa. Mar. 16,
  2009) ...............................................................................................................52

*Blizzard v. Exel Logistics N. Am., Inc.*,
  No. 02-4722 (FLW), 2005 U.S. Dist. LEXIS 28160 (D.N.J. Nov. 15,
  2005) ...............................................................................................................27

*Blue Line Coal Co., v. Equibank*,
  CIV. A. No. 87-6150, 1989 WL 63203 (E.D. Pa. June 12, 1989)......................25

*Boyle v. D'Onofrio*,
  99 F. Supp. 2d 541 (D.N.J. 2000), *aff'd*, 254 F.3d (3d Cir. 2001) .....................32

*Breslin v. Vornado, Inc.*,
  559 F. Supp. 187 (E.D. Pa. 1983) ....................................................................16

*Bridge v. Phoenix Bond & Indem. Co.*,
  128 S. Ct. 2131 (2008).....................................................................................29

*Burger King Corp. v. Am. Nat'l Bank and Trust Co. of Chicago*,
  119 F.R.D. 672 (N.D. Ill. 1988).........................................................................46

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
   547 F.3d 115 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 1908 (2009) ....................38

*Clark v. Prudential Ins. Co. of Am.*,
   No. 08-6197 (DRD), 2009 WL 2959801 (D.N.J. Sept. 15, 2009) .......... 20, 21-22

*Classic Comm'ns, Inc. v. Rural Tele. Serv. Co.*,
   956 F. Supp. 910 (D. Kan. 1997) .......................................................................13

*Coast Cities Truck Sales v. Navistar Int'l Transp. Co.*,
   912 F. Supp. 747 (D.N.J. 1995) .........................................................................38

*Corsi v. Eagle Publ'g, Inc.*,
   No. 1:07-cv-02004, 2008 U.S. Dist. LEXIS 6257 (D.D.C. Jan. 30, 2008) .........51

*Delgado v. Plaza Las Ams., Inc.*,
   139 F.3d 1 (1st Cir. 1998) ..................................................................................47

*Develcom Funding, LLC v. Am. Atlantic Co.*,
   No. Civ. 09-1839(RMB), 2009 WL 2923064 (D.N.J. Sept. 9, 2009) .................45

*Dewey v. Volkswagen AG*,
   558 F. Supp. 2d 505 (D.N.J. 2008) ....................................................................28

*Dickson v. Murphy*,
   202 F. App'x 578 (3d Cir. 2006) .......................................................................45

*Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*,
   861 F. Supp. 179 (E.D.N.Y. 1994) ..............................................................14, 39

*District 1199P Health and Welfare Plan v. Janssen, L.P.*,
   No. 06-3044 (FLW), 2008 U.S. Dist. LEXIS 103526 (D.N.J. Dec. 23,
   2008) ..................................................................................................................25

*Duffy v. Charles Schwab & Co.*,
   97 F. Supp. 2d 592 (D.N.J. 2000) ................................................................39, 43

*E.I. DuPont de Nemours and Co. v. Rhodia Fiber and Resin Intermediates,
S.A.S.*,
   197 F.R.D. 112 (D. Del. 2000), *aff'd in part*, 269 F.3d 187
   (3d Cir. 2001) .................................................................................................44, 46

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
   102 F. Supp. 2d 237 (D.N.J. 2000) ....................................................................33

*Ergobilt, Inc. v. Neutral Posture Ergonomics, Inc.*,
   No. CA 3-97-CV-2548-R, 1998 WL 483624 (N.D. Tex. Aug. 10, 1998) ..........15

*Fallon v. Locke, Liddell & Sapp, LLP*,
   No. C-04-03210 RMW, 2007 WL 2904052 (N.D. Cal. Oct. 2, 2007) ...............53

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*,
   No. 04-3500 (AFT), 2006 U.S. Dist. LEXIS 70834 (D.N.J. Sept. 29,
   2006) ...................................................................................................................40

*Ford Motor Co. v. Edgewood Props., Inc.*,
   Nos. 06-1278, 06-4266 (HAA), 2009 WL 150951 (D.N.J. Jan. 20. 2009) .........17

*Frigitemp Corp. v. Financial Dynamics Fund, Inc.*,
   524 F.2d 275 (2d Cir. 1975) ..............................................................................15

*Fuji Photo Films USA, Inc. v. McNulty*,
   640 F. Supp. 2d 300 (S.D.N.Y. 2009) ................................................................32

*GE Healthcare v. Orbotech, Ltd.*,
   No. 09-C-0035, 2009 WL 2382534 (E.D. Wis. July 2, 2009)...................... 46-47

*GTC Int'l Holdings, Inc. v. Burns*,
   No. 04 C 0570, 2004 U.S. Dist.  LEXIS 19858 (N.D. Ill. Sept. 22, 2004)..........45

*G. & V. Gen. Contrs., Inc. v. Goode*,
   Civ. A. No. 86-7408, 1987 WL 9786 (E.D. Pa. Apr. 21, 1987)..........................54

*Gallup, Inc. v. Talentpoint, Inc.*,
   No. CIV.A. 00-5523, 2001 WL 1450592 (E.D. Pa. Nov. 13, 2001)...................35

*Gianfredi v. Hilton Int'l of Puerto Rico, Inc.*,
    No. 08-0769 (HAA), 2008 WL 4425228 (D.N.J. Sept. 24, 2008) ......................23

*Graco, Inc. v. PMC Global, Inc.*,
    No. 08-1304 (FLW), 2009 WL 904010 (D.N.J. Mar. 31, 2009)..................41, 43

*Granite State Ins. Co. v. Ujex, Inc.*,
    No. 03-1220 (JBS), 2005 U.S. Dist. LEXIS 13692 (D.N.J. July 11, 2005)........33

*HB Gen. Corp. v. Manchester Partners, L.P.*,
    95 F.3d 1185 (3d Cir. 1996) ...............................................................................12

*Heller v. Deutsche Bank AG*,
    No. Civ.A 04-CV-3571, 2005 WL 665052 (E.D. Pa. Mar. 17, 2005) ...............54

*Hemi Group, LLC v. City of New York*,
    130 S. Ct. 983 (2010).....................................................................................24, 29

*Hillhaven Corp. v. Wis. Dep't of Health and Soc. Servs.*,
    634 F. Supp. 1313 (E.D. Wis. 1986) ..................................................................13

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992)............................................................................................24

*Inox Wares Pvt. Ltd. v. Interchange Bank*,
    No. 06-4307 (SRC), 2008 WL 4691906 (D.N.J. Oct. 22, 2008).........................46

*Intercapital Debt Trading Ltd. v. Cantor Fitzgerald, L.P.*,
    N.Y.L.J. 28 (N.Y. Sup. Ct. Mar. 9, 1995)...........................................................41

*Interchange State Bank v. Veglia*,
    286 N.J. Super. 164 (N.J. Super. Ct. App. Div. 1995) ........................................27

*Ivy v. Ferranti Intern., Inc.*,
    Civ. A. No. 90-2535, 1990 WL 204384 (E.D. Pa. Dec. 10, 1990).....................27

*Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*,
    11 F.3d 399 (3rd Cir. 1993) ...............................................................................48

*Johnston v. Nextel Communications, Inc.*,
   No. 07 cv 8473 (GBD), 2009 WL 928131 (S.D.N.Y. Mar. 31, 2009)...............22

*Kauffman v. Dreyfus Fund, Inc.*,
   434 F.2d 727 (3d Cir. 1970) ...............................................................15

*Kazmierski v. General Nutrition Cos.*,
   No. Civ.A. 99-5281 JBS, 2000 WL 35506403 (D.N.J. Mar. 31, 2000)........37, 38

*Kerrigan v. Villei*,
   No. Civ. A. 95-4334, 1996 WL 84271 (E.D. Pa. Feb. 28, 1996) ......................48

*Kolar v. Pref. Real Estate Dec., L.P.*,
   No. 08-3119, 2010 WL 104500 (3d Cir. Jan. 12, 2010)...................................34

*Lamorte Burns & Co. v. Walters*,
   167 N.J. 285 (N.J. 2001) ...............................................................41, 42

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936)........................................................................52

*Lerner v. Fleet Bank, N.A.*,
   318 F.3d 113 (2d Cir. 2003)...............................................................27

*Lewis v. Spencer*,
   No. 494,1989, 1990 WL 72615 (Del. May 11, 1990) ........................................15

*Longmont United Hosp. v. Saint Barnabas Corp.*,
   305 F. App'x 892 (3d Cir. 2009) .......................................................30

*Louis Kamm, Inc. v. Flink*,
   113 N.J.L. 582 (N.J. 1934).................................................................37

*MARJAC, L.L.C. v. Trenk*,
   No. Civ. A. 06-1440 (JAG), 2009 WL 2143686 (D.N.J. July 13, 2009) ......37, 38

*Marianas Hospitality Corp. v. Premier Bus. Solutions, Inc.*,
   Civ-No. 07-00002, 2009 WL 750247 (D. Guam Jan. 14, 2009).........................29

*Mawwhinney v. Bennett*,
  No. 08-cv-3317 (NLH )(JS), 2010 WL 147945 (D.N.J. Jan. 11, 2010)..............11

*Mayo, Lynch & Assocs., Inc. v. Pollack*,
  351 N.J. Super. 486 (N.J. Super. Ct. App. Div. 2002) ........................................34

*Mayor and Council of Borough of Rockaway v. Klockner & Klockner*,
  811 F. Supp. 1039 (D.N.J. 1993)........................................................................35

*McBrearty v. Vanguard Group, Inc.*,
  No. 08 Civ. 7650 (DLC), 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd*,
  No. 09-1445-cv, 2009 WL 4019799(2d Cir. Nov. 23, 2009) ..............................26

*Mendez v. Puerto Rican Int'l Cos.*,
  553 F.3d 709 (3d Cir. 2009) ...............................................................................52

*In re Mercedes-Benz Tele Aid Contract Litig.*,
  257 F.R.D. 46 (D.N.J. 2009)....................................................................20, 21, 22

*Merritt-Chapman & Scott Corp. v. Pa. Tpk. Comm'n*,
  387 F.2d 768 (3d Cir. 1967) ...............................................................................53

*Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*,
  339 F.2d 440 (2d Cir. 1964) ...............................................................................53

*Nelligan ex rel. Estate of Proia v. Cmty. Gen. Hosp. of Sullivan*,
  240 F.R.D. 123 (S.D.N.Y. 2007) ........................................................................48

*Newcomb v. Daniels, Saltz, Mongelluzi & Barrett*,
  847 F. Supp. 1244 (D.N.J. 1994)........................................................................23

*New Jersey Optometric Ass'n v. Hillman-Kohan Eyeglasses, Inc.*,
  144 N.J. Super. 411 (N.J. Super. Ct. Ch. Dir. 1976) ..........................................39

*O'Brien Oil Pollution Serv. Inc. v. Kapoor*,
  06-CV-2945 (DMC), 2009 WL 2407399 (D.N.J. Aug. 4, 2009).................34, 35

*Onyx Waste Servs., Inc. v. Mogan*,
  203 F. Supp. 2d 777 (E.D. Mich. 2002) ................................................ 45-46, 50

*Oswell v. Morgan Stanley Dean Witter & Co.*,
   No. 06-5814 (JBS), 2007 WL 1756027 (D.N.J. June 18, 2007) ........................40

*P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore, L.L.C.*,
   Civ. Action No. 04-4554 (JAG), 2007 WL 708978 (D.N.J. Mar. 5, 2007) ........16

*P.V. ex rel. T.V.  v. Camp of Jaycee*,
   197 N.J. 132 (N.J. 2008) ............................................................................. 22-23

*Pactiv Corp. v. Perk-Up, Inc.*,
   No. 08-05072(DMC), 2009 WL 2568105 (D.N.J. Aug. 18, 2009) ....................36

*Parker v. Learn the Skills Corp.*,
   530 F. Supp. 2d 661 (D. Del. 2008) ..................................................................25

*Penn Mont Sec. v. Frucher*,
   502 F. Supp. 2d 443 (E.D. Pa. 2007) ................................................................24

*In re Phar-Mor, Inc. Sec. Litig.*,
   900 F. Supp. 777 (W.D. Pa. 1994) ...................................................................15

*Pichler v. UNITE*,
   542 F.3d 380 (3d Cir. 2008), *cert. denied*, 129 S. Ct. 1662 (2009) ....................13

*Pittsburgh Corning Corp. v. Travelers Indem. Co.*,
   CIV. A. No. 84-3985, 1988 WL 100787 (E.D. Pa. Sept. 14, 1988) ...................50

*Plymouth Youngle Tape (Shanghai) Co., v. Plymouth Rubber Co., LLC*,
   Civ. A. No. 08-11599-JGD, 2009 WL 5821678 (D. Mass. Dec. 29, 2009) ........47

*Price Paper & Twice Co. v. Miller*,
   182 A.D.2d 748 (N.Y. App. Div. 1992) .............................................................42

*RBC Bank (USA) v. Riley, Riper, Hollin & Colagreco*,
   No. 09-cv-00431(FLW), 2009 WL 2580354 (D.N.J. Aug. 19, 2009)................19

