UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-------------------------------------------------------x
:
TULLETT PREBON, plc,                                  :
:
Plaintiff,                    :
:   Civil Action No. 2:09-cv-5365
- against -                  :   (SRC)
:
BGC PARTNERS, Inc.,                                   :
:
Defendant.                    :
:
-------------------------------------------------------x


## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF BGC PARTNERS, INC.'S MOTION TO DISMISS AND MOTION TO STAY


FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
1633 Broadway
New York, NY  10019-6708
(212) 833-1100
(*Admitted pro hac vice*)

ROBINSON, WETTRE &
  MILLER LLC
One Newark Center, 19th Floor
Newark, NJ 07102
(973) 690-5400


*Attorneys for Defendant BGC Partners, Inc.*


March 26, 2010

866136.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT .................................................................................................... 3

I.    TULLETT UK IS NOT THE REAL PARTY IN INTEREST
      AND THUS LACKS STANDING ............................................................. 3

II.   THE TULLETT SUBSIDIARIES ARE NECESSARY AND
      INDISPENSIBLE PARTIES ..................................................................... 7

      A.    The Tullett Subsidiaries Are Necessary Parties ............................... 7

      B.    The Tullett Subsidiaries Are Indispensible Parties ........................ 10

III.  THIS ACTION SHOULD BE STAYED PENDING THE
      RESOLUTION OF THE FINRA ARBITRATION TO AVOID
      CIRCUMVENTION OF FINRA'S MANDATORY
      ARBITRATION OF THE SAME ALLEGED WRONGDOING ............ 11

IV.   THE COMPLAINT FAILS TO STATE A NJ RICO CLAIM ................ 13

      A.    NJ RICO Does Not Apply to Conduct Causing Alleged
            Injury to Third Parties with Only an Incidental Effect on
            New Jersey Commerce ................................................................. 13

      B.    All Choice of Law Factors Result in Application of New
            York Law ..................................................................................... 14

      C.    Tullett UK Has Failed to State a NJ RICO Claim ........................ 16

            1.    Tullett UK Lacks Standing for its NJ RICO Claim
                  Because it Has Failed to Adequately Allege Direct
                  Injury and Causation ......................................................... 16

            2.    Allegations of Non-Deceptive Conduct That Have
                  Caused Tullett UK No Injury Fail to Allege a
                  Pattern of Racketeering Activity ........................................ 20

V.    THE COMPLAINT FAILS TO STATE ANY COMMON LAW
      CLAIMS ............................................................................................... 22

866136.1

A.   Tullett UK's "Raiding" Claim Is Devoid of Legal Support........... 22

B.   The Tortious Interference Claim Fails Because it Rests
     Upon Conduct Allegedly Directed at the Tullett
     Subsidiaries..................................................................... 23

C.   Tullett UK Does Not Own Any Relevant Trade Secret or
     Confidential Information ............................................... 24

CONCLUSION .................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Avtec Indus., Inc. v. Sony Corp. of Am.,
    500 A.2d 712 (N.J. Sup. Ct. App. Div. 1985)........................................ 22

Balfour v. Gutstein,
    547 F. Supp. 147 (E.D. Pa. 1982) ........................................................ 12

In re Barney's, Inc.,
    206 B.R. 336 (Bankr. S.D.N.Y. 1997) ................................................ 12

Bayer Corp. v. Smithkline Beecham PLC,
    1996 WL 34164 (S.D.N.Y. Jan. 29, 1996)........................................... 10

Bridge v. Phoenix Bond & Indem. Co.,
    128 S. Ct. 2131 (2006) ........................................................................ 19

Browne v. Abdelhak,
    2000 WL 1201889 (E.D. Pa. Aug. 23, 2000)...................................... 17

Clark v. Prudential Ins. Co. of Am.,
    2009 WL 2959801 (D.N.J. Sept. 15, 2009) ................................... 14, 15

Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.,
    956 F. Supp. 910 (D. Kan. 1997) .......................................................... 6

Dickson v. Murphy,
    202 Fed. Appx. 578 (3d Cir. 2006) ....................................................... 8

E.I. DuPont de Nemours and Co. v. Rhodia Fiber and Resin
    Intermediates, S.A.S.,
    197 F.R.D. 112 (D. Del. 2000)............................................................... 8

ErgoBilt, Inc. v. Neutral Posture Ergonomics, Inc.,
    1998 WL 483624 (N.D. Tex. Aug. 10, 1998)........................................ 5

Ford Motor Co. v. Edgewood Props., Inc.,
    2009 WL 150951 (D.N.J. Jan. 20, 2009) ............................................ 13

*Frigitemp Corp. v. Fin. Dynamics Fund, Inc.,*
   524 F.2d 275 (2d Cir. 1975).................................................................. 5, 17

*Gallup, Inc. v. Talent-Point, Inc.,*
   2001 WL 1450592 (E.D. Pa. Nov. 15, 2001)...................................... 22

*GE Healthcare v. Orbotech, Ltd.,*
   2009 WL 2382534 (E.D. Wis. July 2, 2009) ...................................... 10

*Hemi Group LLC v. City of New York, N.Y.,*
   130 S. Ct. 983 (2010) ................................................................. 17, 19

*Hertz Corp. v. Friend,*
   130 S. Ct. 1181 (2010) ...................................................................... 16

*Hillhaven Corp. v. Wis. Dep't of Health and Soc. Servs.,*
   634 F. Supp. 1313 (E.D. Wis. 1986)...................................................... 6

*Holmes v. Sec. Inv. Prot. Corp.,*
   503 U.S. 258 (1992) .......................................................................... 18

*Inox Wares Pvt. Ltd. v. Interchange Bank,*
   2008 WL 4691906 (D.N.J. Oct. 22, 2008)............................................. 8

*Kolar v. Pref. Real Estate Invs., Inc.,*
   2010 WL 104500 (3d Cir. Jan. 12, 2010) ........................................... 22

*In re Mercedes-Benz Tele Aid Contract Litig.,*
   257 F.R.D. 46 (D.N.J. 2009) .............................................................. 15

*Novartis Pharm. Corp. v. Bausch & Lomb, Inc.,*
   2008 WL 4911868 (D.N.J. Nov. 13, 2008)......................................... 24

*O'Brien Oil Pollution Serv., Inc. v. Kapoor,*
   2009 WL 2407399 (D.N.J. Aug. 4, 2009)........................................... 22

