<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TULLETT PREBON, PLC,    :<br>                             :<br>                  Plaintiff,  :<br>                             :<br>          v.                :<br>                             :<br>BGC PARTNERS, INC.,          :<br>                             :<br>                  Defendant. :<br>                             :<br>                             : | Civil Action No. 09-5365 (SRC)<br><br>**OPINION** |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court upon the motion filed by Defendant BGC Partners, Inc. to dismiss the First Amended Complaint [docket entry 35]. Plaintiff Tullett Prebon, plc opposes the motion. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because it is between a citizen of a foreign state and a citizen of the states of Delaware and New York and the amount in controversy exceeds $75,000. The Court has considered the papers submitted by the parties in connection with the instant motion, and pursuant to Federal Rule of Civil Procedure 78, rules without oral argument. For the reasons discussed below, the Court grants the motion to dismiss.

**I.     BACKGROUND**

In this lawsuit, one company engaged in the inter-dealer broker business seeks relief for a competitor's alleged poaching of 77 brokers, who had been employed by American subsidiaries

of the plaintiff company. Inter-dealer brokers create liquidity in financial markets by matching large wholesale bids and offers presented by banks, investment banks and other financial institutions on certain securities and derivative financial products. In other words, they broker financial products between traders at large financial institutions. The business mainly deals with products traded "over the counter," which means they are not traded on an organized exchange. Inter-dealer broker firms organize their business into groups, or "desks," that specialize in brokering specific types of securities. According to the First Amended Complaint, maintaining sufficient liquidity, that is, a pool of potential buyers and sellers large enough to allow the brokers to match trades for their customers, is essential to the successful operation of a desk. This level of liquidity cannot be achieved by a single broker but rather requires a "critical mass of brokers working as a team. A desk that falls below critical mass will not be able to provide sufficient liquidity for its customers, and will lose orders and revenues for the entire desk." (First Am. Compl., ¶ 18.) The First Amended Complaint states that interference with one desk's performance could have a ripple effect on other desks because clients often need to acquire positions in multiple financial products at the same time. Clients, the pleading avers, can be deterred from using a firm that loses sufficient liquidity at one of its desks.

      Having set forth the background of the industry out of which the instant dispute arises, the Court will summarize the relevant facts concerning the events giving rise to this lawsuit. The summary is based on the allegations of the First Amended Complaint, and their truth is assumed for purposes of this motion only.

      The Plaintiff is Tullett Prebon, plc, a United Kingdom company engaged in the inter-dealer broker business. (The Court will refer to the plaintiff company as "Plaintiff" or "Tullett

2

UK".)  Tullett UK owns subsidiaries globally, including the two American offices at issue in this lawsuit.  Its U.S. operations are headquartered in New Jersey.  Defendant BGC Partners, Inc. ("Defendant" or "BGC") is an inter-dealer broker incorporated in Delaware with a principal place of business in New York, New York.  BGC is a direct competitor of Tullett UK, and like its competitor, has subsidiaries with offices around the world.  According to the First Amended Complaint, Tullett UK is the second-largest inter-dealer broker in the world, and BGC is the fourth largest.

Tullett UK alleges that BGC and its affiliated companies have been pursuing a global strategy of luring brokers employed by Tullett UK subsidiaries to terminate their employment with the Tullett desks and join BGC operations.[1]  This lawsuit centers on the "Raid"[2] of two wholly owned subsidiaries of Tullett UK - Tullett Prebon Financial Services LLC ("Tullett

---

[1] The First Amended Complaint uses "Tullett" as an adjective throughout the pleading, referring for example to"Tullett brokers," "Tullett desks" and "Tullett information." It defines the term "Tullett" as "any and all of Tullett Prebon's [that is, Tullett UK's] operating *subsidiaries*, either individually or collectively."  (First Am. Compl., ¶ 2 n.1) (emphasis added). In other words, the term "Tullett" as an adjective concerns the subsidiaries, not the parent company.   It will have the same meaning in this Opinion. Moreover, the Court notes that unless the First Amended Complaint specifically identifies Tullett UK in an allegation, a fact alleged concerns an entity other than the Plaintiff.

[2] The "Raid" is expressly defined in the First Amended Complaint as "the poaching of 77 brokers that were taken from several of [Tullett UK's] New Jersey-based subsidiaries."  (First Am. Compl., ¶ 3.)  The Court uses this term merely because it is used in the First Amended Complaint, and it makes no findings here as to the accuracy of this characterization of Defendant's alleged activities.