*Republic Envtl. Sys. (PA), Inc. v. Reichhold Chems., Inc.*,
   154 F.R.D. 130 (E.D. Pa. 1994)........................................................................28

*Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*,
No. 07 Civ. 3494(DLC), 2008 WL 542596 (S.D.N.Y. Feb. 29, 2008) ...............26

*Ritter v. Klisivitch*,
No. 06-CV-5511 (DRH)(WDW), 2008 WL 2967627 (E.D.N.Y. July 30,
2008) ............................................................................................................29

*Rosenzweig v. Brunswick Corp.*,
No. 08-807 (SDW), 2008 U.S. Dist. LEXIS 63655
(D.N.J. Aug. 20, 2008)................................................................... 49-50

*Ryan v. Carmona Bolen Home for Funerals*,
341 N.J. Super. 87 (N.J. Super. Ct. App. Div. 2001) ..........................................39

*Ryan v. Johnson*,
115 F.3d 193 (3d Cir. 1997) .............................................................51

*S. Freedman and Co. v. Raab*,
No. 06-37232008, 2008 WL 4534069 (D.N.J. Oct. 6, 2008) ............................52

*Schmuck v. U.S.*,
489 U.S. 705 (1989)...........................................................................32

*Securitron Magnalock Corp. v. Schnabolk*,
65 F.3d 256 (2d Cir. 1995) ...............................................................24

*See v. Balfour v. Gutstein*,
547 F. Supp. 147 (E.D. Pa. 1982) ......................................................54

*Sensient Colors Inc. v. Allstate Ins. Co.*,
193 N.J. 373 (N.J. 2008) ...................................................................23

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
742 F.2d 786 (3d Cir. 1984) ........................................................ 31-32

*In re Schering-Plough Corp. Intron/Temodor Consumer Class Action*,
No. 2:06-cv-5774 (SRC), 2009 WL 2043604 (D.N.J. July 10, 2009)...........28, 32

*Site Micrological Sys., Inc. v. Cooper Cos., Inc.*,
797 F. Supp. 333 (D. Del. 1992).......................................................13

*State v. Cagno*,
409 N.J. Super. 552 (N.J. Super. Ct. App. Div. 2009) ........................................18

*State v. Casilla*,
362 N.J. Super. 554 (N.J. Super. Ct. App. Div. 2003) ........................................18

*State v. Motley*,
No. 02-05-0069-S, 2006 WL 848296 (N.J. Super. Ct. App. Div. Apr. 3,
2006) ...............................................................................................................17

*State v. Passante*,
225 N.J. Super. 439 (N.J. Super. Ct. Law Div. 1987) ........................................18

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
Civ. No. 00-2253(JNE/JGL), 2003 U.S. Dist. LEXIS 17347 (D. Minn.
Sept. 25, 2003) .............................................................................................35

*Subcarrier Comm'ns, Inc. v. Day*,
299 N.J. Super. 634 (N.J. Super. Ct. App. Div. 1997) ........................................42

*In re Sumitomo Copper Litig.*,
995 F. Supp. 451 (S.D.N.Y. 1998) .................................................................32

*Tabas v. Tabas*,
47 F.3d 1280 (3d Cir. 1995) .............................................................................32

*Telmark Pkg. Corp., v. Nutro Labs. & Nature's Bounty*,
Civ. No. 05-3049 (GEB), 2008 WL 43954 (D.N.J. Jan. 2, 2008).......................43

*Temple v. Synthesis Corp. Ltd.*,
498 U.S. 5 (1990)............................................................................................46

*Thomas & Betts Corp. v. Richards Mfg. Co.*,
342 F. App'x 754 (3d Cir. 2009) ......................................................................41

*Thomas v. Ford Motor Co.*,
70 F. Supp. 2d 521 (D.N.J. 1999) ...................................................................16

*Trans USA Products, Inc. v. Howard Berger Co.*,
No. 07-5924 (JAP), 2008 WL 3154753 (D.N.J. Aug. 4, 2008) ..........................18

*Ultraflex Sys., Inc. v. Verseidag-Indutex GMBH*,
No. Civ.A. 01-129(JLL), 2006 WL 1098181 (D.N.J. Mar. 30, 2006) .......... 37-38

*United Ref. Co. v. Dep't of Energy*,
 486 F. Supp. 99 (W.D. Pa. 1980).......................................................................54

*United States v. Al-Ame*,
434 F.3d 614 (3d Cir. 2006)................................................................................32

*United States v. Frey*,
42 F.3d 795 (3d Cir. 1994) .................................................................................23

*United States v. Parkin*,
319 F. App'x 101 (3d Cir. 2009) ........................................................................23

*Virginia Surety Co. v. Macedo*,
No. 08-5586, 2009 U.S. Dist. LEXIS 90603 (D.N.J. Sept. 30, 2009)................34

*VT Investors v. R&D Funding Corp.*,
733 F. Supp. 823 (D.N.J. 1990) .........................................................................33

*Wang Labs., Inc. v. Burts*,
612 F. Supp. 441 (D.C. Md. 1984) .....................................................................25

*Warner Lambert Co. v. Purepac Pharm. Co.*,
No. Civ.A. 98-02749(JCL), 2000 WL 34213890 (D.N.J. Dec. 22, 2000) ..........39

*Wear-Ever Aluminum, Inc. v. Townecraft Indus., Inc.*,
75 N.J. Super. 135 (N.J. Super. Ct. Ch. Div. 1962)............................................37

*Weisel Partners LLC v. BNP Paribas, BNP*,
No. C 07-6198 MHP, 2008 WL 3977887 (N.D. Cal. Aug. 26, 2008) .......... 12-13

*Wellness Publ'g v. Barefoot*,
No. 02-3773 (JAP), 2008 WL 108889 (D.N.J. Jan. 8, 2008) .............................43

*Wheaton v. Diversified Energy, LLC*,
   215 F.R.D. 487 (E.D. Pa. 2003) ............................................................48

*White Cap Const. Supply, Inc. v. Tighton Fastener and Supply Corp.*,
   No. 8:08CV264, 2009 WL 483842 (D. Neb. Feb. 25, 2009) ..............................52

*WorldCrisa Corp. v. Armstrong*,
   129 F.3d 71 (2nd Cir. 1997) ..............................................................53

*Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*,
   80 F. Supp. 2d 25 (N.D.N.Y. 1999) ......................................................43

*Yarosh v. Salkind*,
   No. Civ.A. 04-1816(JWB), 2005 WL 1459719 (D.N.J. June 21, 2005) .......30, 32

*Zavala v. Wal-Mart Stores, Inc.*,
   447 F. Supp. 2d 379 (D.N.J. 2006) ......................................................30

## STATUTES & RULES

N.J. Stat. Ann. §  2C:41-1.1 (West 2010) ..............................................23

N.J. Stat. Ann. §  2C:41-2 (West 2010) .............................................19, 30

## RULES OF EVIDENCE AND PROCEDURE

Fed. R. Civ. P. 9(b) ...................................................................28, 31

Fed. R. Civ. P. 12(b)(6)..................................................................11

Fed. R. Civ. P. 12(b)(7)..................................................................44

Fed. R. Civ. P. 19 ....................................................................44, 46

Fed. R. Civ. P. 19(a)..................................................................48, 49

Fed. R. Civ. P. 19(b) .................................................................49, 50

**RESTATEMENTS**

Restatement (Second) Conflict of Laws § 6 (1971) ....................................21, 22, 23

Restatement (Second) Conflict of Laws § 145 (1971) ...............................20, 21, 22

Restatement (Second) of Conflict of Laws § 146 (1971)........................................21

Restatement (Second) of Conflict of Laws § 147 (1971)........................................21

Restatement (Second) of Conflict of Laws § 148(2) (1971) ............................19, 21

Restatement (Second) of Conflict of Laws § 149 (1971)........................................21

Restatement (Second) of Conflict of Laws § 151 (1971)........................................21

**MISCELLANEOUS**

Eugene F. Scoles et al., *Conflict of Laws* § 2.14 (4th ed. 2004).............................23

Dana N. Pescosolido and Christopher P. Stief, Raiding in the Securities
   Industry: The Search for Consensus 1-6 (Sept. 25, 2003) (unpublished
   conference report, *available at*
   http://www.saul.com/common/publications/ pdf_531.pdf)................................35

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------------------x

Tullett Prebon plc,                               :

              Plaintiff,        :   Civ. No.: 2:09-cv-05365-SRC-
                     :   MCA

        - against -                           :

BGC Partners, Inc.,                               :

            Defendant.            :

------------------------------------------------x

## MEMORANDUM OF LAW OF PLAINTIFF TULLETT PREBON PLC IN OPPOSITION TO DEFENDANT BGC PARTNERS, INC.'S MOTION TO DISMISS AND MOTION TO STAY

Plaintiff Tullett Prebon plc ("Tullett Prebon") respectfully submits this memorandum of law in opposition to Defendant BGC Partners, Inc.'s ("BGC") motion to dismiss and motion to stay.

## PRELIMINARY STATEMENT

This action arises from the raid of brokers from Tullett Prebon's New Jersey-based subsidiaries conducted by BGC and others (the "Raid"). The Raid represents BGC's latest efforts to destroy Tullett Prebon's competitive advantage by fatally crippling its inter-dealer broker business and destroying its market capitalization. The Raid was planned and executed by senior executives at BGC, along with others from certain subsidiaries of BGC, and was patterned on similar raids BGC had launched earlier against other subsidiaries of Tullett Prebon located around the world.

BGC's conduct in the Raid constitutes a flagrant disregard for the law. Indeed, it is so egregious that it rises to the level of a violation of New Jersey's RICO statute, legislation passed to protect those within the State from injury caused by racketeering activity.  Among other things, BGC (i) repeatedly lied to brokers in an effort to recruit them to BGC, (ii) used attorneys ostensibly retained to represent others to lie to Tullett Prebon about the very existence of the Raid, (iii) caused brokers who defected to BGC to lie to clients in an effort to direct business to BGC, and (iv) stole trade secrets and confidential information belonging to Tullett Prebon and used such information to advance its own interests in the Raid. Those blatantly improper actions have directly caused hundreds of millions of dollars of damage to Tullett Prebon's business, including loss of market capitalization, goodwill and reputation.

Yet, incredibly, BGC asserts that Tullett Prebon has no ability whatsoever to recover damages for any of this, or seek injunctive relief to protect it from future injury, under any cause of action asserted in the First Amended Complaint.  That notion is patently absurd, and has absolutely no support in the applicable law.

For instance, BGC contends that Tullett Prebon lacks standing to assert any of the causes of action in the First Amended Complaint because it asserts no economic or reputational harm to Tullett Prebon that is distinct and not

wholly derivative of injuries purportedly suffered by its subsidiaries in the Raid. However, Tullett Prebon is the real party in interest here since it has suffered a direct and distinct injury caused by BGC in the Raid.  Indeed, it is the <u>only</u> party that has standing to recover for certain of the injuries it sustained, namely the approximately $400 million drop in its stock price caused by the Raid.  (*See* Section I.B.)

BGC's assertions regarding the purported deficiencies with respect to Tullett Prebon's New Jersey RICO cause of action fare no better.  For example, the contention that the New Jersey RICO statute does not apply here either because BGC's conduct impacts interstate commerce or because New York is the more appropriate choice of law is utterly baseless given that New Jersey has the most significant relationship to this dispute.  (*See* Sections I.C.1-I.C.2.)  Under BGC's theory, a ring of armed robbers who target The City National Bank of New Jersey could not be prosecuted in New Jersey because they robbed more branches in New York than in New Jersey.  Likewise, BGC attempts to demonstrate that certain subsidiaries of Tullett Prebon also injured in the Raid should be joined as parties in this action, thereby destroying diversity jurisdiction.  Indeed, many of the reasons set forth by BGC for its contention that those entities are "necessary" and "indispensable" to the adjudication of this action are grounded in the same

meritless assertion that Tullett Prebon is not the real party in interest here.  (*See* Sections II.A.-II.B.)

BGC seeks, in the alternative, for a stay of this action pending the resolution of an arbitration involving two subsidiaries of Tullett Prebon and a subsidiary of BGC that were involved in the Raid.  However, BGC has proffered absolutely no legally valid bases for staying this action pending the outcome of a proceeding that does not, nor could not, involve either Tullett Prebon or BGC.  The purported parade of horribles that BGC asserts will occur if this action is not stayed is either nonexistent or can be adequately dealt with either by the parties to this action or the Court.  (*See* Section III.)

## THE ALLEGATIONS

### The Raid

This action arises from the raid of brokers employed by Tullett Prebon's New Jersey-based subsidiaries conducted by BGC and others.  (FAC ¶¶ 3, 34, 38, 111.)[1]  The Raid represents BGC's latest efforts to cripple Tullett Prebon's inter-dealer broker business and destroy Tullett Prebon's market capitalization.  (*Id.* ¶¶ 1, 9-10, 23, 39, 112-13.)  The Raid was planned and executed by senior executives at BGC including (i) Tony Verrier, BGC's current Executive Managing Director and the former Global Chief Operating Officer of Tullett Prebon; (ii)

---

[1] "FAC" refers to the First Amended Complaint.