*Pittsburgh Corning Corp. v. Travelers Indem. Co.,*
   1988 WL 100787 (E.D. Pa. Sept. 14, 1988) ...................................... 10

*PPX Enters., Inc. v. Audiofidelity Enters., Inc.,*
   818 F.2d 266 (2d Cir. 1987)............................................................... 24

*State v. Mann*,
   583 A.2d 372 (N.J. Super. Ct. App. Div. 1990)................................. 19

*State v. Passante*,
   542 A.2d 952 (N.J. Super. Ct. Law Div. 1987) .......................... 13, 14

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
   845 A.2d 1031 (Del. 2004)......................................................... 6

*United Refining Co. v. Dep't of Energy*,
   486 F. Supp. 99 (W.D. Pa. 1980) ........................................... 12

*Wear Ever Aluminum v. Townecraft Indus., Inc.*,
   182 A.2d 387 (N.J. Sup. Ct. Ch. Div. 1962) .............................. 22, 23

*Weisel Partners LLC v. BNP Paribas, BNP*,
   2008 WL 3977887 (N.D. Cal. Aug. 26, 2008)..................................... 6

*Wellness Publ'g v. Barefoot*,
   2008 WL 108889 (D.N.J. Jan. 9, 2008) ............................................ 23

*Yarosh v. Salkind*,
   2005 WL 1459719 (D.N.J. June 21, 2005) ..................................... 20

*Zavala v. Wal-Mart Stores, Inc.*,
   447 F. Supp. 2d 379 (D.N.J. 2006) ................................................. 19

## STATUTES AND RULES

Fed. R. Civ. P. 9 .......................................................... 2, 20, 21

Fed. R. Civ. P. 12 ............................................................... 1

Fed. R. Civ. P. 19 .......................................................... *passim*

D.N.J. L.R. 8.1................................................................ 6

N.J. Stat. Ann. § 2C:41-2 ...................................................... 20

**OTHER AUTHORITIES**

4-15 MILGRIM ON TRADE SECRETS
(Matthew Bender & Co. 2009)............................................................... 25

William Meade Fletcher, 12B FLETCHER CYCLOPEDIA OF THE LAW OF
CORPORATIONS § 5910 (West 2009) ...................................................... 7

*O'Brien Oil Pollution Services, Inc. v. Kapoor,*
No. 06-CV-2945, Dkt. Nos. 35 & 36 ................................................. 22

Dana N. Pescosolido and Christopher P. Stief, *Raiding in the Securities
Industry:  The Search for Consensus* (Sept. 25, 2003) ...................................... 23

Restatement (Second) Conflict of Laws § 6............................................................ 14

Restatement (Second) Conflict of Laws § 145................................................. 14, 15

Defendant BGC respectfully submits this reply memorandum of law in further support of its motion to dismiss pursuant to Rules 12(b)(6) and 12(b)(7), or, in the alternative, to stay this action pending arbitration.[1]

## PRELIMINARY STATEMENT

In its opposition brief, as in the FAC, plaintiff Tullett Prebon, plc ("Tullett UK") ignores corporate form, and asserts claims that are not its own. Tullett UK is a United Kingdom company, headquartered in London, claiming damages to its stock traded on the London Stock Exchange.  Meanwhile, the Employees – only 7 out of 77 of whom worked in New Jersey – were employed by, and serviced customers of, the U.S.-based Tullett Subsidiaries.  Those subsidiaries have already asserted the same or similar claims in the FINRA Arbitration concerning these identical Employees, factual allegations and accusations of wrongdoing.

Tullett UK either admits or cannot deny these incontrovertible facts. Rather than address them, it instead repeats unsubstantiated claims that it, and not the Tullett Subsidiaries, is the real party in interest.  This strategy cannot distract from the futility of its claims.  Its continuing disregard for corporate form does not confer standing.  Nor can it avoid Rule 19 dismissal for the non-joinder of the

---

[1] Unless otherwise noted, all defined terms are as defined in BGC's opening Memorandum of Law (the "Opening Brief" or "Mem."), and all emphasis in quoted material has been added.  Citations to "Opp." refer to Tullett UK's opposition brief.

Tullett Subsidiaries. And even if its claims are not dismissed, Tullett UK cannot contravene mandatory FINRA arbitration, and avoid the application of the parallel proceedings stay doctrine, just by substituting in corporate parents as parties.

Each of Tullett UK's claims also fails in its own right. Tullett UK's NJ RICO claim cannot overcome the lack of a significant relationship to New Jersey. Although Tullett UK attempts to diminish the geographic nexus of its *relevant* allegations, it cannot deny that the alleged misconduct occurred in New York and was directed almost entirely to Employees who worked in New York. Accordingly, New York law should apply to (and result in the dismissal of) this claim. Moreover, Tullett UK relies on an empty allegation that it was the intended target of the predicate wrongs directed at the Employees or the Tullett Subsidiaries. This reliance does not overcome its inability to demonstrate a direct injury proximately caused by BGC's purported misconduct. And because the only misrepresentations pled with particularity were allegedly directed to brokers employed by the Tullett Subsidiaries, for whom Tullett UK cannot claim any injury, Tullett UK has not alleged a pattern of racketeering with the particularity required by Rule 9(b).

Its other claims fare no better. Tullett UK fails to cite authority that supports the creation of an independent "raiding" cause of action. And it has not shown interference with a protectable business relationship of its own or

misappropriation of any trade secret or confidential business information that it, as opposed to its subsidiaries, owns.

## ARGUMENT

### I.

### Tullett UK Is Not the Real Party in Interest and Thus Lacks Standing

In the face of BGC's standing argument, Tullett UK's insistence that it is the real party in interest cannot overcome its own allegations – and the incontrovertible facts – that prove otherwise. The FAC alleges that the Employees were employed by the Tullett *Subsidiaries*, not Tullett UK, and that the impact (if any) from the Employees' resignations was felt by the Tullett Subsidiaries. (*See* Mem. at 5-8; Opp. at 17 ("the Raid did substantial damage to the Tullett *Subsidiaries*"); *id.* at 18 ("Here, the Tullett *Subsidiaries* were victimized").)