Financial") and Tullett Prebon Americas Corp. ("Tullett Americas").[3] (When referred to collectively, Tullett Financial and Tullett Americas will be labeled the "Tullett Subsidiaries.") The Tullett Subsidiaries employed approximately 250 brokers at their Jersey City offices and about 150 brokers at their New York City offices. Plaintiff avers that, among other tactics, BGC enlisted the cooperation of several senior brokers and desk heads employed by some unspecified Tullett entity to gain access to confidential Tullett information used by BGC to lure the employees and to assist in the recruiting efforts. BGC would approach Tullett brokers, set up meetings and offer packages closely matching their terms of employment with Tullett Financial or Tullett Americas. They would also misrepresent to the brokers the number of people who would be defecting from the Tullett desks to join a BGC operation, misleading them into believing that they would be among the few staying at deserted, and thus ineffective desks. The first wave of employee resignations from the Tullett Subsidiaries occurred in August 2009, and further resignations followed. The resignation letters delivered by attorneys retained by BGC to represent the defecting employees advised that the employees had signed employment contracts with BGC Financial, L.P.[4] In total, the Tullett Subsidiaries lost 77 brokers from 10 different desks as a result of the Raid. Plaintiff avers that these brokers represent more than $100 million in average annual lost revenue.

The First Amended Complaint states that the Raid is the subject of pending arbitration with FINRA, the Financial Industry Regulatory Authority. Tullett Financial (then known as

---

[3] Tullett Prebon Financial Services LLC was formerly known as Tullett Liberty Securities LLC. Tullett Prebon Americas Corp. was formerly known as Tullett Prebon Holdings Corp.

[4] BGC Financial, L.P. is a subsidiary of Defendant BGC.

Tullett Liberty Securities LLC) commenced the FINRA arbitration against BGC Financial, L.P. in or about August 2009.  Later, Tullett Americas joined the arbitration, and it was expanded to include various individuals employed by the BGC subsidiary and various individuals who had resigned from the Tullett Subsidiaries.  In the First Amended Complaint, Tullett UK declares that it has brought this action because 1) the subsidiaries cannot recover for all of the damages suffered in the Raid, that is, those damages unique to Tullett UK, and 2) the FINRA arbitration cannot reach the conduct of BGC, the parent company defendant to this lawsuit, as it is not a FINRA member.

Plaintiff alleges that as a result of the Raid on the Tullett Subsidiaries, Tullett UK, the parent company, has suffered the loss of $387 million in market capitalization, measured by the drop in Tullett UK stock price between August 13, 2009 (the day before the Raid was announced and the first resignation letters were tendered) through December 28, 2009.  (First Am. Compl., ¶ 112.)  It further alleges that the Raid has caused harm and threatens further harm to Tullett UK's reputation, making it harder for subsidiaries to recruit new brokers and to retain current employees.  Tullett UK avers that "BGC's continued raiding of Tullett Prebon's subsidiaries threatens Tullett Prebon [the parent company] with enormous economic and reputational harm." (Id., ¶ 113.)

The First Amended Complaint contains five causes of action: a claim under the New Jersey Racketeering Influenced Corrupt Organizations statute, N.J.S.A. 2C:41-4; unfair competition; misappropriation of trade secrets and confidential information; tortious interference with business relationships; and raiding.

5

## II.     DISCUSSION

BGC has raised various grounds upon which it contends the First Amended Complaint must be dismissed. It has argued that Tullett UK lacks standing because it is not a real party in interest. It has also challenged the Court's subject matter jurisdiction on the basis that the First Amended Complaint fails to name two indispensable parties, whose joinder would destroy diversity jurisdiction. Alternatively, Plaintiff moves for dismissal of the causes of action pled for failure to state a prima facie claim to relief. The Court begins its analysis, as it must, with the threshold issues of standing and subject matter jurisdiction. Because it ultimately holds that the First Amended Complaint must be dismissed on those grounds, the Court does not reach the question of whether Plaintiff pleads sufficient allegations to state a claim upon which relief may be granted.