Shaun Lynn, the President of BGC; (iii) Lee Amaitis, BGC's Vice Chairman and the number two executive at BGC; and (iv) Sean Windeatt, BGC's Chief Operating Officer.  (*Id.* ¶¶ 3, 43, 45-47, 53, 55-61, 63, 67-71, 80, 82, 85, 94.)  Employees from certain BGC subsidiaries also participated in the planning and execution of the Raid.  (*Id.* ¶¶ 45, 53-54, 63, 80, 83.)  The Raid was patterned on similar raids BGC had launched earlier against other subsidiaries of Tullett Prebon located around the world.  (*Id.* ¶¶ 2, 3, 5, 24-33.)  One Justice of the English High Court has described BGC's conduct as constituting "a cynical disregard for the law and employees' duties."  (*Id.* ¶¶ 2, 30.)

## BGC's Misrepresentations

In an effort to lure brokers to BGC, BGC repeatedly misrepresented to them (i) the number of employees who would be joining BGC, (ii) BGC's technological capabilities, and (iii) that Tullett Prebon planned to fire those brokers or reduce their bonuses.  (*Id.* ¶¶ 6, 63-72, 73-79, 82-83, 122.)  For instance, BGC repeatedly knowingly misrepresented to Michael Farrell, the top-producing broker on Tullett's Treasuries desk, that BGC would be hiring the entire Treasuries desk. (*Id.* ¶ 63.)  This misrepresentation was made to Farrell at several face-to-face meetings he had with BGC executives and others, as well as on at least one phone call made to him in New Jersey.  (*Id.*)  Those misrepresentations were made to pressure Farrell into joining BGC by making him believe that there would be a

stampede for the exits, after which he would be the only broker left on the Treasuries desk -- with no customers left to match orders with his clients. (*Id.* ¶ 64.) In addition, BGC also knowingly misrepresented to him the capabilities of its broking technology. For example, working on behalf of BGC and under BGC's instructions, two former Tullett desk heads, who had been bribed into acting for BGC as "recruiting sergeants," lied to Farrell, telling him that BGC's technology was the "best in the world" and told him that the entire Treasuries desk could simply "unplug" at Tullett and "plug in" at BGC. (*Id.* ¶ 74.) Those statements were utterly false, and were intended to and did lead Farrell to believe that BGC had broking technology that was equal to or better than Tullett's. (*Id.* ¶¶ 73-74, 78.)

As set forth in detail in the First Amended Complaint, Farrell signed a contract with BGC in reliance on the above-referenced misrepresentations. (*Id.* ¶¶ 64, 78.) When he arrived at BGC's offices, he learned that, directly contrary to the representations made to him earlier by BGC executives, less than half of the Treasuries desk had actually been recruited to join BGC. (*Id.* ¶ 65.) In addition, he learned that BGC never developed computer systems comparable to those at Tullett, and, in fact, its systems were horrendous. The "recruiting sergeants" admitted to Farrell that BGC had lied about its computer systems. (*Id.* ¶ 76.) Similar misrepresentations were made to other Tullett brokers, who also relied on

those misrepresentations in deciding to sign contracts with BGC.  (*Id.* ¶¶ 66-72, 79, 82-83.)

In addition to the misrepresentations made by BGC to the Tullett brokers, certain of the Tullett employees who defected to BGC also wrongfully and secretly contacted Tullett customers before leaving and falsely informed them that Tullett was losing a critical mass of personnel necessary to service their business. (*Id.* ¶¶ 8, 37, 136.)  Those misrepresentations were made in a concerted effort to ensure that customers would continue to direct business through them and away from Tullett after their departure to BGC.  (*Id.* ¶ 8.)  BGC also secured certain law firms to represent the employees who left to work for BGC.  (*Id.* ¶¶ 7, 87-97.) Those firms were paid by BGC and/or its affiliates and took direction from BGC. (*Id.*)  Through those lawyers, BGC, among other things, wrote letters falsely denying the very existence of the Raid that they were helping to carry out.  (*Id.* ¶¶ 7, 108-11.)  Copies of certain of those letters, most mailed to Tullett's New Jersey headquarters, are attached to the First Amended Complaint.  (*See, e.g., id.* Ex. 7-9.)

**BGC's Misappropriation**
**Of Confidential Information**

BGC also misappropriated certain confidential information from Tullett Prebon and others in the Raid.  Specifically, BGC misappropriated confidential and proprietary information concerning growth strategy, business

development, business methods, plans, policies, financial reports, current or
planned transactions, details of brokerage arrangements, names of clients (or their
employees), suppliers and terms of business, employees' salary and bonus
compensation, individual employees' productivity and customer relationships,
terms of employment contracts, and other employee information, including names,
addresses, mobile phone numbers, and abilities, as well as highly detailed and
confidential profit and loss information broken down by product, customer, and
broker.  (*Id.* ¶¶ 5, 40-45, 122, 133-36, 143.)  This information belongs to Tullett
Prebon.  (*Id.* ¶¶ 40, 44-45, 133-35, 142.)  BGC used this confidential information
to be certain that the departing brokers would steal Tullett Prebon's customers, and
to structure the incentives that would lure away the targeted Tullett brokers.  (*Id.*
¶¶ 54-62.)

## Damage To Tullett Prebon

BGC's improper actions have caused material damage to Tullett
Prebon.  BGC's conduct already has caused the mass defection of 77 employees in
New Jersey and New York, and an additional 83 employees at Tullett Prebon's
worldwide affiliates.  (*Id.* ¶¶ 3, 38, 113.)  Tullett Prebon has lost no less than $387
million of its market capitalization, and the Raid continues to threaten Tullett
Prebon with enormous economic and reputational harm.  (*Id.* ¶¶ 3, 86, 112-13.)
Stock analysts have downgraded their ratings of Tullett Prebon, noting the

detrimental impact that the Raid has had on Tullett Prebon's business, and, in the process, damaging its reputation and goodwill.  (*Id.* ¶¶ 112-13.)

## The First Amended Complaint

The First Amended Complaint asserts causes of action under New Jersey's RICO statute, as well as common law claims for unfair competition, misappropriation of trade secrets and confidential information, tortious interference with business relationships and raiding.  (*Id.* ¶¶ 114-54.)  Those causes of action are asserted only against BGC and seek compensatory and injunctive relief only against BGC for the damage it caused to Tullett Prebon in the Raid and to prevent continued unlawful activity by BGC.  (*Id.*)

## The FINRA Arbitration

Two of Tullett Prebon's U.S. subsidiaries, Tullett Prebon Financial Services LLC (f/k/a/ Tullett Liberty Securities LLC) and Tullett Prebon Americas Corp. (together, the "Tullett Subsidiaries") also have suffered damages as a result of the Raid.  (*Id.* ¶¶ 4, 38; Harker Decl. Ex. 5.)  Accordingly, those entities have commenced a FINRA arbitration against one of BGC's subsidiaries that participated in the Raid, BGC Financial, L.P. and certain individuals, to recover damages for injuries they suffered as a result of that subsidiary's actions (the "FINRA Arbitration").  (*Id.* ¶ 4; Harker Decl. Ex. 5.)  The Tullett Subsidiaries and BGC Financial, L.P. are registered with FINRA.  (*Id.*)  However, the FINRA

9

Arbitration cannot reach the conduct of BGC, which is not registered with FINRA, nor can the Tullett Subsidiaries recover for injuries suffered by Tullett Prebon in the Raid.  (FAC ¶ 4.)

**New Jersey Contacts**

New Jersey has the most significant relationship to the allegations in the First Amended Complaint.  Although Tullett Prebon is a United Kingdom public company headquartered in London, all of its North American operations are headquartered and based in New Jersey.  (*Id.* ¶¶ 11, 38.)  The Raid was aimed squarely at those operations.  (*Id.* ¶¶ 34, 38.)  The targeted Tullett Subsidiaries both have their senior management, legal department, compliance department, human resources department, information technology department, as well as the majority of their inter-dealer brokerage desks located there.  (*Id.* ¶ 38.)   In addition, the respective finance departments of the Tullett Subsidiaries are in New Jersey. Combined, those entities have approximately 250 brokers working in New Jersey with another approximately 150 working out of offices in New York City.  (*Id.* ¶ 34.)  In total, the Tullett Subsidiaries lost 77 brokers from 10 different desks as a result of the Raid.  (*Id.* ¶¶ 3, 38.)  Those brokers, more than half of whom were under contract, represent more than $100 million in average annual lost revenue and their loss will affect Tullett Prebon's New Jersey-based subsidiaries' ability to

generate revenues in New Jersey and to employ support personnel and vendors who are located, or operate, in New Jersey.  (*Id.* ¶ 38.)

BGC conducted the Raid through numerous telephone calls, e-mails, and text messages aimed at the targeted employees.  (*See, e.g., id.* ¶¶ 7, 43, 47, 53, 55-63, 67, 70-71, 80-81, 122.)  Many of those communications were sent by BGC executives or lawyers to Tullett employees or their attorneys in New Jersey, including brokers who may have worked in New York City.  (*See, e.g., id.* ¶¶ 46-47, 55-60, 63, 67, 70-71, 80, 122.)

<u>**ARGUMENT**</u>

**II.    BGC'S MOTION TO DISMISS FOR
<u>FAILURE TO STATE A CLAIM SHOULD BE DENIED</u>**

**A.    <u>The Applicable Standard</u>**

A complaint will survive a motion to dismiss pursuant to Rule 12(b)(6), if the facts demonstrate that the pleader has a "plausible claim to relief." *Mawwhinney v. Bennett*, No. 08-cv-3317(NLH )(JS), 2010 WL 147945, at *5 (D.N.J. Jan. 11, 2010).  The moving party bears the burden of showing that no claim has been presented.  *Id.*  As demonstrated below, BGC has not satisfied its burden.

**B.    Tullett Prebon Has Standing To Assert The
Claims In The First Amended Complaint Because It Is
<u>Suing To Recover For Injuries Directly Inflicted On It By BGC</u>**

BGC asserts that Tullett Prebon lacks standing to assert any of the causes of action in the First Amended Complaint because Tullett Prebon is not the "real party in interest" to assert those causes of action.  (Br. at 5-8, 12-16.)[2]  This is so, according to BGC, because the First Amended Complaint asserts no economic or reputational harm to Tullett Prebon that is distinct and not wholly derivative of injuries purportedly suffered by the Tullett Subsidiaries in the Raid.  (*Id.* at 6-8, 12-16, 24-25, 27-28.)  This contention is legally and factually meritless.

The real party in interest in an action is the party who "under the governing substantive law . . . [is] entitled to enforce the claim at issue."  *HB Gen. Corp. v. Manchester Partners, L.P.,* 95 F.3d 1185, 1196 (3d Cir. 1996).  The First Amended Complaint contains numerous express allegations that Tullett Prebon has suffered harm to <u>its</u> <u>own</u> business, goodwill and reputation as a result of BGC's actions in the Raid.  (*See* FAC ¶¶ 3, 86, 112-13, 140, 144, 149, 154.)  Those allegations are more than sufficient to plead an injury to Tullett Prebon that is distinct from an injury to any of its subsidiaries, and, accordingly, Tullett Prebon is the real party in interest in this action.  *See Weisel Partners LLC v. BNP Paribas,*

---

[2] "Br." Refers to the Memorandum Of Law In Support Of BGC Partners, Inc.'s Motion To Dismiss And Motion To Stay.

*BNP*, No. C 07-6198 MHP, 2008 WL 3977887, at *3 (N.D. Cal. Aug. 26, 2008)

("The shareholder standing rule, however, is not applicable in this case because

[parent] is not bringing suit solely on behalf of [subsidiary].  It has alleged direct

harm to itself as a result of defendants' conduct."); *Classic Comm'ns, Inc. v. Rural*

*Tele. Serv. Co.*, 956 F. Supp. 910, 916 (D. Kan. 1997) (refusing to dismiss parent

company's claim where injury may be distinct from what was suffered by

subsidiaries); *Hillhaven Corp. v. Wis. Dep't of Health and Soc. Servs.*, 634 F. Supp.

1313, 1326 (E.D. Wis. 1986) ("The defendants cite no authority for the proposition

that the plaintiff lacks standing to bring this action simply because it operates the

individual nursing homes through subsidiary corporations which are themselves

separate legal entities.  The critical fact is that the defendants' illegal actions have

caused a substantial monetary harm to the plaintiff corporation itself.").

   The authorities relied upon by BGC are inapposite for they all involve

situations in which the parent corporation is seeking to step in the shoes of the

subsidiary and assert a cause of action, such as breach of contract, to adjudicate a

right belonging solely to the subsidiary.  *See Pichler v. UNITE*, 542 F.3d 380, 390-

92 (3d Cir. 2008) (holding that spouses could not sue for the misuse of their

husbands' personal information under the Driver's Privacy Protection Act of 1994),

*cert. denied*, 129 S. Ct. 1662 (2009); *Site Micrological Sys., Inc. v. Cooper Cos.,*

*Inc.*, 797 F. Supp. 333, 338 (D. Del. 1992) ("The Court is not convinced, and the

plaintiff offers no authority, that a parent corporation effectively has the patent rights of owners, assignees, and licensees by virtue of its ownership of a subsidiary holding a patent."); *Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994) ("[Parent] is a legal stranger to the contract and business relations that were allegedly interfered with.  [Parent's] sister corporation, [subsidiary], is the actual party to the contract and the entity engaged in trade with the third party suppliers."); *Aetna U.S. Healthcare, Inc. v. Columbia Cas. Co.*, No. Civ. A. 99-596, 1999 WL 554606, at *3 (E.D. Pa. July 20, 1999) ("[Parent] cannot rest its standing upon [subsidiaries'] injuries as judgment debtors in *Goodrich* because [parent], a separate corporation, has not suffered its own injury or loss in that case.").