Meanwhile, the Tullett Subsidiaries have brought claims in the FINRA Arbitration that make all of the same factual allegations and accusations of wrongdoing as are found in the FAC. (*See* Harker Decl. Exs. 3, 5.) Tullett Financial even described itself in the FINRA Arbitration as "the real party in interest" with respect to the Employees that resigned from it. (*Id.* Ex. 3 ¶ 8 n.1). Tullett UK's assertion that it "has suffered harm to *its own* business, goodwill and reputation" (Opp. at 12 (emphasis in original)) does not change which Tullett entities employed these brokers, serviced their customers, and have claimed direct losses from their resignations.

866136.1

3

Tullett UK's disregard for the distinct legal existence and interests of a parent and its subsidiaries is both puzzling and baseless. Its damage theory is based on the premise that a foreign parent may recover for a decline in the price of its stock, traded on a foreign exchange, because its U.S.-based subsidiaries suffered damages in the form of lost revenue, or are *expected* to lose future revenue. This theory falls apart at inception.

First, Tullett UK cannot satisfy the required causation element of its claims under this tortuous theory. (*See* Mem. at 39-44, 52-53; *infra* at Parts IV.C.1, V.B.) But even if it could, and was able to trace every dollar of lost market capitalization to its subsidiaries' injuries (instead of independent market conditions or investor decisions),[2] any such recovery would be duplicative of a recovery by the Tullett Subsidiaries in the FINRA Arbitration. Nowhere does Tullett UK assert that it suffered any cognizable economic loss – *e.g.*, a decrease in *its* balance sheet or revenue – separate and apart from the Tullett Subsidiaries' alleged losses. Rather, under Tullett UK's reasoning, any publicly traded company whose market capitalization drops because its subsidiary suffers damages has standing to sue. This theory – which would result in thousands of duplicative lawsuits by parent

_____

[2] In particular, Tullett UK makes no effort – in the FAC or its brief – to explain how the drop in its stock price is attributable *solely* to what it calls the "Raid," rather than the host of independent factors and issues relevant to the stock price of a corporation like Tullett UK with multifaceted business interests.

companies whose subsidiaries suffer damages – is not, and cannot be, the law.[3]

Rather, the rejection of this premise in *ErgoBilt, Inc. v. Neutral Posture*

*Ergonomics, Inc.*, 1998 WL 483624, at *3 (N.D. Tex. Aug. 10, 1998), is exactly on

point.[4]  (*See* Mem. at 14-15.)

Tullett UK's allegations of loss of goodwill and reputation similarly

fail to confer standing.  *All* of those allegations identify injury allegedly suffered by

the Tullett *Subsidiaries*, not Tullett UK.[5]  (*See* Mem. at 7-8.)  Tullett UK's

---

[3] For example, as Tullett mentions in the FAC, it and some of its UK affiliates
are co-plaintiffs in a proceeding in the United Kingdom concerning hiring by a BGC
UK affiliate.  The alignment of the parties in this single UK proceeding shows that
even Tullett UK acknowledges that it cannot double recover for damages to one of
its subsidiaries.  Otherwise, the facts and issues in that action are irrelevant here.
(FAC ¶ 3 (defining the "Raid" as limited to the hiring of the 77 Employees who
were employed by its North American subsidiaries).)  Indeed, the Court in the UK
proceeding denied the application by Tullett UK and its UK affiliates to introduce
evidence concerning brokers in the United States.  Accordingly, Tullett UK's
request to comment on the applicability of a recent decision in the injunctive phase
of the UK proceeding should be denied.  The UK litigation and this action concern
different facts and should be viewed separately, as the UK court has acknowledged.

[4] That the plaintiff in *Ergobilt* brought a Lanham Act claim (*see* Opp. at 15-16),
has no bearing on its applicability to this standing analysis.  Nor is the Second
Circuit's relevant observation in *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*,
524 F.2d 275, 281 n.6 (2d Cir. 1975), that "[s]peaking *generally*, a rise or fall in the
market price of the corporate shares does not make the corporation richer or poorer,"
limited by the type of the plaintiff's claims.  Moreover, the cases Tullett UK cites
for the proposition that an issuing corporation is the *only* party that may seek to
recover for a drop in its stock price (Opp. at 15) are inapposite.  In none of those
cases is the stock price drop alleged to have been caused by injury to the issuer's
*subsidiary*, rather than to the issuer itself.

[5] Cases alleging actual losses to the *plaintiff* are distinguishable.  (Opp. at 16.)

assertions that *it* suffered a loss of goodwill or reputation – distinct from such losses

by its subsidiaries – *are* impermissibly "vague and unsubstantiated."[6]  (Opp. at 16 .)

Tullett UK's other arguments in opposition are unavailing.  Its criticism

that all of the cases cited by BGC "involve situations in which the parent

corporation is seeking to step in the shoes of the subsidiary" (Opp. at 13) ignores

that Tullett UK seeks to do *exactly* that here.  BGC has not, as Tullett UK asserts,

argued that Tullett UK is "barred from seeking recovery for damage" because its

subsidiaries also have been damaged.  (Opp. at 14.)  Rather, it cannot seek recovery

for damages *it has not suffered*, or which, at best, are duplicative.[7]

Moreover, under Delaware law, pursuant to which the Tullett

Subsidiaries are organized (*see* Harker Decl. Ex. 5 at ¶¶ 7-8), a shareholder cannot

sue directly for a decline in the value of its shares caused by an injury to the

company, except in extraordinary circumstances not applicable here.  *See Tooley v.*

---

[6] While its allegations concerning loss of goodwill are vague and unsupported, in specifying an amount of damages, Tullett UK violates Local Rule 8.1.

[7] The standing cases Tullett UK cites (Opp. at 12-13) are either easily distinguishable, *see Weisel Partners LLC v. BNP Paribas, BNP*, 2008 WL 3977887, at *1, 3 (N.D. Cal. Aug. 26, 2008) (parent was real party in interest and suffered direct injury), or were wrongly decided and are not binding.  *See Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.*, 956 F. Supp. 910, 916 (D. Kan. 1997) (acknowledging that "injury arising solely out of harm done to a subsidiary corporation is generally insufficient to confer standing," but refusing to apply this rule); *Hillhaven Corp. v. Wis. Dep't of Health and Soc. Servs.*, 634 F. Supp. 1313, 1326 (E.D. Wis. 1986) (ignoring corporate form because parent was "d/b/a" its subsidiaries).

*Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035, 1039 (Del. 2004). Tullett UK's claim – derived entirely from the purported decline in value of its ownership interest in its subsidiaries – thus cannot be brought directly.[8]

## II.
### The Tullett Subsidiaries Are Necessary and Indispensible Parties

Even if this Court decides that Tullett UK has standing, the non-diverse Tullett Subsidiaries are necessary and indispensible parties, and the action must be dismissed. (*See* Mem. at 16-25.)