### A.    Tullett UK's Standing To Sue

BGC argues that Tullett UK lacks standing because it bases its claims on harm sustained by the Tullett Subsidiaries. Motions to dismiss for lack of standing are governed by Federal Rule of Civil Procedure 12(b)(1). Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007); Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d, 181, 187-88 (3d Cir. 2006). BGC's standing argument constitutes a facial attack on subject matter jurisdiction, as it maintains that the allegations of the First Amended Complaint fail to establish that Tullett UK has standing to bring this suit. Turicentro, S.A. v. American Airlines, Inc., 303 F.3d 293, 300 n.4 (3d Cir. 2002) (contrasting facial attacks on subject matter jurisdiction with factual attacks). As such, the Court must consider whether the factual allegations of the First Amended Complaint, taken as true, are sufficient to invoke jurisdiction, that is, in this case, to establish standing. Id. at 300.

To have standing, a party must satisfy the constitutional requirements of Article III, which limit the Court's jurisdiction, as well as the prudential requirements, which limit the Court's exercise of Article III jurisdiction. Franchise Tax Bd. of Calif. v. Alcan Aluminum Ltd., 493 U.S. 331, 335 (1990). Constitutional standing requires, among other things, that the plaintiff have sustained an injury-in-fact. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 96-97 (1998); Interfaith Cmty. Org. v. Honeywell Int'l, 399 F.3d 248, 254 (3d Cir. 2005). The Supreme Court has stressed that injury-in-fact requires not only an invasion of a cognizable legal interest but also that the injury have "affect[ed] the plaintiff in a personal and individual way." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 n.1, 563 (1992). Moreover, in addition to the constitutional limitations federal court jurisdiction, standing also involves prudential limitations on the exercise of its jurisdiction. As a matter of prudence, a court will not exercise its jurisdiction under Article III unless the plaintiff asserts his own rights as opposed to those of some third party. Warth v. Seldin, 422 U.S. 490, 498 (1975).

A plaintiff seeking redress in federal court bears the burden of establishing it has standing to sue. Lujan, 504 U.S. at 561; Warth, 422 U.S. at 508. Where, as is the case here, standing is challenged at the pleadings stage of litigation, the plaintiff must demonstrate it has standing based upon the complaint's factual allegations Lujan, 504 U.S. at 561.

Tullett UK does not allege that the brokers who were lured away to BGC were employees of Tullett UK; rather, it concedes that they were employed by the Tullett Subsidiaries. Nor does it claim that Tullett UK, the parent company, lost business or customers. Rather, it contends that as a result of BGC's Raid on Tullett Financial and Tullett America, Tullett UK sustained two kinds of injury that are distinct from any harm suffered by its subsidiaries. The First Amended

Complaint avers that, as a result of BGC's campaign of improperly enticing brokers to break their contracts of employment with the targeted American subsidiaries, Tullett UK suffered a loss of market capitalization and harm to its reputation. In this Court's view, however, neither of the theories of harm claimed by Tullett UK expresses a concrete injury to the parent company distinct from the violations of the subsidiaries' interests.

Under the market capitalization theory articulated in paragraph 112 of the First Amended Complaint, Tullett UK seeks to recover for a drop in its stock price allegedly attributable to the Raid. The Third Circuit has held, as Plaintiff argues, that decreases in share value reflect decreases in the value of a company, and thus represent a cognizable loss to the corporation. In re Sunrise Sec. Litig., 916 F.2d 874, 886 (3d Cir. 1990). Arguing that this measure of loss is recognized by governing jurisprudence, however, misses the mark in demonstrating standing. The Supreme Court has been clear that, to establishing standing, asserting a cognizable loss is not enough. The injury for which recovery is sought must have occurred personally to the plaintiff. See Lujan, 504 U.S. at 563 (citing Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972)). It is axiomatic that a plaintiff "generally must assert his own legal rights and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, 422 U.S. at 499. In contrast to this well-established principle of standing, Tullett UK's loss in market capitalization, a factual allegation assumed to be true on this motion to dismiss, relates to an offense committed against other entities.[5] The theory is that because employees and business were stolen from Tullett America and Tullett Financial, Tullett UK's stock price dropped. At its essence, Plaintiff

---

[5] It is a well-settled principle that a parent company is a distinct legal entity from a subsidiary. See Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001). No party to this suit has argued that the facts of this case warrant disregarding the corporate form.