        In such circumstances, the subsidiary is properly considered the real party in interest since it is the party that possesses the legal interest that the plaintiff is seeking to vindicate.  Here, Tullett Prebon is not attempting to assert contractual rights or any other right belonging to the Tullett Subsidiaries, but rather, it is seeking to recover for damage done to it by BGC.  BGC has cited no authority whatsoever for the proposition that Tullett Prebon is somehow barred from seeking recovery for damage done to it in the Raid because its subsidiaries also were damaged in the Raid.

The damages that Tullett Prebon may seek to recover include the drop in the price of Tullett Prebon's stock as a result of the detrimental impact of the Raid on its business.  BGC pins much of its motion on the argument that Tullett Prebon can not recover for such damages because a corporation may not recover for a decrease in the price of its own stock.  That simply is not the law.  Courts have consistently held that an issuing corporation may properly seek damages for a drop in its stock price; indeed the issuing corporation is the <u>only</u> party that may seek to recover such damages.  *See Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970); *In re Phar-Mor, Inc. Sec. Litig.*, 900 F. Supp. 777, 782-83 (W.D. Pa. 1994); *Lewis v. Spencer*, No. 494,1989, 1990 WL 72615, at *2-3 (Del. May 11, 1990).

BGC's reliance on a footnote in *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 281 n.6 (2d Cir. 1975) and *Ergobilt, Inc. v. Neutral Posture Ergonomics, Inc.*, No. CA 3-97-CV-2548-R, 1998 WL 483624, at *1-2 (N.D. Tex. Aug. 10, 1998), is misplaced.  *Frigitemp* concerned the issue of whether a party could recover damages for loss of image or prestige under the federal securities laws in the absence of monetary loss; while the question before the court in *Ergobilt* was whether a stockholder could sue under the Lanham Act for misleading statements about the corporation in which it owned stock.  The statements in those cases cited by BGC are purely dicta, and provide absolutely no

15

authority for the notion that Tullett Prebon is somehow stripped of standing to recover any damages from BGC from the drop in its stock price caused by the Raid.

BGC's assertion that the allegations in the First Amended Complaint concerning damage to Tullett Prebon are legally deficient for the additional reason that they are "vague and completely unsubstantiated" (Br. at 16 n.12) is absurd. Allegations to the effect that a party has suffered "damages to their business and loss of good will" are legally sufficient to defeat a motion to dismiss; no further particularity is required at this stage.  *See P.C. of Yonkers, Inc. v. Celebrations! The Party And Seasonal Superstore, L.L.C.*, Civ. Action No. 04-4554 (JAG), 2007 WL 708978, at *11 (D.N.J. Mar. 5, 2007) (allegations that plaintiffs suffered "damages to their business and loss of good will" sufficient at the pleading stage); *see also Thomas v. Ford Motor Co.*, 70 F. Supp. 2d 521, 527 (D.N.J. 1999) (holding that pleading need not "set forth in detail the facts upon which the claim is based," including plaintiff's claim for damages) (quoting *Breslin v. Vornado, Inc.*, 559 F. Supp. 187, 191 (E.D. Pa. 1983)).  Here, Tullett Prebon has set out the specific amount of its loss of market capitalization (thus far $387 million) and has cited to analyst reports downgrading the stock and Tullett Prebon's goodwill in the process.  (FAC ¶¶ 3, 112-13.)  Tullett Prebon properly has alleged standing to assert all of the causes of action alleged in the First Amended Complaint.

### C.    The First Amended Complaint States A
####      Claim Under The New Jersey RICO Statute

#### 1.    The New Jersey RICO Statute Applies To BGC's Conduct

BGC moves to dismiss Tullett Prebon's cause of action for violations of the New Jersey RICO statute on a number of independent grounds, none of which have any validity.  First, BGC asserts that the New Jersey RICO cause of action is fatally flawed because it is premised on conduct that affects "only interstate and foreign -- not New Jersey -- commerce."  (Br. at 29-30.)

The First Amended Complaint alleges that the Raid did substantial damage to the Tullett Subsidiaries, which are headquartered in New Jersey and have a majority of their brokerage desks and brokers located there.  (FAC ¶¶ 34, 38.)  The Raid had a significant impact on their ability to generate revenue and employment in New Jersey.  (*Id.* ¶ 38.)  In addition, many of the communications made in furtherance of BGC's fraudulent scheme were made in New Jersey or to Tullett brokers residing in New Jersey.  (*Id.* ¶¶ 35, 46-47, 55-61, 67-71, 80.)  Such allegations are more than sufficient to adequately plead that the RICO enterprise's activities were engaged in or affected New Jersey commerce.  *See, e.g., Ford Motor Co. v. Edgewood Props., Inc.*, Nos. 06-1278, 06-4266 (HAA), 2009 WL 150951, at *11 (D.N.J. Jan. 20. 2009) (enterprise affected New Jersey commerce where it distributed contaminated concrete in New Jersey); *State v. Motley*, No. 02-05-0069-S, 2006 WL 848296, at *10 (N.J. Super. Ct. App. Div. Apr. 3, 2006)

17

(enterprise affected commerce by illegally laundering money through bank accounts in New Jersey); *State v. Cagno*, 409 N.J. Super. 552, 601 (N.J. Super. Ct. App. Div. 2009) (enterprise affected New Jersey commerce where crimes occurred in New Jersey).

The cases relied upon by BGC are inapposite. *State v. Casilla*, 362 N.J. Super. 554, 564-66 (N.J. Super. Ct. App. Div. 2003), did not apply the New Jersey RICO statute because the victims of defendants' extortion and threats were located in New York. Similarly, in *Trans USA Products, Inc. v. Howard Berger Co.*, No. 07-5924 (JAP), 2008 WL 3154753, at *5 (D.N.J. Aug. 4, 2008), the plaintiff alleged that the enterprise's racketeering activity impacted only markets <u>outside</u> of New Jersey. Here, the Tullett Subsidiaries were victimized in New Jersey by misconduct that took place in New Jersey, the result of which was a significant impact on their ability to engage in commerce in this State.[3]

BGC's assertions that the New Jersey RICO statute does not apply because the economic impact of the Raid was felt primarily in New York rather than New Jersey given that is where many of the Tullett Subsidiaries' affected desks were located (Br. at 31) is equally meritless. The statute says nothing about where commerce was "primarily affected," and, instead focuses on whether the

---

[3] *State v. Passante* is not on point as it merely held that the New Jersey RICO Statute does not violate the commerce clause of the U.S. Constitution. 225 N.J. Super. 439, 446 (N.J. Super. Ct. Law Div. 1987).

enterprise "engaged in or activities of which affect trade or commerce." N.J. Stat.

Ann. §§ 2C:41-2(a-c). In any event, the Raid primarily affected New Jersey

commerce because it impacted companies located there. The fact that the Tullett

Subsidiaries facilitate global transactions is similarly irrelevant. (*See* Br. at 31-32.)

Under BGC's theory no multinational company with a presence in New Jersey

would be protected by the New Jersey RICO Statute. This plainly is not the case.

Accordingly, the New Jersey RICO statute applies to BGC's conduct.

## 2.   New Jersey Law Applies To This Action

BGC also asserts that New Jersey RICO does not apply to this action

since New York has the most significant relationship to the allegations in the First

Amended Complaint. (Br. at 32-36.) However, BGC's arguments are based on the

incorrect application of only one of the relevant factors used for determining which

law to apply under New Jersey's choice of law rules.[4]   When all of the factors are

---

[4] New Jersey's choice of law rules require the court to weigh the factors enumerated in the Restatement (Second) Conflict of Laws section corresponding to the plaintiff's cause of action.  *RBC Bank (USA) v. Riley, Riper, Hollin & Colagreco*, No.09-cv-00431(FLW), 2009 WL 2580354, at *5 (D.N.J. Aug. 19, 2009).  Restatement Section 148(2) provides the following factors:  the place or places where "(a) . . . the plaintiff acted in reliance upon the defendant's representations, (b) . . . the plaintiff received the representations, (c) . . . the defendant made the representations, (d) . . . place of incorporation and place of business of the parties, (e) . . . a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) . . . plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant."  Restatement (Second) of Conflict of Laws § 148(2) (1971).

properly taken into account, the facts alleged in the First Amended Complaint

clearly call for the application of New Jersey law.

The first two factors weigh in favor of the application of New Jersey

law because Tullett Prebon and the brokers recruited in the Raid received and

relied on BGC's misrepresentations in New Jersey.  (FAC ¶¶ 55-62, 67-71, 80,

122.)  The fourth factor also weighs in favor of the application of New Jersey law

as Tullett Prebon's principal place of business in the United States is New Jersey

(*id.* ¶ 11) and the "domicil, residence and place of business of the plaintiff are more

important than are similar contacts on the part of the defendant."  Restatement

(Second) Conflict of Laws § 145 cmt. i. (1971).[5]  The fifth and sixth factors are, as

BGC admits, irrelevant.

BGC relies most heavily on the third factor, the place where the

misrepresentations were made, asserting that the First Amended Complaint fails to

allege that any telephone calls or other communications were initiated in New

Jersey.  (Br. at 34-36.)  BGC asserts, relying on *Clark v. Prudential Insurance Co.

of America*, No. 08-6197 (DRD), 2009 WL 2959801 (D.N.J. Sept. 15, 2009) and *In

re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46 (D.N.J. 2009), that

the Court should only consider the state where the misrepresentations originated

_____

[5] The Restatement counsels that for most issues, "a corporation's principal place of
business is a more important contact than the place of incorporation."  Restatement
(Second) Conflict of Laws § 145 cmt. e.

from.  (Br. at 34-36 & n.30.)  However, unlike BGC's cursory choice of law

argument, both *Clark* and *Mercedes* demonstrate that a thorough choice of law

analysis requires the application of Restatement Sections 145 and 6 in addition to

Section 148.  Section 145 of the Restatement provides the general choice of law

principles for tort cases, and its very first factor is "the place where the injury

occurred."  Restatement (Second) Conflict of Laws § 145(2)(a) (1971).[6]  This is

consistent with other Restatement sections involving torts, which generally provide

that the goals of tort law are best achieved through the application of the law of the

place where the defendant's actions had their injurious effect.[7]  Both of BGC's

cases involved two or more plaintiffs who were located in different states.  *Clark*,

---

[6] Restatement (Second) Conflict of Laws § 145(2) states: Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, the residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.  Restatement (Second) Conflict of Laws § 145(2) (1971).  Here, we discuss section (a), as section (b) is analogous to Section 148(2)(c), section (c) is the same as Section 148(2)(d) and section (d) is irrelevant.  *See* Restatement (Second) Conflict of Laws § 148(2) (1971).

[7] *See* Restatement (Second) Conflict of Laws § 146 (1971) (local law of state where injury occurred generally governs, subject to § 6, in personal injury action), § 147 (1971) (local law of state where injury occurred generally governs, subject to § 6, in injuries to tangible things), § 149 (1971) (local law of state where publication occurred governs in defamation cases, subject to § 6), § 151 (1971) (choice of law rules in injurious falsehood actions the same as in defamation).  The choice of law rules for defamation and injurious falsehood should weigh strongly in this case because of the very similar subject matter.

2009 WL 2959801, at *8; *Mercedes*, 257 F.R.D. at 66-69.  Under those

circumstances, the injurious effect was not confined to a single state, and so the

Court gave greater weight to where the fraud emanated from.  But where, as here,

the injury "occurred in a single, clearly ascertainable state," that state's law should

apply.[8]  Restatement (Second) Conflict of Laws § 145 cmt. e (1971) ("[P]ersons

who cause injury in a state should not ordinarily escape liabilities imposed by the

local law of that state on account of the injury.").[9]

Section 6 of the Restatement, which the New Jersey Supreme Court

has called the "cornerstone of the entire Restatement," requires the Court to

consider the relevant contacts in light of, among other things, the policies advanced

by the laws at issue.  *P.V. ex rel. T.V. v. Camp of Jaycee*, 197 N.J. 132, 140-43

---

[8] BGC also asserts that the statement of claim originally filed in the FINRA
Arbitration supports their choice of law position, because it called for the
application of New York law.  (Br. at 32 n.24.)  However, that document was filed
on August 24, 2009, a week after the Raid started.  That was before Tullett Prebon
knew the full extent of the Raid and before BGC had extended the Raid to include
trading desks in New Jersey.  Approximately 25 additional brokers left after that
document was filed, including many from the affected New Jersey desks.  (*See*
FAC ¶¶ 91-96.)  Apparently, BGC feels it should be rewarded for the secrecy with
which it went about its scheme to destroy Tullett Prebon's business.