### A.    The Tullett Subsidiaries Are Necessary Parties

Tullett UK fails to overcome BGC's arguments that the Tullett Subsidiaries are necessary parties under Rule 19(a). Its conclusory assertion that it is the real party in interest in this action is undermined by the facts. Although it concedes that this action and the FINRA Arbitration involve at least "overlapping issues" (Opp. at 46), the issues are actually *identical*. (*See* Mem. at 5-8, 17-20.) Tullett UK has simply named the parent companies as parties, restated some of the Tullett Subsidiaries' tort claims, and added a few additional claims – all of which are based on, and allege damages that are derived entirely from, the same facts and

---

[8] It is black letter law that "[t]he fact that a shareholder owns all, or practically all, or a majority of the stock does not of itself authorize the shareholder to sue as an individual." William Meade Fletcher, 12B FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5910 (West 2009) (footnotes omitted).

damages alleged by the Tullett Subsidiaries in the FINRA Arbitration.[9] The case law cited by BGC in its Opening Brief makes clear that under these circumstances, the Tullett Subsidiaries are necessary parties. (*See* Mem. at 17-20.)

By contrast, Tullett UK's reliance on cases holding that joint tortfeasor defendants are not necessary parties (*see* Opp. at 46) is misplaced. BGC has not argued that the Tullett Subsidiaries are joint tortfeasors, or that the BGC Subsidiaries are necessary parties. Rather, Tullett UK confuses non-joined plaintiffs with non-joined defendants, which are treated differently for purposes of Rule 19. *See, e.g.*, *Dickson v. Murphy*, 202 Fed. Appx. 578, 580-81 (3d Cir. 2006) (distinguishing between non-joined plaintiffs and defendants).[10]

The substantial risk of inconsistent and multiple exposure if the Tullett Subsidiaries are not joined is very real, despite Tullett UK's protestations. (Opp. 47-48.) On inconsistency, Tullett UK's claims and factual allegations are the same as its subsidiaries. Adjudicating these in two different fora risks not only "'logically

---

[9] Tullett UK's reliance on *E.I. DuPont de Nemours and Co. v. Rhodia Fiber and Resin Intermediates, S.A.S.*, 197 F.R.D. 112 (D. Del. 2000), is misplaced. There, the joined party claimed damages arising from fraudulently induced loan guarantees it made separate and apart from the non-joined subsidiary's contractual relationship with the defendant. *Id.* at 124. Here, each Tullett entity's alleged injuries arise from the same alleged wrongdoing, and Tullett UK's damages – if they were cognizable – must be traced to the Tullett Subsidiaries' damages.

[10] Nor does BGC base its non-joinder argument on a simple principal/agent relationship (Opp. at 46), rendering *Inox Wares Pvt. Ltd. v. Interchange Bank*, 2008 WL 4691906, at *10 (D.N.J. Oct. 22, 2008), inapposite.

inconsistent decisions'" (Opp. at 46), but also contradictory judgments affecting all of the related parties.  Moreover, FINRA, whose Rules preclude depositions except in extraordinary circumstances, is likely to prohibit the Tullett Subsidiaries from taking depositions.  Meanwhile, Tullett UK will take depositions in this action of the brokers named as individual respondents in the FINRA Arbitration.  (Mem. at 19 n.16.)  Undoubtedly, the Tullett Subsidiaries – represented by the same counsel as Tullett UK – will seek to use information from those depositions to their advantage in the FINRA hearing against these same brokers.[11]

And on multiplicity, if *both* this Court *and* FINRA were to conclude that the recruitment of the Employees was unlawful, and *both* awarded damages, then the recovery by the Tullett entities from the BGC entities – given Tullett UK's damage theory – would truly be double.  The unfairness of such double recovery would not be ameliorated simply because different corporate relatives would pay, and receive, the judgments.  Moreover, the cases Tullett UK cites (Opp. at 48) are inapplicable because none involves non-joined plaintiffs.[12]

---

[11] This example demonstrates why the conflicting orders consideration expressed in the cases cited by Tullett UK (*see* Opp. at 47) is implicated here.  The parties will violate FINRA's order prohibiting depositions by complying with this Court's order to produce the same witnesses for what will be the same depositions.

[12] Tullett UK's assertion that the Tullett Subsidiaries' interests are "adequately protected" by Tullett UK (Opp. at 46) fails.  While a potential recovery by the subsidiaries would automatically flow to Tullett UK and make it whole, the benefits of a recovery by Tullett UK, would not necessarily inure to the Tullett Subsidiaries'

**B.**    **The Tullett Subsidiaries Are Indispensible Parties**

      Tullett UK's arguments under Rule 19(b) fail for many of the same reasons.  Tullett UK's criticism of the cases BGC cites – that in each, a legal interest belonging to a non-joined party was being adjudicated (Opp. at 49-50) – misses the point.  By adjudicating the lawfulness of the BGC Subsidiaries' hiring of the Employees, this Court would indeed be adjudicating whether the non-joined Tullett Subsidiaries' legal interests vis-à-vis the Employees have been violated.

      Tullett UK's overly technical argument that there could not be duplicative recovery (Opp. 50) ignores that Tullett UK is trying to recover from BGC the same damages that the Tullett Subsidiaries are trying to recover from the BGC Subsidiaries.[13]  It would turn Rule 19 on its head to permit Tullett's corporate family to recover the same damages from BGC's corporate family twice.

      Lastly, because the Employees worked for the Tullett Subsidiaries and now work for the BGC Subsidiaries, an award of damages and/or injunctive relief in

---

benefit.  In the cases Tullett UK cites, either the parent's interests were not already protected by nearly identical litigation commenced by its subsidiary, *see GE Healthcare v. Orbotech, Ltd.*, 2009 WL 2382534 (E.D. Wis. July 2, 2009), or the defendant failed to identify potential harm to the non-joined subsidiary, *see Bayer Corp. v. Smithkline Beecham PLC*, 1996 WL 34164, at *5 (S.D.N.Y. Jan. 29, 1996).