takes the position that it can bring a derivative suit based on an alleged violation of its subsidiaries' rights.  Plaintiff cites no authority supporting its position.  Indeed, the law is to the contrary. Wrongdoing to a subsidiary does not confer standing upon the parent company, even where the parent is the sole shareholder of the subsidiary. See, e.g., Aetna U.S. Healthcare, Inc. v. Columbia Cas. Co., No. 99-596, 1999 WL 554606, at *3 (E.D.Pa. July 20, 1999) (holding plaintiff company had no standing to bring suit based on harm to wholly owned indirect subsidiary); Diesel Sys., Ltd. v. Yip Shing Diesel Eng'g Co., 861 F.Supp. 179, 181 (E.D.N.Y. 1994) (holding that "[a] corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined."); Site Microsurgical Sys., Inc. v. Cooper Companies, Inc., 797 F.Supp. 333, 338-339 (D.Del. 1992) (rejecting argument that parent company of subsidiary patent holder had standing to sue for infringement, even though parent argued that it effectively controlled patent and had suffered lost sales of its product as a result of the infringement).

Tullett UK argues that it must have standing because only it - and not its subsidiaries - may recover for the parent corporation's loss of market value, which it alleges occurred as consequence of the Raid on the subsidiaries.  Plaintiff, however, cites no authority for the proposition that an offense to a subsidiary company can give rise to a claim to the parent company merely because the wrongdoing against the subsidiary has a measurable impact on the parent company.  The cases it does cites generally undermine its argument.  For example in one case, the court reasoned that the parent company had standing because it alleged that the defendant had misappropriated information belonging to the parent from computers it jointly owned with the subsidiary.  Weisel Partners LLC v. BNP Paribas, No. C 07-6198 MHP, 2008

WL 3977887, at *3 (N.D. Cal. Aug. 26, 2008).  In another case cited in the opposition brief, the court actually recited the rule that "injury arising solely out of harm done to a subsidiary corporation is generally insufficient to confer standing or status as real party in interest on a parent corporation." Classic Comm'ns, Inc. v. Rural Tele. Serv. Co., 956 F.Supp. 910, 916 (D.Kan. 1997) (citing K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1154 (10th Cir.1985)).[6]  Plaintiff's articulation of a metric of corporate harm does not and cannot compensate for the critical allegation missing from the First Amended Complaint - that is, what right of Tullett UK did Defendant invade?

The First Amended Complaint's other claim of injury, in the form of loss of goodwill and tarnished reputation, is similarly deficient.  Although a company may theoretically recover for such harm, the First Amended Complaint does not allege what injury has been inflicted on Tullett UK, as opposed to the subsidiaries.  Instead, it avers that damage has been done to Tullett UK's reputation as a result of the Raid on *other* corporate entities.  Moreover, it does not allege what impact such loss of goodwill has had on the parent corporation but instead claims that the Raid has impeded and will continue to impede the *subsidiaries'* recruitment and business generation efforts.

Tullett UK is, at bottom, a shareholder of the affected subsidiaries. Regardless of how Tullett UK tries to re-characterize the alleged harm, there is no denying that it seeks to recover

---

[6] The court in Classic Communications, however, did not apply the rule to dismiss the parent corporation's claims because, relying the now-abrogated "any set of facts" standard of reviewing a complaint, it opined that it was too early in the litigation to conclude that the parent could not demonstrate standing under any set of facts. Classic Comm'ns, Inc., 956 F.Supp. at 916-917.  The holding reached by the United States District Court for the District of Kansas is of questionable validity, in light of the more stringent standard of review now governing Rule 12(b)(6) motions, and in any event, not binding on this Court.

for injury inflicted on the companies it owns. The Third Circuit has rejected the concept of a shareholder's standing to bring claims for harm to the corporation on the basis of a downturn in stock price. Kauffman v. Dreyfus Fund, Inc., 434 F2d. 727, 732 (3d Cir. 1970). It has reasoned:

> A stockholder of a corporation does not acquire standing to maintain an action in his own right, as a shareholder, when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets. In this situation, it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the shareholder, experiencing no direct harm, possesses no primary right to sue.

Id.; see also In re Dein Host, Inc., 835 F.2d 402, 405-06 (1st Cir. 1987) (holding that shareholder possesses no right to sue for injury to the corporation and citing various cases, including Kauffman, supporting this well-recognized principle).