[9] BGC also relies on *Johnston v. Nextel Communications, Inc.*, No. 07 cv 8473
(GBD), 2009 WL 928131, at *3 n.3 (S.D.N.Y. Mar. 31, 2009).  But that case
applied New York's choice of law rules to a contract dispute where the only
contact with New Jersey was that the documents at issue were executed in New
Jersey.  Here, the First Amended Complaint alleges that BGC aimed its tortious
conduct at Tullett Prebon's New Jersey-based subsidiaries and made many of the
fraudulent statements to Tullett brokers in New Jersey.

(N.J. 2008) (quoting Eugene F. Scoles et al., *Conflict of Laws* § 2.14 (4th ed. 2004)); Restatement (Second) Conflict of Laws § 6 (1971).  The Section 6 analysis clearly favors the application of New Jersey law here because of the state's strong interest in enforcing civil sanctions such as those found in the New Jersey RICO statute.  N.J. Stat. Ann. § 2C:41-1.1(c); *see also Gianfredi v. Hilton Int'l of Puerto Rico, Inc.*, No. 08-0769 (HAA), 2008 WL 4425228, at *5 (D.N.J. Sept. 24, 2008) (applying New Jersey law because of "New Jersey's paramount interest in the compensation and protection of its residents"); *Sensient Colors Inc. v. Allstate Ins. Co.*, 193 N.J. 373, 394-95 (N.J. 2008) (applying New Jersey contract law where case implicated the safety and welfare of the people of New Jersey); *Newcomb v. Daniels, Saltz, Mongelluzi & Barrett*, 847 F. Supp. 1244, 1250-51 (D.N.J. 1994) (applying New Jersey court rule which was based on "the strong New Jersey public policy protecting clients in attorney contingent fee contracts").

BGC also asserts that many of the First Amended Complaint's facts are irrelevant to the choice of law analysis because they either concern brokers still employed by Tullett or do not involve misconduct.  (Br. at 36 n.31.)  But misrepresentations do not have to succeed in defrauding a person to establish a pattern of mail or wire fraud; the intent to defraud is sufficient.  *See U.S. v. Frey*, 42 F.3d 795, 800 (3d Cir. 1994); *U.S. v. Parkin*, 319 F. App'x 101, 109 (3d Cir. 2009).

23

### 3. The First Amended Complaint Adequately Pleads A RICO Injury

BGC asserts that the decline in the value of Tullett Prebon's market capitalization does not constitute a legally cognizable injury to Tullett Prebon under the New Jersey RICO statute because it did not amount to actual harm to Tullett Prebon.  (Br. at 37-39.)  According to BGC, any harm to Tullett Prebon resulting from a decrease in its market capitalization is "indirect" since it is realized in the first instance by the Tullett Subsidiaries.  (*Id.*)  This assertion constitutes nothing more than a rehash of the standing argument which, as we demonstrated above, has absolutely no validity.[10]

BGC also asserts that Tullett Prebon's loss of goodwill and reputation do not constitute a cognizable RICO injury.  (Br. at 39.)  That simply is wrong. Loss of reputation and goodwill is cognizable where, as here, such loss is linked to a concrete loss to the plaintiff's business or property.  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 262 (2d Cir. 1995) (upheld award of damages for

---

[10] The authorities cited by BGC are inapposite as they all involve an analysis of whether a plaintiff has alleged adequately that predicate acts proximately caused an injury.  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258 (1992); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000); *Penn Mont Sec. v. Frucher*, 502 F. Supp. 2d 443 (E.D. Pa. 2007); *Hemi Group, LLC v. City of NewYork*, 130 S. Ct. 983 (2010).  As we demonstrate in Section I.C.4, *infra*, the First Amended Complaint adequately pleads proximate cause.  In any event, those authorities do not stand for the proposition that a drop in the price of a corporation's stock does not constitute a cognizable RICO injury.

"injury to reputation and/or loss of goodwill" where defendant was found to have engaged in fraudulent misrepresentations designed to malign plaintiff's reputation in the marketplace); *Aamco Transmissions, Inc. v. Marino*, CIV. A. Nos. 88-5522, 88-6197, 1990 WL 106760, at *4 (E.D. Pa. July 18, 1990) (allegations of "injury to the value of their franchises and the good will of their businesses by reason of the fraudulent sales practices" stated federal RICO injury); *Blue Line Coal Co. v. Equibank*, CIV. A. No. 87-6150, 1989 WL 63203, at *7 (E.D. Pa. June 12, 1989) (allegations of "injury to their business, property, and reputation" stated federal RICO claim); *Wang Labs., Inc. v. Burts*, 612 F. Supp. 441, 444 (D.C. Md. 1984) (plaintiffs' "allegations of injury to its business reputation and customer goodwill . . . satisfied the injury requirement" for a federal RICO claim arising from defendants' fraudulent scheme to defraud plaintiff of money).[11]  Here, Tullett Prebon's allegations of loss of goodwill and reputation are backed up by analyst

---

[11] BGC's cases are inapposite as they involved cursory allegations of injury that failed to identify how plaintiffs suffered any concrete loss.  In *District 1199P Health and Welfare Plan v. Janssen, L.P.*, No. 06-3044 (FLW), 2008 U.S. Dist. LEXIS 103526, at *8 (D.N.J. Dec. 23, 2008), the Court held that purchasers of drugs for an off-label use had not alleged a RICO injury because they had not alleged that the drugs were ineffective for their prescribed use.  In *Parker v. Learn the Skills Corp.*, 530 F. Supp. 2d 661, 678-79 (D. Del. 2008), the court faulted plaintiffs for failing to identify any lost revenue or market share or percentage. Here, in contrast, Tullett Prebon has alleged, among other things, a concrete loss of over $387 million of its market capitalization.

reports, downgrading its stock, and of course by the undisputable loss in market value directly caused by the Raid.

### 4.   The First Amended Complaint Adequately Pleads RICO Causation

BGC asserts that Tullett Prebon's cause of action for subsection (c) of the New Jersey RICO statute is deficient because the First Amended Complaint does not adequately allege a direct casual link between the alleged predicate acts and the injury suffered by Tullett Prebon.  (Br. at 39-43.)  In particular, BGC asserts that there is no causal link between the predicate acts and the injury where, as here, the decline in the price of stock is the result of the public disclosure of the alleged scheme, rather than the result of the scheme itself.  (*Id.* at 40-41.) However, the authorities relied upon by BGC all involve situations in which the alleged injury was not the intended result of the RICO scheme, and, therefore, that injury could be said to have been only "indirectly" caused by the predicate acts. *See McBrearty v. Vanguard Group, Inc.*, No. 08 Civ. 7650 (DLC), 2009 WL 875220, at *3 (S.D.N.Y. Apr. 2, 2009), *aff'd*, No. 09-1445-cv, 2009 WL 4019799 (2d Cir. Nov. 23, 2009) (investors in an illegal gambling enterprise had no standing to sue for loss of their investment; "Plaintiffs, as those providing economic backing for the gambling investments, were not the intended victims or targets of this enterprise"); *Ritchie Capital Mgmt., L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494(DLC), 2008 WL 542596, at *5-6 (S.D.N.Y. Feb. 29, 2008) (plaintiffs, as

purchasers of insurance policies in the secondary market, were only indirect

victims of a fraudulent scheme that was aimed at the policyholders themselves;

"[a]ny misrepresentations to plaintiffs were not 'a substantial factor in the sequence

of responsible causation' of plaintiffs' alleged injury") (quoting *Lerner v. Fleet*

*Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)); *Interchange State Bank v. Veglia*,

286 N.J. Super. 164, 182 (N.J. Super. Ct. App. Div. 1995) ("Depending on the

specific transaction, it was the customers and lenders that were the targets and

intended victims of the alleged fraud.  [The bank's] damages were several steps

removed from the predicate acts of fraud and forgery that [the bank] alleges.").[12]

There is nothing "remote" or "indirect" about the injury suffered by

Tullett Prebon.  To the contrary, Tullett Prebon was the intended target of the

RICO scheme alleged in the complaint, and the destruction of its business was the

primary goal of BGC's fraudulent conduct.  (*See* FAC ¶¶ 1, 9, 23, 39, 84-85, 112-

13.)  In such circumstances, the fact that the Tullett Subsidiaries also were injured

in the Raid does not render Tullett Prebon's injuries any less "direct."  *See Ivy v.*

*Ferranti Int'l, Inc.*, Civ. A. No. 90-2535, 1990 WL 204384, at *1 (E.D. Pa. Dec.

10, 1990) (plaintiff pled federal RICO injury even though subsidiary also injured;

---

[12] *Blizzard v. Exel Logistics North America, Inc.*, No. 02-4722 (FLW), 2005 U.S.
Dist. LEXIS 28160 (D.N.J. Nov. 15, 2005) is inapplicable; the Court dismissed the
RICO claims for failure to allege any predicate acts, not lack of causation.  *Id.* at
*34.

"RICO plaintiff need not be the original victim of the predicate acts, so long as the acts injure that complainant").  Nor does the fact that the Raid was publicly disclosed -- there is a direct causal link between such disclosure and the predicate acts sufficient to satisfy the proximate cause requirement.  *Compare In re Schering-Plough Corp. Intron/Temodor Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *18 (D.N.J. July 10, 2009) (distinguishing that case, where misrepresentations led physicians to prescribe medications that plaintiffs then bought, from one where misrepresentations directly affected a party to the case).

BGC asserts that the causal link is broken here also by the purported "independent reasons" that BGC speculates each recruited broker (some who later became recruiting sergeants for BGC in the Raid) had in joining BGC.[13]  First of all, that argument requires the Court to accept contested factual assertions that would be inappropriate on a Rule 56 motion, let alone on a pre-answer Rule 12

---

[13] BGC's assertion that as an initial matter, the First Amended Complaint does not allege that Tullett employees relied on its misstatements (Br. at 41) is belied by the many detailed allegations to the contrary.  (FAC ¶¶ 63-72, 73-79, 84-86.)  Contrary to BGC's assertion, such allegations are pled with the requisite particularity required by Rule 9(b) since they detail how each person relied on the misstatements.  *See, e.g., Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008); *Republic Envtl. Sys. (PA), Inc. v. Reichhold Chems., Inc.*, 154 F.R.D. 130, 132 (E.D. Pa. 1994).

motion.  In any event, RICO proximate cause is established where, as here, there is a direct link between the predicate acts and plaintiff's injury, regardless of whether the causal chain includes actions taken by third parties.  *See Ritter v. Klisivitch*, No. 06-CV-5511 (DRH)(WDW), 2008 WL 2967627, at *5-6. (E.D.N.Y. July 30, 2008) (finding proximate cause where defendants' conduct caused third parties to engage in conduct that caused plaintiff's injury); *Marianas Hospitality Corp. v. Premier Bus. Solutions, Inc.*, Civ-No. 07-00002, 2009 WL 750247, at *8 (D. Guam Jan. 14, 2009) (finding proximate cause where defendants' misrepresentations to the IRS caused the IRS to seek taxes from plaintiff); *see also Bridge v. Phoenix Bond & Indem. Co.,* 128 S. Ct. 2131, 2139-45 (2008) (refusing to dismiss RICO claim where misrepresentations made to and relied upon by county treasurer's office caused injury to market competitors, and suggesting that a RICO plaintiff can have standing to sue for mailed misrepresentations without ever receiving or relying on them).

The cases relied upon by BGC involved predicate acts that were far more removed than in this case, where the predicate acts were purposefully engaged in to harm Tullett Prebon itself.  *Hemi Group, LLC*, 130 S. Ct. at 985 (cigarette retailers sold cigarettes without submitting the required information to state, which therefore could not pass information to city, causing Plaintiff city to be unable to determine which customers failed to pay the cigarette tax and pursue

them for payment); *Longmont United Hosp. v. Saint Barnabas Corp.*, 305 F. App'x 892, 894-95 & n.5 (3d Cir. 2009) (defendant hospital consortium scheme changed policies, but intervening agencies' interpretation and implementation of policies caused plaintiff's injury; "[plaintiff] has not alleged facts sufficient to show that [defendant's] cost inflation, by itself, would have required [the Medicare agency] to raise [the fixed loss threshold] in any given year in order to meet its statutory obligations"); *Zavala v. Wal-Mart Stores, Inc.*, 447 F. Supp. 2d 379, 387-88 (D.N.J. 2006) ("[T]he predicate acts of transporting, harboring and encouraging aliens are 'entirely distinct' from the immediate cause of Plaintiffs' injuries (underpayment of wages).").

BGC also makes the bold assertion that the misrepresentations made directly to Tullett Prebon did not cause it to take or refrain from any actions.  (Br. at 43.)  BGC's argument is factually incorrect; the First Amended Complaint alleges that the letters sent by the lawyers hired by BGC prevented Tullett Prebon from taking action to counter the Raid.  (FAC ¶¶ 108-11.)[14]

---

[14] BGC also asserts that Tullett Prebon's claims under N.J. Stat. Ann. § 2C:41-2(a) and (b) should be dismissed because the First Amended Complaint has not alleged that BGC invested in or acquired an interest in any enterprise.  (Br. at 43 n.32.)  This argument ignores the allegations that BGC actively invested money in the RICO enterprise by, among other things, providing millions of dollars to certain recruits to provide confidential information and to recruit other brokers on BGC's behalf.  (FAC ¶¶ 45-48.)  In similar circumstances, at least one court in this District has upheld a violation of N.J.S. 2C:41-2(a).  *See, e.g, Yarosh v. Salkind*, No. Civ.A. 04-1816(JWB), 2005 WL 1459719, at *7-8 (D.N.J. June 21, 2005).