    [13] In *Pittsburgh Corning Corp. v. Travelers Indemnity Co.*, 1988 WL 100787, at *3 (E.D. Pa. Sept. 14, 1988), there was no possibility that the defendant could face multiple and inconsistent liability because the non-joined claimants had no right under law or contract to bring a claim against the defendant.

the FINRA Arbitration (where those entities are the parties) would obviate the need

for any award in favor of Tullett UK.  If the Court were to apply the logic of Tullett

UK's damage theory (ignoring its flawed causation assumptions), and if the Tullett

Subsidiaries were to recover in the FINRA Arbitration, then the market's reaction to

any such recovery would cause a corresponding rise in Tullett UK's stock price.

Similarly, if the Tullett Subsidiaries were to obtain injunctive relief, the only hiring

of which Tullett UK complains would stop.[14]  (*See* Mem. at 23-24.)

## III.
### This Action Should Be Stayed Pending the Resolution of the FINRA Arbitration To Avoid Circumvention of FINRA's Mandatory Arbitration of the Same Alleged Wrongdoing

Even if not dismissed, this action should be stayed.  Tullett UK cannot

contravene FINRA's mandatory arbitration of the dispute between its registered

subsidiaries and BGC's by simply swapping in the parties' corporate parents in a

non-arbitral forum.  Denial of a stay would expose the individual respondents in the

FINRA Arbitration, who are not subject to depositions in that proceeding, to

depositions in this action.  The Tullett Subsidiaries will, inevitably, seek to use that

discovery in the FINRA Arbitration.[15]  Such an attempt to undermine FINRA's

---

[14] Because the availability of an alternate forum is not the only factor weighing in favor of a Rule 19(b) dismissal, the cases Tullett UK cites on this point (*see* Opp. at 51) are irrelevant.

[15] This fundamental divergence between federal court discovery and FINRA discovery makes the coordination of discovery contemplated in the parallel court

statutory scheme, and the streamlined discovery that scheme mandates, should not be countenanced – especially because Tullett UK seeks merely to circumvent FINRA in order to recover treble damages under NJ RICO.

Tullett UK's citation of inapposite cases does not alter that conclusion. BGC's invocation of the abstention doctrine (Mem. at 25-28) is not an argument for a mandatory stay under Section 3 of the Federal Arbitration Act. (*Contrast* to cases cited at Opp. at 52-53.) Nor is BGC's position premised on speculation about parallel proceedings that *might* be commenced, or where discovery is nearly complete in the federal action, or where the corporate defendant that hired the employees at issue is not a party to the parallel arbitration. (*Id.* at 52-53.) BGC clearly has identified hardship that it, its subsidiaries, and the individual FINRA Arbitration respondents will suffer absent a stay. (Mem. at 27-28.) Even Tullett UK admits that the issues in the parallel proceedings – which arise from identical facts – at least "overlap."[16] And because the two actions are essentially co-extensive, judicial resources will be wasted absent a stay, unlike in *Balfour v. Gutstein*, 547 F. Supp. 147, 149 (E.D. Pa. 1982).

---

proceedings in *United Refining Co. v. Department of Energy*, 486 F. Supp. 99, 100-01 (W.D. Pa. 1980) unworkable.

[16] *Compare In re Barney's, Inc.*, 206 B.R. 336, 344 (Bankr. S.D.N.Y. 1997) ("the issues to be resolved in this litigation and the arbitration proceeding do *not* overlap"), *with* Opp. at 46 ("this action *does* involve overlapping issues").

**IV.**

**The Complaint Fails to State a NJ RICO Claim**

**A.    NJ RICO Does Not Apply to Conduct Causing Alleged Injury to Third Parties with Only an Incidental Effect on New Jersey Commerce**

The purpose of NJ RICO is to combat racketeering enterprises that impact New Jersey commerce and that have no more than "an incidental effect on interstate commerce." *State v. Passante*, 542 A.2d 952, 955 (N.J. Super. Ct. Law Div. 1987). Applying NJ RICO to the facts alleged in the FAC would fly in the face of that purpose. In doing so, the Court would permit a non-domiciliary plaintiff to sue a non-domiciliary defendant for conduct occurring outside the state, that primarily affected interstate and foreign commerce, and that, at most, had an incidental effect on third parties located in New Jersey.[17] (Mem. at 31-32.) This result would be particularly troubling because the only parties arguably impacted in New Jersey – the Tullett Subsidiaries[18] – have already initiated their own legal actions based on the same purported misconduct.[19] (Part I, *supra*.)

---

[17] The authorities Tullett UK relies on (Opp. at 17-18) are inapposite. In *Ford Motor Co. v. Edgewood Properties, Inc.*, 2009 WL 150951 (D.N.J. Jan. 20, 2009), the racketeering activities occurred wholly within New Jersey, solely affected New Jersey commerce and caused direct injury to plaintiff. The two cited criminal cases implicate New Jersey's public safety concerns that are utterly lacking here.

[18] *See* Opp. at 17 ("the Raid did substantial damage *to the Tullett Subsidiaries*").

[19] Tullett UK relies on alleged injury to the Tullett Subsidiaries as the basis for the application of NJ RICO. This reliance is directly at odds with its denial elsewhere of attempting to assert those subsidiaries' rights. (Opp. at 14.) Moreover,

**B.**    **All Choice of Law Factors Result in the Application of New York Law**

Instead of New Jersey, New York law should apply, as it has the most significant relationship to the facts and circumstances underlying Tullett UK's RICO claim. Tullett UK argues that BGC misapplied the choice of law analysis by focusing on the place where BGC's alleged tortious conduct occurred, and neglecting to consider additional choice of law factors found in Restatement Sections 145 and 6.[20] But BGC's focus on place of conduct is appropriate, and consideration of the additional factors does not alter the conclusion that New York law applies.

The Restatement and caselaw instruct that "the place where the defendant's conduct occurred" should "be given particular weight" when, as is the case with NJ RICO,[21] the primary purpose of the "tort rule involved is to deter or punish misconduct." RESTATEMENT (SECOND) CONFLICT OF LAWS § 145 cmt. e

---

the minimal effect on these third parties in New Jersey does not bring Tullett UK within the statute's scope. (*See* Mem. at 30.)

[20] Tullett UK concedes that the only additional factor from Sections 145 and 6 to be considered is the place of the alleged injury. (Opp. at 21 n.6.)