In short, the harm for which Tullett UK seeks relief at best manifests an effect on the parent company of the allegedly wrongful conduct committed against the subsidiaries. The Court finds that Tullett UK has failed to demonstrate that it meets the basic standing requirement that a plaintiff may seek to vindicate only its own rights, not those of a third party. Accordingly, the suit must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

      **B.**    **Indispensable Parties**

Assuming, *arguendo*, that Tullett UK's complained-of loss of market capitalization and harm to reputation are sufficient to establish that it has standing to sue for the Raid committed against its subsidiaries, the First Amended Complaint must nevertheless be dismissed for failure to join indispensable parties. BGC has argued in it motion papers that the allegedly raided Tullett Subsidiaries are indispensable parties to this lawsuit.

Federal Rule of Civil Procedure 12(b)(7), invoked by Defendant as an alternative ground for dismissal of this action, provides that a party may by move to dismiss for failure to join a party under Rule 19. Rule 19 determines whether a non-joined party is indispensable and must be joined in the action. If the joinder would deprive the Court of subject matter jurisdiction, and the party is both necessary and indispensable to the action, the Court must dismiss the complaint. Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 404 (3d Cir.1993). Thus, where the Rule 12(b)(7) motion implicates the Court's jurisdiction, the motion is essentially one for dismissal of the action under Rule 12(b)(1). Landmark Am. Ins. Co. v. FDC Fire Protection, Inc., No. 08-3513 (GEB), 2010 WL 1838377, *2 (D.N.J. May 6, 2010). In reviewing a Rule 12(b)(7) motion to dismiss, the court must accept all allegations in the complaint as true and draw all reasonable inferences therefrom in favor of the non-moving party. Jurimex Kommerz Transit G.M.B.H. v. Case Corp., 65 Fed. App'x 803, 805 (3d Cir. 2003). The burden to prove that a non-party is both necessary and indispensable to the action falls to the moving party. Am. Home Mortgage Corp. v. First Am. Title Ins. Co., No. 07-01257 (JLL), 2007 WL 3349320, *3 (D.N.J. Nov. 9, 2007).

An analysis under Rule 19 involves two steps. In the first, the Court must determine whether the non-joined party must be joined according to the standard provided by Rule 19(a). Gen. Refractories Co. v. First Sale Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007). If joinder is required but not feasible, for instance because joinder would destroy diversity jurisdiction, the Court must proceed to the second step and determine whether the non-joined party is indispensable, under Rule 19(b). Id. If the non-joined parties are both necessary and

indispensable, the action cannot go forward.  Id. (citing Janney Montgomery Scott, Inc., 11 F.3d at 404).

Rule 19(a)(1) sets forth, in the disjunctive, circumstances in which joinder is compulsory.  A party must be joined if, "in that party's absence, the Court cannot afford complete relief among existing parties."  Fed.R.Civ.P. 19(a)(1)(A).  Alternatively, an absent party claiming an interest in the action must be joined if disposition of the action would impair its ability to protect its interest or "leave an existing party subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of the interest."  Fed.R.Civ.P. 19(a)(1)(B).  Here, Defendant argues that, even though merely satisfying one of these categories would suffice to compel joinder, all of them are met in this case.  It contends that Tullett Americas and Tullett Financial must be joined because they are the parties that employed the brokers who resigned in favor of a position with a BGC entity, which is precisely the subject of the current action. Thus, it contends the subsidiaries are the real parties in interest.  Moreover, it argues that in light of the Tullett Subsidiaries' pursuit of their own claims in arbitration against BGC Financial, L.P., non-joinder of the Tullett Subsidiaries renders it impossible for complete relief to be afforded in this suit and exposes BGC to inconsistent obligations.

The Court finds that the absent subsidiaries are necessary parties under Rule 19(a)(1)(B). Even assuming, as Plaintiff has argued, that it, too, is a party in interest, it is clear that the allegedly raided subsidiaries have an interest in the subject matter of the instant action. Adjudication of Plaintiff Tullett UK's right to relief necessarily requires the Court to determine the wrongfulness of BGC's conduct as to the absent subsidiaries.  This Court will have to make

rulings on legal and factual matters that are at the core of the Tullett Subsidiaries' pending arbitration, and their absence from this action could, as a practical matter, impair their ability to protect their interests. Moreover, their absence could also create a substantial risk of inconsistent obligations for Defendant BGC. The FINRA arbitration pursued by the Tullett Subsidiaries seeks, among other things, to enjoin a BGC subsidiary and its employees from further solicitation or hiring of Tullett employees. As Defendant argues, this creates a situation in which one BGC entity may be barred from communicating with additional brokers concerning employment but another may not be.