### 5.   The First Amended Complaint Adequately Pleads A Pattern Of Racketeering Activity

BGC makes a number of assertions as to why the First Amended Complaint does not adequately plead a pattern of racketeering activity.  First, BGC asserts that the First Amended Complaint's allegations lack the requisite particularity mandated by Rule 9(b).  (Br. at 44-45 & n.33.)  That assertion is utterly baseless.  The First Amended Complaint specifically identifies who made the representations (FAC ¶¶ 63, 67-71, 74, 80, 82), who received them (*id.* ¶¶ 63, 67-71, 74, 82), what was said (*id.* ¶¶ 63, 67-71, 73, 82, 108-10), who misappropriated confidential information (*id.* ¶¶ 40, 42, 54), what information was misappropriated (*id.* ¶¶ 41, 54-61), and which defendants resigned in breach of their contracts (*id.* ¶¶ 91-96).  In addition, the attorney letters used in the scheme are attached to the First Amended Complaint itself.  (*Id.* Ex. 1-9.)

These allegations are more than sufficient to plead with the requisite particularity at least two incidents of racketeering conduct occurring within 10 years of one another.  *See, e.g., Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920-21 (8th Cir. 2001); *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,

---

*Lightening Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) is not relevant here since it was decided after a full trial on the merits and is thus irrelevant to determine what facts are required at the pleading stage. *Id.* at 1165-66. Accordingly, the First Amended Complaint adequately pleads a cause of action under those two subsections as well as subsection (c) of the New Jersey RICO statute.

742 F.2d 786, 791 (3d Cir. 1984); *Fuji Photo Films USA, Inc. v. McNulty,* 640 F.

Supp. 2d 300, 317-18 (S.D.N.Y. 2009); *Yarosh*, 2005 WL 1459719, at *8; *In re*

*Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *cf. In re*

*Schering-Plough Corp. Intron/Temodor Consumer Class Action*, 2009 WL

2043604, at *25 ("[N]owhere in the Complaint . . . do Plaintiffs detail which

doctor(s) were paid remunerations, which third party payor(s) paid . . . for what

indications they paid, and which patient(s) paid for the Subject Drugs.").  None of

the cases cited by BGC is to the contrary.

           Second, BGC asserts that many of the statements alleged in the First

Amended Complaint do not involve fraud or deception, and thus are not actionable

as mail and wire fraud.  (Br. at 45-47.)  That assertion is wrong as a descriptive

matter because almost all of the challenged incidents do involve fraud.  (FAC ¶¶ 5-

8, 63-72, 73-79, 82-83, 87-111.)  It is also meritless as a legal proposition since

each incident of mail or wire fraud need not contain a misstatement or omission so

long as the use of the mail or wires was in furtherance of the fraudulent scheme.

*See Schmuck v. U.S.*, 489 U.S. 705, 712, 714-15 (1989); *U.S. v. Al-Ame*, 434 F.3d

614, 616-17 (3d Cir. 2006); *Tabas v. Tabas*, 47 F.3d 1280, 1295 n.18 (3d Cir.

1995).  *Boyle v. D'Onofrio*, 99 F. Supp. 2d 541 (D.N.J. 2000), *aff'd*, 254 F.3d 1077

(3d Cir. 2001), is not to the contrary since the Plaintiffs in that case never alleged

an intent to deceive.  The First Amended Complaint details a thorough scheme of deception.

Third, BGC asserts that certain alleged misstatements merely constitute "puffery" or are non-actionable opinions or predictions about the future. (Br. at 45-47.)  However, the First Amended Complaint specifically alleges that BGC knew that each such statement was false when made.  (*See, e.g., FAC ¶¶ 6, 63-72, 73-79, 82-83, 87-97, 98-107, 108-11).  Such statements are actionable as fraud.  S*ee Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 248-49 (D.N.J. 2000); *VT Investors v. R&D Funding Corp.*, 733 F. Supp. 823, 836 (D.N.J. 1990).  The authorities cited by BGC involve statements that, unlike those at issue here, were not alleged to be knowingly false when made.  *Granite State Ins. Co. v. Ujex, Inc.*, No. 03-1220 (JBS), 2005 U.S. Dist. LEXIS 13692, at *23-24 (D.N.J. July 11, 2005); *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 436 (D.N.J. 1998), *aff'd*, 172 F.3d 859 (3d Cir. 1998).

Fourth, BGC asserts that the attorney letters cannot constitute mail or wire fraud because they present opinions or conclusions of law.  (Br. at 47-48.) But the First Amended Complaint alleges that the letters contained misrepresentations of fact, not legal opinions or conclusions of law, including misrepresentations about the existence of the Raid and the role of certain brokers recruited by BGC, "at-will employees on the same desk made a logical and

independent decision to join their colleagues' future employer.  Nothing was

engineered . . . . There were no 'ring leaders.'"  (FAC ¶¶ 98-107, 108-11, Ex. 9.)

BGC has cited to no authority that exempts such statements from liability.[15]

BGC's cases involve statements of legal opinion, not fact.  *See Kolar v. Pref. Real*

*Estate Dec., L.P.*, No. 08-3119, 2010 WL 104500, at *6 n.9 (3d Cir. Jan. 12, 2010)

(involving assertions of legal rights that were not calculated to deceive); *Va. Surety*

*Co. v. Macedo*, No. 08-5586, 2009 U.S. Dist. LEXIS 90603, at *22-23 (D.N.J.

Sept. 30, 2009) (involving legal designation of an "employee" within the meaning

of the Workers' Compensation Act).

### D.   The First Amended Complaint States A Claim For Raiding Under New Jersey Law

BGC asserts that Tullett Prebon's cause of action for raiding must be

dismissed because no such tort exists under New Jersey law.  (Br. at 49.)

However, at least one court in this District has permitted such a cause of action to

proceed.  *See, e.g., O'Brien Oil Pollution Serv., Inc. v. Kapoor*, No. 06-CV-2945

(DMC), 2009 WL 2407399, at *2 (D.N.J. Aug. 4, 2009).  In addition, numerous

commentators and practitioners have advocated for the recognition of raiding as a

---

[15] Moreover, legal opinions are not somehow immune from the reach of the New Jersey RICO statute where, as alleged here (s*ee, e.g.,* FAC ¶¶ 7, 35, 98-107, 108-11), such opinions were written with knowledge of, and in furtherance of, the fraudulent scheme.  *See, e.g., Mayo, Lynch & Assocs., Inc. v. Pollack*, 351 N.J. Super. 486, 497-500 (N.J. Super. Ct. App. Div. 2002).  Accordingly, the First Amended Complaint adequately pleads a pattern of racketeering activity.

separate cause of action that is distinguished from other torts by: (i) the severe

economic harm that results from the raid; (ii) defendant's malicious or predatory

motive; and (iii) the use of improper means to carry it out. *See* Dana N.

Pescosolido and Christopher P. Stief, Raiding in the Securities Industry: The

Search for Consensus 1-6 (Sept. 25, 2003) (unpublished conference report,

*available at* http://www.saul.com/common/publications/pdf_531.pdf.)  All of those

factors are present here.  BGC's cases do not hold otherwise, as they do not involve

the application of New Jersey law.  *See Gallup, Inc. v. Talentpoint, Inc.*, No.

CIV.A. 00-5523, 2001 WL 1450592, at *9 (E.D. Pa. Nov. 13, 2001) (applying

Nebraska law); *Storage Tech. Corp. v. Cisco Sys., Inc.*, Civ. No. 00-

2253(JNE/JGL), 2003 U.S. Dist. LEXIS 17347, at *8 (D. Minn. Sept. 25, 2003)

(applying Minnesota law).[16]

---

[16] Contrary to BGC's assertion, the existence of the tort of tortious interference
does not preclude the application of a cause of action for raiding.  *See Mayor and
Council of Borough of Rockaway v. Klockner & Klockner*, 811 F. Supp. 1039,
1053 (D.N.J. 1993) ("[T]here is no bar to the assertion of different legal theories of
recovery even if they seek the same remedy or are based on the same factual
predicate."); *see also O'Brien Oil Pollution Serv.*, 2009 WL 2407399, at *2
(allowing tortious interference and raiding causes of action to proceed to trial).  In
addition, BGC's assertion (Br. at 50) that even if a cause of action for raiding
exists, the Tullett subsidiaries are the proper parties to assert it fails for the same
reasons dealt with above.  *See Supra* Section I.B.

**E.      Tullett Prebon Has Standing To Assert**
**        <u>A Cause Of Action For Tortious Interference</u>**

BGC asserts that Tullett Prebon lacks standing to assert a tortious

interference cause of action because it has not alleged any protectable economic

interest that BGC interfered with, specifically, it has not pled "that the structural

relationship between it and its subsidiaries has been altered in *any way* as a result

of BGC's alleged conduct."  (Br. at 51.)

Nowhere does BGC explain what "alteration of structural

relationship" actually means, and, in any event, BGC has cited no authority for the

proposition that the absence of such an allegation is fatal to a tortious interference

cause of action.  This is so because no such allegation need be pled.  Rather, what

must be pled is: (i) an existing economic benefit or advantage, (ii) the defendant's

knowledge of that expectancy, (iii) the defendant's wrongful, intentional

interference with that expectancy, (iv) the reasonable probability that the claimant

would have received the anticipated economic benefit in the absence of the

defendant's interference, and (v) damages resulting from the defendant's

interference.  *Pactiv Corp. v. Perk-Up, Inc.*, No. 08-05072(DMC), 2009 WL

2568105, at *11 (D.N.J. Aug. 18, 2009).

The First Amended Complaint satisfies this standard.  It alleges that

Tullett Prebon had an existing economic benefit flowing from its relationships with

its subsidiaries and would have continued to receive that benefit in the absence of

the Raid (FAC ¶¶ 113, 136, 139, 146-48, 153), that BGC knew of those

relationships and intentionally and wrongfully interfered with them by

orchestrating and executing the Raid against the Tullett Subsidiaries (*id.* ¶ 147),

and that Tullett Prebon suffered damages as a result.  (*Id.* ¶¶ 148-49.)  Under New

Jersey law, BGC's actions, which were designed to harm a competitor's business,

constitute tortious interference.  *See Wear-Ever Aluminum, Inc. v. Townecraft*

*Indus., Inc.*, 75 N.J. Super. 135, 142 (N.J. Super. Ct. Ch. Div. 1962) ("While a

trader may lawfully engage in the sharpest competition with those in a like

business, . . . when he oversteps that line and commits an act with the Malicious

intent of inflicting injury upon his rival's business, his conduct is illegal.") (quoting

*Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 587-89 (N.J. 1934)); *see also Avtec*

*Indus., Inc. v. Sony Corp. of Am.*, 205 N.J. Super. 189, 194 (N.J. Super. Ct. App.

Div. 1985) ("The general rule appears to be that . . . inducement is actionable . . . if

the party offering the inducement either has an unlawful purpose or improper

purpose or uses unlawful or improper means.").[17]

---

[17] BGC cites *Kazmierski v. General Nutrition Cos.*, No. Civ.A. 99-5281 JBS, 2000
WL 35506403 (D.N.J. Mar. 31, 2000) and *MARJAC, L.L.C. v. Trenk*, No. 06-1440
(JAG), 2009 WL 2143686 (D.N.J. July 13, 2009) for the proposition that a cause of
action for tortious interference with business relationships requires the existence of
"a prospective economic or contractual relationship."  (Br. at 50-51.)  Those cases
are inapplicable because they allege different torts -- tortious interference with
contractual relations and prospective economic advantage -- than the tort of
interference with existing business relationships that is pled here.  *See, e.g.,*
*Ultraflex Sys., Inc. v. Verseidag-Indutex GMBH*, No. Civ.A. 01-129(JLL), 2006

BGC's assertion that Tullett Prebon has not alleged a cognizable injury or causation fails for the reasons stated above (*see supra* Section I.B; Br. at 52-53), and its cases are inapplicable.  In *Coast Cities Truck Sales v. Navistar International Transportation Co.*, 912 F. Supp. 747, 771-76 (D.N.J. 1995), the complaint failed to allege an essential link in the chain of causation -- how defendant's misconduct resulted in any interference with its prospective contractual relationships -- and otherwise failed to allege the economic right interfered with or that defendants engaged in any malicious conduct.  In *Catskill Development, L.L.C. v. Park Place Entertainment Corp.*, 547 F.3d 115, 132-37 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 1908 (2009), the complaint failed to allege fraud that was directed at either of the parties to the contracts allegedly interfered with, and otherwise failed to allege that defendants engaged in any malicious conduct.  In contrast, the First Amended Complaint alleges direct injury to Tullett Prebon

---

WL 1098181, at *7-8 (D.N.J. Mar. 30, 2006).  Furthermore, in both cases, the Court found that the plaintiff had failed to allege malice, either because the defendant was contractually allowed to engage in the allegedly tortious conduct, *Kazmierski*, 2000 WL 35506403, at *4, or because plaintiffs failed to show that defendants had acted without justification or cause.  *MARJAC*, 2009 WL 2143686, at *10.  Here, by contrast, the First Amended Complaint alleges that BGC's actions used improper means to destroy Tullett Prebon's business.

caused by the malicious acts of BGC.  Accordingly, Tullett Prebon has standing to

assert a cause of action for tortious interference.[18]

### F.    Tullett Prebon Has Standing To Assert A Cause Of Action For Misappropriation Of Trade Secrets And Unfair Competition

Unfair competition is a broad and flexible tort that "prohibit[s] the use

of misleading or deceptive practices which renders competition unfair."  *Ryan v.*

*Carmona Bolen Home for Funerals*, 341 N.J. Super. 87, 92 (N.J. Super. Ct. App.