[21] NJ RICO's primary purpose is not to compensate and protect its citizens by enforcing civil sanctions (Opp. at 22-23 (citing cases that have nothing to do with NJ RICO)); it is to "prevent[], disrupt[] and eliminate[e] the infiltration of organized crime type activities into the commerce of this State." *Passante*, 542 A.2d at 955; *see also Clark v. Prudential Ins. Co. of Am.*, 2009 WL 2959801, at *10 (D.N.J. Sept. 15, 2009) (availability of treble damages reflects goal of deterrence).

(1971); *see also In re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. 46, 67 (D.N.J. 2009); (Mem. at 33-34).

The place of conduct also will be given particular weight "when the [alleged] injury occurred in two or more states." Restatement § 145 cmt. e. While Tullett UK argues that the injury occurred in a single state and that the place of injury should be afforded more weight than the place of conduct (Opp. at 21-22), it is wrong on both counts. First, the only injury actually alleged was sustained by the Tullett Subsidiaries, not Tullett UK. And that injury occurred – if at all – in both New Jersey and New York, where the Employees worked and where the Tullett Subsidiaries maintain offices. (FAC ¶¶ 34, 38.) If Tullett UK had alleged an independent injury (which it has not), that injury occurred in London, not New Jersey. (*See* Part I, *supra.*) Second, courts recognize that with claims of fraud or misrepresentation "the place where the injury occurred does not play an important role in the choice of applicable law because there is 'little reason in logic or persuasiveness to say that one state rather than another is the place of injury.'" *Clarke*, 2009 WL 295801, at *11 (quoting Restatement § 145 cmt. e).

The other choice of law factors relied on by Tullett UK do not favor New Jersey either. As to the place plaintiff received and relied on the alleged misrepresentations, Tullett UK predictably mentions only those communications

received in New Jersey. (Opp. at 20.)[22] It completely ignores the fact that *70 of the 77* Employees were employed by a Tullett Subsidiary in New York, and that none of the alleged recruiting meetings took place in New Jersey. (*See* Mem. at 35.)[23] More significantly, none of the alleged misrepresentations was directed toward, received, or relied upon by Tullett UK. Finally, Tullett UK's principal place of business argument (Opp. at 20) ignores both its own allegations and the law. (*See* FAC ¶ 11 (Tullett UK is "headquartered" in "London")); *Hertz Corp. v. Friend*, 130 S. Ct. 1181, No. 08-1107, slip. op. at 14 (Feb. 23, 2010) (company has only one principal place of business, the location of its headquarters).

## C.    Tullett UK Has Failed to State a NJ RICO Claim

### 1.    Tullett UK Lacks Standing for its NJ RICO Claim Because it Has Failed to Adequately Allege Direct Injury and Causation

Tullett UK lacks standing to bring its NJ RICO claim for two reasons. First, neither of its theories of injury – the stock price drop, or the loss of goodwill and reputation – is based upon a direct injury to Tullett UK. Second, the injury it

---

[22] Most, if not all, of the New Jersey communications are irrelevant to the choice of law analysis. (Mem. at 34 n.29, 36 n.31.) Tullett UK's reliance on two criminal mail and wire fraud cases for the proposition that communications that do not induce reliance or injury are relevant to the choice of law analysis (Opp. at 23) is misplaced. Civil RICO plaintiffs, unlike prosecutors, are required to show direct injury caused by the alleged fraud. (Mem. at 37.)

[23] Tullett UK's argument that the Court should disregard its earlier admission in the FINRA Arbitration that New York law should apply because an additional 25 brokers left after the SoC was filed (Opp. at 22 n.8) makes no sense: all but seven of the later-hired brokers were based in New York. (Mem. at 9-10.)

has alleged is too attenuated from the alleged predicate acts to establish proximate causation.

As demonstrated in Part I, Tullett UK has failed to articulate any theory under which it could have suffered direct injury. Tullett UK has offered no persuasive distinction for the application here of the holding in *Frigitemp* – that a decline in its stock price does not harm Tullett UK.[24] Even if Tullett could allege a cognizable distinct injury, it still would be based on injuries suffered in the first instance by its subsidiaries, which is insufficient to confer RICO standing. As the Supreme Court recently held, "in the RICO context the focus is on the *directness* of the relationship between the conduct and the harm." *Hemi Group LLC v. City of New York, N.Y.*, 130 S. Ct. 983, 989 (2010) (the party injured by the predicate acts was *not* the plaintiff). In these circumstances, courts routinely deny RICO standing for such indirect allegations of harm. (*See* cases cited at Mem. at 40-41); *see also Browne v. Abdelhak*, 2000 WL 1201889, at *5 (E.D. Pa. Aug. 23, 2000).

On its other damage theory, Tullett UK cites cases for the proposition that losses to goodwill and reputation can be cognizable RICO injuries if "linked to a concrete loss to the plaintiff's business or property." (Opp. at 24-25.) But those cases only highlight the deficiencies in the FAC, which fails to demonstrate any

---

[24] Tullett UK dismisses BGC's argument, labeling it a "rehash" of BGC's standing argument. But the point is applicable in both the general and RICO-specific standing sections, and has not been neutralized by Tullett UK.

measurable economic loss to Tullett UK separate and apart from the Tullett Subsidiaries' alleged losses.[25]

      In addition to its alleged injury being too indirect, Tullett UK also lacks standing because it has not pled proximate causation. Tullett UK never denies that its stock drop injury was directly caused – if at all – by the public disclosure of the purported misconduct, rather than by the alleged predicate acts. (Mem. at 40.) Nevertheless, it argues that there is a "direct causal link" between the predicate acts and its alleged injury because Tullett UK was the "intended target" of BGC's wrongful acts. (Opp. at 26-27.) But Tullett UK's alleged injury was caused by alleged misconduct directed at the Employees and/or the Tullett Subsidiaries. (FAC ¶ 34 ("Tullett Financial and … Tullett Prebon Americas Corp … [the Tullett Subsidiaries] were the *primary targets* of the Raid").) While Tullett UK contends such injury is sufficient under RICO (Opp. at 27-28), the authority it cites pre-dates the Supreme Court's seminal decision in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), and misstates the controlling law.[26] In any event, Tullett UK's "intended target" analysis cannot stand in for the required showing of

---

[25] Tullett UK's lack of any economic losses linked to any alleged reputational injury make its cited authorities inapposite. (Opp. at 24-25.)