Joinder of the Tullett Subsidiaries as plaintiffs would, however, deprive this Court of subject matter jurisdiction by destroying complete diversity. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), based on the requisite amount in controversy and the diversity of citizenship between Tullett UK, a citizen of a foreign state, and BGC, a citizen of the State of Delaware and the State of New York. Tullett Americas, however, is also a citizen of the State of Delaware.[7] Diversity jurisdiction, however, requires that there be complete diversity between plaintiffs and defendants. Strawbridge v. Curtiss, 3 Cranch 267, 2 L.Ed. 435

---

[7] 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business"). The Tullett Subsidiaries' First Amended Statement of Claim in the FINRA arbitration states that Tullett Americas is incorporated in the State of Delaware. (Harker Decl., Ex. 5, ¶ 8.) Although Defendant asserts in its brief that Tullett Financial is a citizen of Delaware, this statement is not supported by the papers before the Court. Although it is organized under the laws of the State of Delaware, Tullett Financial is an limited liability company, and thus the Court cannot determine its citizenship without knowing the citizenship of all of its members. Zambelli Fireworks Mfg. Co., Inc. v Wood, 592 F.3d 412, 420 (3d Cir. 2010) (holding that, for purposes of diversity jurisdiction, "the citizenship of an LLC is determined by the citizenship of its members.")

(1806); Dickson v. Murphy, 202 F.App'x 578, 581 (3d Cir. 2006) ("In order for a federal court to have jurisdiction in a diversity suit, complete diversity of citizenship must exist."). As joinder of at least one of the required parties would not be feasible, the Court must proceed to the second part of the Rule 19 analysis and determine whether Tullett Americas and Tullett Financial are indispensable within the meaning of Rule 19(b).

Rule 19(b) states that when a required party cannot be joined,

> the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>     (A) protective provisions in the judgment;
>     (B) shaping the relief; or
>     (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be inadequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Fed.R.Civ.P. 19(b). The four factors favor dismissal. As discussed above, both the absent Tullett Subsidiaries and existing party BGC might be prejudiced by a judgment in this action, especially in view of ongoing proceedings by the Tullett Subsidiaries against BGC Financial and various brokers in the FINRA arbitration. This action necessarily calls for a determination of the lawfulness of the BGC entities' hiring of the Tullett Subsidiaries' employees, and thus a disposition in this action could prejudice the rights of the absent parties. Moreover, the action presents a real threat of duplicative recovery, as the same alleged wrongdoing at the heart of the

Tullett Subsidiaries' FINRA arbitration is also the basis for recovery here.  While defendant entities are different - Defendant BGC, the parent company, is not a party to the FINRA arbitration involving subsidiaries - recovery is sought in one case by a parent company and in another proceeding by its subsidiaries for the same misconduct by BGC-related companies.  The prejudice to BGC could not be cured or lessened by this Court.  As FINRA members, the Tullett Subsidiaries must arbitrate their claims, and thus the Court could not assuage the threat of contradictory rulings.   Moreover, without joinder of the Tullett Subsidiaries, any judgment in favor BGC in this action would not be sufficient to protect its interests.  Exposure to liability to the allegedly raided subsidiaries would still exist.  Tullett UK, however, would not be left without remedy by a dismissal of this action for non-joinder.  The parent company's "injury" - a drop in stock price - would presumably be rectified by a victory for the subsidiaries in the arbitration.  If the Tullett Subsidiaries prevailed, Tullett UK and its reputation would also benefit from the cessation of any further "raiding" or BGC hiring of Tullett employees.

        The non-joined parties are, in short, both necessary and indispensable.  As their non-diverse citizenship renders it impossible for them to be joined in this action as plaintiffs, the Court must dismiss the action pursuant to Rule 12(b)(7).

### III. CONCLUSION

For the foregoing reasons, this Court will dismiss the First Amended Complaint in its entirety pursuant to Rule 12(b)(1) for Plaintiff's lack of standing, and alternatively, pursuant to Rule 12(b)(7) for failure to join a party under Rule 19.  An appropriate form of order will be filed together with this Opinion.

    s/ Stanley R. Chesler
    STANLEY R. CHESLER
    United States District Judge

DATED: June 18, 2010