Div. 2001); *see also Duffy v. Charles Schwab & Co.*, 97 F. Supp. 2d 592, 600

(D.N.J. 2000) ("[Unfair competition] is as flexible and elastic as the evolving

standards of commercial morality demand.") (quoting *New Jersey Optometric*

*Ass'n v. Hillman-Kohan Eyeglasses, Inc.*, 144 N.J. Super. 411, 427 (N.J. Super. Ct.

Ch. Div. 1976)); *Warner Lambert Co. v. Purepac Pharm. Co.*, No. Civ.A. 98-

02749(JCL), 2000 WL 34213890, at *10-11 (D.N.J. Dec. 22, 2000) (recognizing

that the tort of unfair competition captures conduct that "substantially interferes

with the ability of others to compete on the merits of their products").  BGC moves

---

[18] BGC's other cases are distinguishable as they involve corporations trying to assert tortious interference of relationships belonging to their subsidiaries and/or affiliates.  *See Alexander & Alexander of N.Y. Inc. v. Fritzen*, 495 N.Y.S.2d 386, 388 (N.Y. App. Div. 1985), *aff'd,* 503 N.E. 2d 968 (N.Y. 1986)  ("[S]ince, apparently, both [plaintiff] and [plaintiff's affiliate] are separate and distinct entities, with neither exercising complete dominion and control over the other, there is no basis upon which [plaintiff] may interpose a claim for tortious interference with the employment relationships between [plaintiff's affiliate] and its employees."); *see also* discussion of *Diesel Sys.*, 861 F. Supp. at 181 *supra* Section I.B.

to dismiss Tullett Prebon's cause of action for misappropriation of trade secrets and unfair competition on the grounds that the information allegedly misappropriated did not belong to Tullett Prebon, and, in any event, that information was not confidential.  (Br. at 53-55.)

Both of those grounds should be rejected.  The First Amended Complaint alleges that the confidential information taken by BGC belonged to Tullett Prebon.  (FAC ¶¶ 5, 10, 40-41, 44-45, 62, 113, 133-35, 142-44.)  The First Amended Complaint also alleges that a wide variety of confidential information was taken in the Raid, including, but not limited to, confidential and proprietary information regarding growth strategies and future corporate transactions, in addition to salary information.  (*Id.* ¶¶ 5, 41-42, 122, 133.)  Such allegations are sufficient to plead a misappropriation claim.  *See, e.g., Oswell v. Morgan Stanley Dean Witter & Co.*, No. 06-5814 (JBS), 2007 WL 1756027, at *7 (D.N.J. June 18, 2007) (holding that plaintiff satisfied the "minimal standards of a trade secret claim" by alleging "that the information she conveyed to [defendant] . . . was a trade secret and that it was being conveyed to [defendant] in confidence"); *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, No. 04-3500 (AFT), 2006 U.S. Dist. LEXIS 70834, at *25 (D.N.J. Sept. 29, 2006) ("Plaintiff has alleged that it had trade secrets that were disclosed.  It is sufficient that the Plaintiff

makes an allegation that it reasonably believes it can support with specific information.").

        BGC cites *Intercapital Debt Trading Ltd. v. Cantor Fitzgerald, L.P.*, N.Y.L.J. 28 (col. 3) (N.Y. Sup. Ct. Mar. 9, 1995) for the proposition that salary information is never entitled to protection.  However, that case was decided after a hearing on the merits, wherein the court found that no confidential information had in fact been taken.  That case also applied New York law.[19]  Under New Jersey law, "[t]he key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information."  *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 299 (N.J. 2001); *Graco, Inc. v. PMC Global, Inc.*, No. 08-1304(FLW), 2009 WL 904010, at *21 (D.N.J. Mar. 31, 2009) (same).  Where, as here, employees are provided information during the course of their employment that they know the employer has taken steps to protect, they cannot provide that information to a direct competitor.  *Lamorte Burns & Co.*, 167 N.J. at 299-301; *Thomas & Betts Corp. v. Richards Mfg. Co.*, 342 F. App'x 754, 759 (3d Cir. 2009).

-----

[19] BGC erroneously asserts that New York law should apply if there is a conflict, relying on *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 267 (3d Cir. 2000).  That case applied the law of the place where the trade secrets were licensed and safeguarded, and where the secret information was used -- all factors that favor the applicability of New Jersey law in this case.

The First Amended Complaint alleges that salary and other employment information about Tullett brokers was only provided to desk heads and other senior employees, and that they were required to sign confidentiality provisions to protect that information, which was highly valuable to competitors like BGC. (FAC ¶¶ 45, 133-35.) As the authorities discussed above reflect, New Jersey law protects such information.[20]

BGC cites to certain cases -- decided before *Lamorte Burns & Co.* -- that stand for the uncontroversial proposition that information easily obtained through publicly available sources is not protected confidential information. *See Subcarrier Comm'ns, Inc. v. Day*, 299 N.J. Super. 634, 643 (N.J. Super. Ct. App. Div. 1997) (holding that customer list was not protected where it could be compiled by looking for tall buildings in the area and searching the internet); *Price Paper & Twice Co. v. Miller*, 182 A.D.2d 748, 749 (N.Y. App. Div. 1992) (holding customer list not protected where customers were generally known to all within the trade and could be discovered through the use of phone directories). The First

---

[20] Indeed, BGC itself regards such information as confidential. In the legal proceedings commenced following BGC's raid against Tullett Prebon's London subsidiary (*see id.* ¶¶ 25-30), Tony Verrier and Shaun Lynn, two BGC executives who were also involved in the planning and execution of the Raid, admitted under oath in open court that BGC regarded salary information for the brokers on their trading desks as confidential and would consider it a breach of contract if any BGC employee divulged such information to a competitor, as BGC is alleged to have done here. (Momborquette Decl. Ex. A at 65; Ex. B at 113-14.)

Amended Complaint does not allege the loss of any such easily obtainable information.  BGC also cites to other cases that stand for the equally uncontroversial proposition that only the owner of confidential information or property may assert causes of action for the misappropriation of that information or property.  *See Telmark Pkg. Corp. v. Nutro Labs. & Nature's Bounty,* Civ. No. 05-3049 (GEB), 2008 WL 43954 (D.N.J. Jan. 2, 2008); *Worldwide Sport Nutritional Supplements, Inc. v. Five Star Brands, LLC*, 80 F. Supp. 2d 25 (N.D.N.Y. 1999); *Wellness Publ'g v. Barefoot*, No. 02-3773 (JAP), 2008 WL 108889 (D.N.J. Jan. 8, 2008); *Abe's Rooms, Inc. v. Space Hunters, Inc.*, 833 N.Y.S.2d 138 (2d Dep't 2007).  Where, as here, a company has alleged that it is the owner of the misappropriated information, it has standing to assert a misappropriation cause of action based on the theft of that information.  *See Graco*, 2009 WL 904010, at *21-23; *Duffy*, 97 F. Supp. 2d at 602.

Moreover, BGC does not even address Tullett Prebon's second basis for asserting an unfair competition cause of action: BGC's illegal raiding activity.  BGC's plan to cripple a direct competitor through the use of fraud, deception, and threats cannot be disguised as anything but unfair competition.  Accordingly, Tullett Prebon has adequately pled a cause of action for misappropriation and unfair competition.

### III.   THE TULLET SUBSIDIARIES ARE NOT NECESSARY OR INDISPENSABLE PARTIES TO THIS ACTION

#### A.   The Tullett Subsidiaries Are Not Necessary Parties

BGC also has moved to dismiss the First Amended Complaint pursuant to Rules 12(b)(7) and 19 of the Federal Rules of Civil Procedure for failure to join the Tullett Subsidiaries as parties despite the fact that, according to BGC, the Tullett Subsidiaries are both "necessary" and "indispensable" parties to this action.  (Br. at 16-25.)  According to BGC, the Tullett Subsidiaries are "necessary" parties under Rule 19(a) because complete relief can not be awarded among the existing parties in the absence of the Tullett Subsidiaries because the Tullett Subsidiaries are the real parties in interest.  (Br. at 17-18.)  However, as demonstrated above (*see* Section I.B.), Tullett Prebon is the real party in interest in this action, not the Tullett Subsidiaries, since it is seeking to recover damages to it caused by BGC's improper conduct.  Accordingly, the Tullett Subsidiaries' presence is not necessary to award complete relief to Tullett Prebon.  *See E.I. DuPont de Nemours and Co. v. Rhodia Fiber and Resin Intermediates, S.A.S.*, 197 F.R.D. 112, 124 (D. Del. 2000), *aff'd in part*, 269 F. 3d 187 (3d Cir. 2001) (holding that plaintiff's subsidiary was not a necessary party where plaintiff asserted different claims and sought different damages than those sought by its subsidiary in a parallel arbitration proceeding).

44

The cases relied on by BGC are inapposite as they all involve either the adjudication of rights under a contract to which the non-joined person was a party or situations in which a party is seeking to assert claims belonging solely to the non-joined party. *See Dickson v. Murphy*, 202 F. App'x 578, 579 (3d Cir. 2006) (holding that the suit could go forward only if all parties to the purchase agreement were joined); *Acton Co. of Mass. v. Bachman Foods, Inc.*, 668 F.2d 76, 77-78 (1st Cir. 1982) (involving a situation where both the parent and the subsidiary were parties to the same contract, and where the subsidiary's obligations were guaranteed by the parent); *Develcom Funding, LLC v. Am. Atlantic Co.*, No. 09-1839(RMB), 2009 WL 2923064, at *3 (D.N.J. Sept. 9, 2009) (the non-joined person was a party to a contract that would have been rendered null and void if plaintiff's suit was successful); *GTC Int'l Holdings, Inc. v. Burns*, No. 04 C 0570, 2004 U.S. Dist. LEXIS 19858, at *10 (N.D. Ill. Sept. 22, 2004) (involving a parent company asserting rights that arose from a contract to which only its subsidiary was a party); *Onyx Waste Servs., Inc. v. Mogan*, 203 F. Supp. 2d 777, 786 (E.D. Mich. 2002) (involving a parent and a non-joined subsidiary that both held rights arising from the employment contract at issue).

In those situations, the non-joined party is considered "necessary" because it has a "legally protected interest," such as the enforceability of a contract to which it is a party, that is being adjudicated in that party's absence. *Onyx Waste*

45

*Servs., Inc.*, 203 F. Supp. 2d at 786 (quoting *Burger King Corp. v. Am. Nat'l Bank and Trust Co. of Chicago*, 119 F.R.D. 672, 675 (N.D. Ill. 1988)).  In contrast, here Tullett Prebon is not attempting to assert any legally protected interest that belongs to the Tullett Subsidiaries.  Although this action does involve overlapping issues with the FINRA Arbitration, BGC has provided absolutely no authority for the proposition that the mere existence of overlapping issues causes a non-joinded party to become a "necessary party" for purposes of Rule 19.  Indeed, the law is to the contrary.  *See Temple v. Synthesis Corp. Ltd.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."); *E.I. DuPont de Nemours and Co.*, 197 F.R.D. at 124 ("A risk of logically inconsistent decisions does not trigger Rule 19 and make an absent party indispensable."); *Inox Wares Pvt. Ltd. v. Interchange Bank*, No. 06-4307 (SRC), 2008 WL 4691906, at *10 (D.N.J. Oct. 22, 2008) ("It is well-established that joinder of principals and agents is not essential in tort actions, nor is the joinder of joint tortfeasors.").

BGC further asserts that the Tullett Subsidiaries' absence from this action will impair their ability to protect whatever interest they have in this action.  (Br. at 19 n.15.)  However, where, as here, the absent party's interests are adequately protected by a party to the action, the absent party will not be considered a "necessary" party.  *See GE Healthcare v. Orbotech, Ltd.*, No. 09-C-

0035, 2009 WL 2382534, at *8 (E.D. Wis. July 2, 2009) ("[T]he Court cannot imagine a scenario in which [the parent corporation] would have any less incentive to press its claims than would [the subsidiary corporation]."); *Bayer Corp. v. Smithkline Beecham PLC*, No. 95 Civ. 5582 (SHS), 1996 WL 34164, at *5 (S.D.N.Y. Jan. 29, 1996) (holding subsidiaries were not necessary parties because defendant failed to identify any interest the parent could not adequately protect).