[26] Tullett UK attempts to sidestep this indirectness by conclusorily stating that there is a direct causal link between the predicate acts and the *disclosure*. (Opp. at 28.) Even if true, the connection between those two points in the causal chain does not bring the end points – the predicate acts and injury – any closer together.

proximate causation. *See Zavala v. Wal-Mart Stores, Inc.*, 447 F. Supp. 2d 379, 388 (D.N.J. 2006) ("a plaintiff cannot circumvent the directness requirement simply by claiming that the predicate acts were performed with intent to produce the injury").

Even if Tullett UK could legitimately base its causation theory on public disclosure of the alleged scheme, the chain of causation is simply too attenuated.[27] BGC supposedly deceived 77 individuals into working for the BGC subsidiaries.[28] Their departure allegedly caused the Tullett Subsidiaries to lose revenue. That event (or the prediction of such loss) subsequently led analysts to downgrade the stock of the foreign parent company, Tullett UK. And *that* event allegedly caused Tullett UK's stock price to fall. (Opp. at 9; FAC. ¶ 112.) Even putting aside why each Employee independently decided to resign, this attenuated

---

[27] Tullett UK's reliance on authorities for the proposition that a legally sufficient causal chain is not broken merely because the chain encompasses acts of third parties (Opp. at 29) is misplaced. None of the three cases it cites involves simultaneous actions brought by direct recipients of the misrepresentations seeking relief for related, if not the same, injuries, as is the case here.

[28] While Tullett UK claims that the Employees' attorneys made misrepresentations to Tullett UK (Opp. at 30), the FAC alleges that these were made to counsel for the Tullett Subsidiaries. (FAC ¶¶ 108-110.) The FAC also alleges that, had BGC been truthful, the *Tullett Subsidiaries* could have taken steps to prevent further defections. But the FAC makes clear that the Tullett Subsidiaries (and presumably Tullett UK) viewed the lawyers' representations as "obviously false," and thus they could not have relied upon them. (*Id.* ¶ 109); *see also State v. Mann*, 583 A.2d 372, 374 (N.J. Super. Ct. App. Div. 1990) (no reliance where the intended victim was not deceived).

chain of causation leaves Tullett UK's injury too remote from the predicate acts to satisfy NJ RICO's proximate cause requirement.[29]  (Mem. at 42-43.)

> **2.  Allegations of Non-Deceptive Conduct That Have Caused Tullett UK No Injury Fail to Allege a Pattern of Racketeering Activity**

Tullett UK does not, as it must, plead a pattern of racketeering activity. Rather, it relies upon allegations of conduct that could not have caused it injury, were not deceptive or were not directed at Tullett UK.  None of these constitutes actionable predicate conduct.

Its rejoinder to BGC's argument that the FAC fails to satisfy the particularity requirement of Rule 9(b) is based entirely on allegations concerning brokers currently employed by the Tullett Subsidiaries.  (Opp. at 31.)  Those allegations – even if true – are not actionable predicate conduct under NJ RICO because they could not have resulted in *any* harm to Tullett UK.[30]  Notably, Tullett

---

[29] Tullett UK defends its claim under N.J. Stat. Ann. § 2C:41-2(a) by arguing that "BGC actively invested in the RICO enterprise . . . ." (Opp. 30 at n. 14.)  But this subsection requires the plaintiff to allege an injury that was *not* caused by the predicate acts of racketeering, as the authority cited by Tullett UK acknowledges. *See Yarosh v. Salkind*, 2005 WL 1459719, at *6 (D.N.J. June 21, 2005).  And Tullett's silence concedes that it has no claims under subsections (b) and (d) of the statute.  (Mem. at 43-44 n.32.)

[30] Tullett UK also states that it has specifically set forth its allegations concerning misappropriation of confidential information and letters sent by lawyers for the Employees.  (Opp. at 31).  However, it does not have a NJ RICO cause of action based on misappropriation of confidential information (Mem. at 48 n.35.), and, as explained below, the Tullett Subsidiaries were not deceived by the supposed misrepresentations.

UK does not deny that it has not pled with particularity even a *single* misrepresentation that was made by BGC to a broker who is currently employed by a BGC Subsidiary.  (Mem. at 45.)[31]

Tullett UK has failed to sufficiently allege predicate acts of mail and wire fraud because it has not set forth facts to establish any deception by BGC. (Mem. at 45-46).  It contends that BGC's alleged statements are actionable because the FAC "specifically alleges that BGC knew that each such statement was false when made."  (Opp. at 33.)  However, only one of the paragraphs plaintiff cites to contains an allegation that the speaker knew the representation was false at the time, and that lone paragraph relates to a broker (Farrell) who is *currently* employed by a Tullett Subsidiary.  (FAC ¶ 63.)

Finally, Tullett UK's assertion that letters sent by attorneys for the Employees contained factual misrepresentations to counsel for the Tullett Subsidiaries (Opp. at 33-34) is simply inaccurate.  Those letters contain legal opinions that the clients had not engaged in any misconduct, and what Tullett UK labels deceptive statements are nothing more than legal positions with which it disagrees.  (Mem. at 47-48.)  Courts have rejected similar attempts to "transmute" correspondence between attorneys into RICO claims "by simply appending the

---

[31] None of the cases cited by Tullett UK concerning Rule 9(b) suggests that a plaintiff can circumvent this pleading requirement by alleging with particularity a fraud for which it suffered no injury.  (Opp. at 28 n.13, 31-32.)

terms 'false' and 'fraudulent'" to legal positions.  *Kolar v. Pref. Real Estate Invs., Inc.*, 2010 WL 104500, at *6 (3d Cir. Jan. 12, 2010).

**V.**

**The Complaint Fails To State Any Common Law Claims**

**A.**   **Tullett UK's "Raiding" Claim Is Devoid of Legal Support**

No court that has ever considered the issue has held that "raiding" is a cognizable independent cause of action.  (Mem. at 49.)[32]  The sole case Tullett UK relies on in support of its raiding claim, *O'Brien Oil Pollution Services, Inc. v. Kapoor*, 2009 WL 2407399 (D.N.J. Aug. 4, 2009), is not to the contrary.  There, the parties never disputed, and the court never analyzed, whether "raiding" was an independent, cognizable claim.  The parties merely argued whether the claim was supported by the evidence, each citing tortious interference cases for support.[33]

Nor does an unpublished report prepared following a law firm-sponsored conference at which some attendees advocated for the recognition of "raiding" as an independent tort save Tullett UK's claim.  (Opp. at 34.)[34]  None of

---

[32] *See also Gallup, Inc. v. Talent-Point, Inc.*, 2001 WL 1450592, at *9-10 (E.D. Pa. Nov. 15, 2001) (naming multiple states that do not recognize raiding as a separate cause of action).