BGC also asserts that the failure to join the Tullett Subsidiaries "undoubtedly creates a 'substantial risk' of inconsistent obligations and multiple exposure."  (Br. at 19.)  Possibilities include, according to BGC, "conflicting" rulings on requests for injunctive relief whereby one BGC entity is enjoined but not the other, or "inconsistent" rulings whereby one party obtains discovery in one action regarding a particular subject matter, but not in the other.  (*Id.*)  However, the risk of "conflicting" or "inconsistent" obligations under Rule 19 only arises if "a party is unable to comply with one court's order without breaching another court's order concerning the same incident."  *Delgado v. Plaza Las Ams., Inc.*, 139 F.3d 1, 3 (1st Cir. 1998); *see also Plymouth Youngle Tape (Shanghai) Co. v. Plymouth Rubber Co., LLC*, No. 08-11599-JGD, 2009 WL 5821678, at *10-11 (D. Mass. Dec. 29, 2009) (absent party found necessary where multiple lawsuits could result in separate court orders forcing plaintiff to characterize investment as both "a debt" and "other than a debt").

BGC has not even asserted that this type of risk exists here; nor could it since this action involves different parties asserting different causes of action against different defendants than the FINRA Arbitration, and, therefore, there is no risk that the parties will face multiple, conflicting liabilities. *See Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 410 (3d Cir. 1993) (finding that parent and subsidiary were not in privity and that litigation involving subsidiary would have no preclusive effect on parent corporation); *Nelligan ex rel. Estate of Proia v. Cmty. Gen. Hosp. of Sullivan*, 240 F.R.D. 123, 125 (S.D.N.Y. 2007) ("It is self-evident that where a plaintiff sues different defendants in different forums, there is no risk that a defendant, who is sued in only one of those forums, will incur double or multiple liability."); *Wheaton v. Diversified Energy, LLC*, 215 F.R.D. 487, 491 (E.D. Pa. 2003) ("there is no risk that [defendant] would suffer double or multiple judgments against it because of the parallel litigation in state court" because defendant is "not a defendant in the state suit"); *Kerrigan v. Villei*, No. Civ. A. 95-4334, 1996 WL 84271, at *3 (E.D. Pa. Feb. 28, 1996) (where there is no pending suit against defendant, "the risk of double, multiple, or inconsistent obligations to [defendant] is speculative, at best" and thus, does not weigh in favor of dismissal under Rule 19(a)).  Accordingly, the Tullett Subsidiaries should not be considered "necessary" parties to this action.

### B.     Neither Are The Tullett <u>Subsidiaries Indispensable Parties</u>

No inquiry under Rule 19(b) is necessary because BGC has not satisfied the threshold requirements of Rule 19(a).  However, even if the Court were to conclude that BGC has satisfied those requirements, its Rule 19 motion should still be denied because, as demonstrated below, the Tullett Subsidiaries are not "indispensable" parties to this action for purposes of Rule 19(b).

BGC attempts to support its assertion that the Tullett Subsidiaries are "indispensable" parties with some of the same arguments that it used to support its assertion that the Tullett Subsidiaries were "necessary" parties, specifically, that those entities are the real parties in interest in this action and this action will subject BGC to the threat of multiple liabilities or inconsistent obligations.  (Br. at 21.)  However, as we demonstrated above, those assertions have no validity. Consequently, they provide absolutely no support for the assertion that the Tullett Subsidiaries are "indispensable" parties to this litigation.

The authorities relied upon by BGC are distinguishable in that they all involve situations where a legal interest belonging to the non-joined party was being adjudicated in an action, and therefore, the absent party faced the real risk of conflicting obligations.  *See Acton Co.*, 668 F.2d at 79 (concluding that non-joined party faced a risk that two different courts would order it to return a deposit to two different sources); *Rosenzweig v. Brunswick Corp.*, No. 08-807 (SDW), 2008 U.S.

Dist. LEXIS 63655, at \*20-22, 27-28 (D.N.J. Aug. 20, 2008) (action involved the interpretation of a contract to which the non-joined party was a signatory); *Onyx-Waste Servs.*, 203 F. Supp. 2d at 783 (concluding that non-joined party faced a substantial risk that it would find itself with inconsistent obligations under the same contract).  As demonstrated above, this action does not involve the adjudication of any legal interest belonging to the Tullett Subsidiaries, and, therefore, the Tullett Subsidiaries do not face the risk of inconsistent liabilities with the FINRA Arbitration.

        BGC also asserts that the Tullett Subsidiaries are "indispensable" parties here because proceeding with this litigation in their absence would subject BGC to duplicative recovery -- once in this action and again in the FINRA Arbitration.  (Br. at 21-22.)  However, that risk is not present here for the simple reason that BGC is not a party in the FINRA Arbitration in the first place and can not be made one, and therefore, BGC does not face the possibility of duplicative recovery.  *See Pittsburgh Corning Corp. v. Travelers Indem. Co.*, CIV. A. No. 84-3985, 1988 WL 100787, at \*3 (E.D. Pa. Sept. 14, 1988) (where it is legally impossible for defendant to be subjected to a separate, related action, "defendant does not face the possibility of multiple and inconsistent liability" under Rule 19(b)); *see also* authorities cited at pp. 47 to 48, *supra*.

BGC further asserts that Tullett Prebon would have an adequate remedy if this action is dismissed since the FINRA Arbitration can provide complete relief to all parties involved in the Raid.  (Br. at 23-25.)  That assertion is wrong.  Since BGC is not registered with FINRA, the FINRA Arbitration can not reach its conduct.  Accordingly, BGC's liability for the damage it caused in the Raid can not be adjudicated in the FINRA Arbitration.  *Corsi v. Eagle Publishing, Inc.*, No. 1:07-cv-02004, 2008 U.S. Dist. LEXIS 6257, at *16 (D.D.C. Jan. 30, 2008) is inapposite because, unlike here, plaintiffs in that action had signed contracts requiring arbitration, and thus, had an adequate alternative forum for their claims.  In any event, the mere availability of an alternate forum does not make a party indispensable where it is the only factor favoring dismissal.  *Ryan v. Johnson*, 115 F.3d 193, 200 (3d Cir. 1997); *Bank of Am. Nat'l Trust and Savs. Assoc. v. Hotel Rittenhouse Assoc.*, 844 F.2d 1050, 1055 (3d Cir. 1988); *Am. Home Mortgage Corp. v. First Am. Title Ins. Co.*, No. 07-01257, 2007 WL 3349320, at *8 (D.N.J. Nov. 9, 2007).  Accordingly, the Tullett Subsidiaries are not "indispensable" parties to this action.

## IV.   THIS ACTION SHOULD NOT BE STAYED PENDING THE RESOLUTION OF THE FINRA ARBITRATION

BGC asserts that in the event that the Court denies "any part" of its motion to dismiss, it should stay this action pending the final resolution of the FINRA Arbitration.  (Br. at 25-28.)  However, BGC has proffered absolutely no

valid basis for the stay of this proceeding.  Federal courts typically do not stay a

court action involving parties that are not bound by an arbitration clause.  *See*

*Mendez v. Puerto Rican Int'l Cos.*, 553 F.3d 709, 711 (3d Cir. 2009).  Rather, the

"extraordinary remedy" of a stay is only granted in those rare circumstances where

the moving party demonstrates "a clear case of hardship or inequity in being

required to go forward" in both forums.  *S. Freedman & Co. v. Raab*, No. 06-

37232008, 2008 WL 4534069, at *2 (D.N.J. Oct. 6, 2008) (quoting *Landis v. N.*

*Am. Co.*, 299 U.S. 248, 255 (1936)).  Accordingly, courts will not stay an action in

which there is no overlap of any of the parties between the two proceedings at

issues since no "clear case of hardship or inequity in being required to go forward"

can be shown when a party is not involved in both actions.  *See Blevins v.*

*Katherman*, Civil Action No. 1:07-CV-0633, 2009 WL 712350, at *1 (M.D. Pa.

Mar. 16, 2009) (defendant's motion to stay pending resolution of Maryland state

court litigation was denied in part because "defendant [was] not a party to the

Maryland litigation"); *White Cap Const. Supply, Inc. v. Tighton Fastener & Supply*

*Corp.*, No. 8:08CV264, 2009 WL 483842, at *4 (D. Neb. Feb. 25, 2009) (in a

raiding case, court denied corporate defendant's motion to stay pending arbitration

between plaintiff and the individual employee defendants in part because

"[plaintiff] did not bargain for arbitration with [corporate defendant] and would be

unfairly prejudiced if its claims against [defendant] are stayed indefinitely until

52

after the other parties' arbitration is concluded"); *Fallon v. Locke, Liddell & Sapp, LLP*, No. C-04-03210 RMW, 2007 WL 2904052, at *2-5 (N.D. Cal. Oct. 2, 2007) (refusing to grant defendant's motion to stay in favor of arbitration because court could not find any hardship to defendant who was "not a party to [the non-party's] arbitration agreement"); *In re Barney's, Inc.*, 206 B.R. 336, 344 (S.D.N.Y. 1997) (where defendant is not party to related arbitration, "[t]here is no purpose in staying this litigation as to [defendant]").

        BGC attempts to avoid this problem by asserting that since the Tullett Subsidiaries are the real parties in interest in this action, Tullett Prebon has attempted "to litigate in this action claims and subject matters that are subject to mandatory arbitration."  (Br. at 25.)  However, as we have demonstrated, BGC's assertions regarding who is the real party in interest in this case are clearly erroneous.  Indeed, all of the cases relied upon by BGC involve situations where at least one party is common to both the federal court action and the arbitration.[21]

---

[21] *See WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 73-74 (2d Cir. 1997) (parent and subsidiary brought action against former employee in federal court, and former employee filed demand for arbitration against subsidiary); *AgGrow Oils L.L.C. v. Nat'l Union Fire Ins.*, 242 F.3d 777, 780-81 (8th Cir. 2001) (party to contract sued surety in federal court, and both parties to contract were involved in arbitration); *Merritt-Chapman & Scott Corp. v. Pa. Tpk. Comm'n*, 387 F.2d 768, 770 (3d Cir. 1967) (plaintiff and defendant were both parties to the arbitration); *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964) (plaintiff was involved in both federal court action and arbitration); *Anderson v. Corinthian Colls., Inc.*, No. C06-5157 FDB, 2006 WL 2380683, at *1 (W.D. Wash. Aug. 16, 2006) (plaintiffs brought multiple suits against the same

However, unlike those cases, this action involves different claims grounded on different legal theories asserted in a proceeding involving different parties than the FINRA Arbitration.

BGC also asserts that permitting both actions to proceed simultaneously would result in a waste of judicial resources. However, courts have concluded that judicial efficiency is not fostered where the other action would not resolve the dispute. *See v. Balfour v. Gutstein*, 547 F. Supp. 147, 149 (E.D. Pa. 1982) ("Hence, even if we stayed this action and awaited judgment in the state court case, the parties would nevertheless be required to return to this forum and litigate those matters not previously decided."). That would undoubtedly be the case here since, at a very minimum, Tullett Prebon's claims for loss in stock value and goodwill, as well as its RICO cause of action will not be resolved in the FINRA Arbitration. Moreover, BGC has not demonstrated why any purported hardship it may suffer as a result of such duplication can not be mitigated by agreement of the parties or the Court. *United Ref. Co. v. Dep't of Energy*, 486 F. Supp. 99, 100-01 (W.D. Pa. 1980) ("[W[e think the parties can agree on some

---

defendant, and many plaintiffs brought arbitration claims against defendant); *Heller v. Deutsche Bank AG*, No. Civ.A 04-CV-3571, 2005 WL 665052, at *1 (E.D. Pa. Mar. 17, 2005) (involving two related arbitrations, both involving plaintiffs in the federal court action, and one involving the defendant in the federal court action); *G. & V. Gen. Contrs., Inc. v. Goode*, Civ. A. No. 86-7408, 1987 WL 9786, at *1 (E.D. Pa. Apr. 21, 1987) (plaintiff sued defendants in federal court, and most defendants moved to compel arbitration against plaintiffs).

coordination of discovery between the cases, and the court is always open for consideration of an appropriate protective order.").  Indeed, with all due respect to opposing counsel, a multi-national company such as BGC that embarks on stealing competitor's employees and confidential information is ill-poised to claim "hardship" or "inequity" from being involved in multiple actions.  Accordingly, BGC's motion for a stay should be denied.

## <u>CONCLUSION</u>

For the reasons set forth above, Tullett Prebon respectfully requests that the Court deny in its entirety BGC's motion to dismiss and motion to stay.

Dated:  Parsippany, New Jersey
       March 10, 2010

KELLEY DRYE & WARREN LLP

By: *s/ Joseph A. Boyle*_____
   Joseph A. Boyle

200 Kimble Drive
Parsippany, New Jersey  07950
(973) 503-5920

*Attorneys for Plaintiff*

SCHULTE ROTH & ZABEL LLP
Robert M. Abrahams
David K. Momborquette

919 Third Avenue
New York, New York  10022
(212) 756-2000

*Of Counsel*