[33] *See Kapoor*, No. 06-CV-2945, Dkt. Nos. 35 & 36 (relying on *Avtec Indus., Inc. v. Sony Corp. of Am.*, 500 A.2d 712 (N.J. Sup. Ct. App. Div. 1985) and *Wear Ever Aluminum v. Townecraft Indus., Inc.*, 182 A.2d 387 (N.J. Sup. Ct. Ch. Div. 1962), both of which Tullett UK cites for *tortious interference* (Opp. at 37)).

[34] This report collected the anonymous views of approximately 50 hand-picked attorneys.  *See* Dana N. Pescosolido and Christopher P. Stief, *Raiding in the*

the factors Tullett UK cites from that report – economic harm, malicious or predatory motive, and improper means (*Id.*) – warrants such recognition. They are indistinguishable from elements of tortious interference and unfair competition.[35]

## B.   The Tortious Interference Claim Fails Because it Rests <u>Upon Conduct Allegedly Directed at the Tullett Subsidiaries</u>

Tullett UK has not, and cannot, support the existence of its patently deficient claim for tortious interference with a parent's relationship with its subsidiary. It has not cited a single case recognizing the undefined "economic relationships" between a parent and its subsidiaries as a protectable interest upon which to base such a claim.[36] (FAC ¶ 147.)   Nor does it allege any facts to show

---

*Securities Industry: The Search for Consensus*, at 1 (Sept. 25, 2003). These attorneys mostly represented retail brokerage firms – not inter-dealer brokers – whose clients were known only to the brokers, not their competitors. Thus, these retail brokerage firms had a greater concern for the theft of information about the identity of their customers, as compared to the institutional clients of inter-dealer brokers, whose identity is known to multiple market participants. Moreover, when these lawyers voted on whether "raiding should be considered an independent cause of action," nearly a third had already left the conference. *Id.* at 4 & n.2. This type of ad hoc procedure cannot provide the basis for the creation of a new common law tort that can be recognized by a federal court.

[35] *See, e.g., Wear Ever*, 182 A.2d at 391 (tortious interference); *Wellness Publ'g v. Barefoot*, 2008 WL 108889, at *20 (D.N.J. Jan. 9, 2008) (unfair competition).

[36] In contrast to Tullett UK, the plaintiffs in the tortious interference cases cited by Tullett UK (Opp. at 37) were parties to the business relationships with which defendants allegedly interfered. Tullett UK has merely alleged "'interference' with the benefits derived from a relationship that leaves the relationship itself unchanged in any way." *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 270 (2d Cir. 1987) (dismissing claim where plaintiff did not allege "interference with the

that BGC intentionally interfered with this or any of *Tullett UK's* relationships. Rather, the gravamen of its claim – of the entire FAC – is that BGC "induced and/or encouraged [the] Tullett [*Subsidiaries'*] employees to resign and join BGC, thus interfering with Tullett [UK]'s economic relationships with its subsidiaries." (*Id.*)

These circumstances give no basis for an independent tortious interference claim. Nor does Tullett UK give any logical explanation of how conduct allegedly directed at employees of the Tullett Subsidiaries could interfere with the parent-subsidiary relationship. Accepting Tullett UK's strained theory would allow corporate parents to assert claims of this nature every time a subsidiary is injured. Such an attempt to shoehorn a derivative claim into tortious interference with business relationships – and thus enjoy a double recovery – should be rejected.

## C.   Tullett UK Does Not Own Any Relevant Trade Secret or Confidential Information

Tullett UK cannot claim that it is the *owner* of a trade secret or other confidential information allegedly misappropriated. This fundamental flaw denies it standing to bring a misappropriation or unfair competition claim regarding the unauthorized use of that information.[37] Tullett UK argues that it satisfies this

---

underlying business relations"); *see also Novartis Pharm. Corp. v. Bausch & Lomb, Inc.*, 2008 WL 4911868, at *4 (D.N.J. Nov. 13, 2008) (no conflict between NY and NJ tortious interference law).

[37] *See* 4-15 MILGRIM ON TRADE SECRETS § 15.01[1] n.5 (Matthew Bender & Co. 2009) ("requirement that the *plaintiff* be an owner of the trade secret is virtually

requirement merely by alleging that the "information taken by BGC belonged to Tullett [UK]." (Opp. at 40.) But that conclusion is belied by Tullett UK's own allegations. Indeed, the FAC and SoC make clear that the relevant information[38] "belonged" to the brokers themselves, or to the Tullett Subsidiaries for whom the Employees worked – and not to Tullett UK.[39] (*See* FAC ¶ 135; Mem. at 3; Harker Decl. Ex. 3 ¶ 8 n.1; Part I, *supra*.)

---

uniform") (emphasis in original); (Mem. at 54-55). The plaintiffs in the misappropriation cases Tullett UK cites (Opp. at 40-41) owned the information for which protection was sought.

[38] The only information relevant to the misappropriation claim is information allegedly *used* by BGC to Tullett UK's detriment – *i.e.*, primarily salary and employment information." (Mem. at 53-54.)

[39] To the extent the unfair competition claim is based on alleged "raiding activity" (Opp. at 43), it must be dismissed because Tullett UK lacks standing to assert claims based on conduct directed solely toward its subsidiaries. (*See* Parts I & V.B, *supra*; Mem. at 12-16.)

## CONCLUSION

For the foregoing reasons, and the reasons stated in BGC's Opening Brief, the Court should dismiss the FAC in its entirety, or in the alternative, stay this action pending resolution of the FINRA Arbitration.

Dated:  Newark, New Jersey
        March 26, 2010

Respectfully submitted,

ROBINSON, WETTRE & MILLER          FRIEDMAN KAPLAN SEILER &
LLC                                ADELMAN LLP

BY: _s/ Donald A. Robinson_        By: _Eric Seiler_
    Donald A. Robinson                 Eric Seiler (*pro hac vice*)
    Leda Dunn Wettre                   Hallie B. Levin (*pro hac vice*)
    Keith J. Miller                    Mala Ahuja Harker (*pro hac vice*)
    One Newark Center, 19th Floor      1633 Broadway
    Newark, NJ 07102                   New York, NY 10019-6708
    (973) 690-5400                     (212) 833-1100

*Attorneys for Defendant BGC Partners, Inc.*